# UNITED STATES DISTRICT COURT

## DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREW MACKMIN, et al., Individually and on Behalf of All Others Similarly Situated, | No. 11-cv-01831 (ABJ) |
| Plaintiffs, | |
| v. | |
| VISA INC., et al., | |
| Defendants. | |

**BANK ATM CUSTOMERS' MEMORANDUM IN OPPOSITION
TO THE BANK DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ...................................................................................................................... 5

I.  Standard Of Law ..................................................................................................... 5

II.  Plaintiffs Adequately Plead That The Bank Defendants Have Engaged In
     A Horizontal Agreement In Restraint Of Trade ................................................. 6

     A.  Plaintiffs Adequately Plead Concerted Action ...................................... 6

     B.  Plaintiffs Adequately Plead A Horizontal Agreement Between The
         Network Defendants, The Bank Defendants And The Bank Co-
         Conspirators ............................................................................................. 8

         1.  Defendants Have Participated In A Continuing Horizontal
             Agreement That Predates The Network Defendants' IPOs ........ 8

         2.  Plaintiffs Have Adequately Alleged A Hub-and-Spoke
             Conspiracy Post-IPOs Between The Network Defendants,
             The Bank Defendants And The Bank Co-Conspirators............ 11

         3.  The FAC Adequately Alleges A Horizontal Conspiracy
             Between The Bank Defendants, The Bank Co-Conspirators
             And The Network Defendants Under *American Needle*.......... 17

III.  Plaintiffs Adequately Plead the Factual Basis for Anticompetitive Injury...... 20

     A.  Antitrust Injury Is An Anticompetitive Effect Of Conduct That
         Violates The Antitrust Laws ................................................................. 20

     B.  Defendants' ATM Access Fee Restraints Cause Antitrust Injury By
         Functioning As An Agreement That Fixes Network Prices And
         Eliminates Consumer Choice ................................................................ 21

         1.  Defendants' ATM Access Fee Restraints Function As An
             Illegal Agreement To Fix Prices ............................................... 21

         2.  Defendants' ATM Access Fee Restraints Are Akin To Visa
             and MasterCard's Anti-Steering Rules Which Have Been
             Condemned As Anticompetitive ................................................ 24

       3.     The Agreement To Impose ATM Access Fee Restraints
Causes Consumers To Pay A Fixed, Higher Price And
Denies Them A Choice Of Lower-Cost Networks ................................... 27

IV.    The Bank Defendants Mischaracterize Their Agreement To Impose ATM
Access Fee Restraints As An MFN That Is Legal *Per Se*.................................................. 30

V.    If The Court Grants The ATM Defendants' Motion In Whole Or In Part,
Plaintiffs Request Leave To Amend ................................................................................ 37

CONCLUSION ............................................................................................................................. 38

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*AD/SAT v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) ........................................................................................14, 15

*Adams v. Pan Am. World Airways, Inc.*,
828 F.2d 24 (D.C. Cir. 1987) ...............................................................................................28

*Am. Needle, Inc. v. NFL*,
130 S.Ct. 2201 (2010) ................................................................................................. *passim*

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*,
256 F.3d 799 (D.C. Cir. 2001) ........................................................................................5, 20

*Armco Steel Co. v. CSX Corp.*,
790 F. Supp. 311 (D.D.C. 1991) .........................................................................................10

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) .............................................................................................................21

*Bassett v. NCAA*,
528 F.3d 426 (6th Cir. 2008) ...............................................................................................20

*Blue Cross & Blue Shield of Ohio v. Bingaman*,
No. 1:94 CV 2297, 1996 WL 677094 (N.D. Ohio June 24, 1996) ..............................30, 32, 33

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ...............................................................................................36

*In re Brand Name Prescription Drugs Antitrust Litig.*,
123 F.3d 599 (7th Cir. 1997) ...............................................................................................10

*Broadcast Music, Inc. v. CBS*,
441 U.S. 1 (1979) .................................................................................................................31

*Brothers v. Portage Nat'l Bank*,
No. Civ. A 3:06-94, 2007 WL 965835 (W.D. Pa. Mar. 29, 2007) .........................................29

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .................................................................................................20, 21, 27

*In re Cardizem CD Antitrust Litigation*,
332 F.3d 896 (6th Cir. 2003) ...............................................................................................20

*Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*,
148 F.3d 1080 (D.C. Cir. 1998) ...........................................................................................37

*Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*,
    421 U.S. 616 (1975) ........................................................................................................33

*Continental T. V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ..........................................................................................................21

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ...........................................................................................13

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992) ........................................................................................................35

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986) ........................................................................................................21

*Federal Prescription Services, Inc. v. American Pharmaceutical Association*,
    663 F.2d 253 (D.C. Cir. 1981) ...................................................................................14, 15

*GTE New Media Services Inc. v, Ameritech Corp.*,
    21 F. Supp. 2d 27 (D.D.C. 1998) .....................................................................................36

*Howell v. Gray*,
    No. 11-01177, 2012 WL 456487 (D.D.C. Feb. 14, 2012) ...................................................6

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ........................................................................................13, 14

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939) ....................................................................................................11, 12

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .....................................................................................14, 16

*Kotteakos v. United States*,
    328 U.S. 750 (1946) ........................................................................................................11

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................................................................21

*Mardirosian v. The American Institute of Architects*,
    474 F. Supp. 628 (D.D.C. 1979) ......................................................................................36

*Matsushita Elec. Industrial. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................................................22

*Meijer, Inc. v. Biovail Corp.*,
    533 F.3d 857 (D.C. Cir. 2008) .........................................................................................20

iv

*Monsanto Co v. Spray-Rite Service Corp*,
    465 U.S. 752 (1984) ..................................................................................................13, 17

*New York ex rel Abrams v. Anheuser-Busch, Inc.*,
    811 F. Supp. 848 (E.D.N.Y. 1993) ....................................................................................8

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
    472 U.S. 284 (1985)..........................................................................................................21

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode
    Island*,
    692 F. Supp. 52 (D.R.I. 1988)..........................................................................................34

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode
    Island*,
    883 F.2d 1101 (1st Cir. 1989) .....................................................................................34, 35

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
    No. 05-MD-1720, 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008)................................14, 16, 24

*Pfeffer v. HSA Retail, Inc.*,
    No. 11-CV-959, 2012 WL 280740 (W.D. Tex. Jan. 31, 2012 ) ..............................................29

*PSKS, Inc v. Leegin Creative Leather Prods, Inc.*,
    615 F.3d 412 (5th Cir. 2010)........................................................................................13, 14

*Pepsico, Inc. v. The Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)..............................................................................................13

*Retail Travel Agents, Ltd. v. Air Transportation Association of America*,
    635 F. Supp. 534 (D.D.C. 1986) .................................................................................14, 15

*Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*,
    708 F. Supp. 2d 257 (E.D.N.Y. 2010) ...............................................................................25

*Rosenberg v. Avis Rent A Car Sys.*,
    No. Civ. 07-1110, 2007 WL 2213642 (E.D. Pa. July 31, 2007)..............................................29

*Rothery Storage & Van Co. v. Atlas Van Lines*,
    792 F.2d 210 (D.C. Cir. 1986) ..........................................................................................18

*Standard Oil Co. of N.J. v. United States*,
    221 U.S. 1 (1911)..............................................................................................................36

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010)..............................................................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...................................................................................................6

*Toys "R" Us Inc. v. F.T.C.*,
   221 F.3d 928 (7th Cir. 2000)................................................................................8, 11, 12

*U.S. v. AT&T Co.*,
   524 F. Supp. 1336 (D. D.C. 1981) ...............................................................................8

*U.S. v. Delta Dental Plan of Ariz., Inc.*,
   No. 94-1793, 1995 U.S. Dist. LEXIS 9752 (D. Ariz. May 19, 1995) .....................................32

*U.S. v. Phillip Morris, Inc.*,
   316 F. Supp. 2d 1 (D.D.C. 2004) ...............................................................................10

*United States v. Am. Express Co.*,
   No. 10-CV-4496, 2011 U.S. Dist. LEXIS 78835 (E.D.N.Y. July 20, 2011) ...........................25

*United States v. Am. Express Co.*,
   No. 10-CV-4496, 2011 U.S. Dist. LEXIS 87560 (E.D.N.Y. July 20, 2011) ...........................26

*United States v. Blue Cross Blue Shield of Michigan*,
   No. 10-14155, 2011 U.S. Dist. LEXIS 89849 (E.D. Mich. Aug. 12, 2011) ...........................33

*United States v. Delta Dental of R.I.*,
   943 F. Supp. 172 (D.R.I. 1996)........................................................................30, 31, 36

*United States v. Delta Dental of R.I.*,
   No. Civ.A. 96-113P, 1997 WL 527669 (D.R.I. July 2, 1997) ...............................................32

*United States v. Masonite Corp.*,
   316 U.S. 265 (1942).....................................................................................................18

*United States v. Mathis*,
   216 F.3d 18 (D.C. Cir. 2000) ...............................................................................14, 15

*United States v. Oregon Dental Serv.*,
   No. Civ. C95 1211, 1995 WL 481363 (N.D. Ca. July 14, 1995).......................................32

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972).......................................................................................................8

*United States v. United States Gypsum Co.*,
   438 U.S. 422 (1978).....................................................................................................31

*United States v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003)...........................................................................................9

*Visa U.S.A., Inc. v. First Data Corp.*,
No. 02-01786, 2005 WL 3274105 (N.D. Cal. Aug. 16, 2005) ..................................9

*In re Vitamins Antitrust Litig.*,
217 F.R.D. 30 (D.D.C. 2003) ................................................................37

*West Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010) ................................................................7, 20

**MISCELLANEOUS**

Philip E. Areeda & Hebert Hovenkamp, *Antitrust Law*
¶¶ 337, 338 (3d ed. 2007) ................................................................20

Arnold Celnicker, *A Competitive Analysis of Most Favored Nations Clauses in
Contracts Between Health Care Providers and Insurers*,
69 N.C.L. Rev. 863, 885 (1991) ........................................................33, 34

*Report of the Attorney General's National Committee to Study the Antitrust Laws*,
335 (1955) ................................................................33

Susan E. Stenger, *Most-Favored-Nation Clauses and Monopsonistic Power: An
Unhealthy Mix?*,
15 Am. J.L. & Med. 111, 127-28 (1989) ................................................34

Beth Ann Wright, *How MFN Clauses Used in the Health Care Industry
Unreasonably Restrain Trade Under the Sherman Act*,
18 J.L. & Health 29, 31 (2003/2004) ..................................................33

Plaintiffs Andrew Mackmin, Barbara Inglis, Sam Osborn, and John Epseland, on behalf of themselves and a class of similarly situated consumers ("Plaintiffs" or the "Bank ATM Customers") who paid an ATM Access Fee (defined below) for Foreign ATM Transactions (defined below) directly to any Bank Defendant (defined below) or Bank Co-Conspirator (defined below) on or after October 1, 2007, submit this memorandum in opposition to the motion ("Motion") of Bank of America, National Association, NB Holdings Corp., Bank of America Corp., Chase Bank USA, N.A., JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., Wells Fargo & Co. and Wells Fargo Bank, N.A. (collectively, the "Bank Defendants") to dismiss the first amended class action complaint ("FAC") filed in the above-captioned action.

## PRELIMINARY STATEMENT

The Bank ATM Customers represent a class of PIN debit cardholders who paid supra-competitive ATM Access Fees to the Bank Defendants – the three largest owners of ATMs in America and the Bank Co-Conspirators. Plaintiffs assert that Defendants Visa and MasterCard (together, the "Network Defendants")[1] and the Bank Defendants violated federal antitrust laws (and state antitrust laws in the alternative) by agreeing to restrain competition.[2]

Plaintiffs' FAC describes the origin and continuation of a horizontal agreement between the Network Defendants, the Bank Defendants (together with the Network Defendants,

---

[1]    The Network Defendants filed a separate motion to dismiss [D.E. 40], which Plaintiffs have opposed in a separate submission.

[2]    Two related class action complaints are also pending before this Court . *See The National ATM Council, Inc. v. Visa Inc.*, No. 11-cv-01803 and *Stoumbos v. Visa Inc.*, No. 11-cv-1882. The National ATM Council represents a class of independent, non-bank ATM operators that Defendants' agreement restrains from reducing ATM Access Fees. Stoumb*os* represents a class of PIN debit cardholders who paid supra-competitive fees to independent (non-bank owned) ATM operators. The *National ATM Council* and *Stoumbos* actions assert claims only against the Network Defendants.

"Defendants") and the Bank Co-Conspirators[3] to implement and "adhere to rules and operating regulations that require ATM Access Fees[4] to be fixed at a certain level."  FAC ¶¶ 45, 72.

The horizontal agreement is explicitly set forth in certain rules promulgated and enforced by the Network Defendants ("ATM Access Fee Rules" or "ATM Access Fee Restraints") that prevent ATM Operators[5] from charging less for transactions processed through networks owned by entities other than Visa or MasterCard than they charge for transactions processed through either Visa or MasterCard's network without regard to any savings incurred by the ATM Operator from obtaining services from one of the other networks.  *Id.* ¶¶ 68-70.  Accordingly, the ATM Access Fee Restraints effectively fix and enforce the price for Foreign ATM Transactions at the price an ATM Operator charges for a Visa or MasterCard network transaction, which constitutes a *per se* violation of § 1 of the Sherman Act.  *Id.* ¶¶ 106-111.

Critically, the ATM Access Fee Restraints were agreed to and enacted at a time when the Network Defendants were jointly owned and operated by most of the retail banks in the United States, including the Bank Defendants and Bank Co-Conspirators.  *Id.* ¶¶ 44-46, 71-72.  In short, the Network Defendants' member banks – horizontal competitors in the ATM Services market – jointly agreed to the ATM Access Fee Restraints, which were then enforced through Visa and MasterCard on all ATM Operators.  *Id.*  Even after Visa and MasterCard's initial public offerings ("IPOs"), pursuant to which they became public companies in 2008 and 2006, respectively, the member banks had effectively ceded power to Visa and MasterCard to set,

---

[3]  "Bank Co-Conspirators" refers to every bank that is a member of Visa and/or MasterCard networks that charges ATM Access Fees on Foreign ATM Transactions."  *Id.* ¶ 46.

[4]  An "ATM Access Fee" is a fee imposed by an ATM Operator (defined below) on a customer in connection with a Foreign ATM Transaction.  FAC ¶ 59.  A "Foreign ATM Transaction" is a transaction in which a consumer with a depository account in one bank withdraws money from that account at an ATM owned or operated by another bank.  FAC ¶ 56.

[5]  An ATM operator is a bank that operates an ATM terminal.  *Id.* ¶ 2.  An independent ATM operator is a non-bank that operates an ATM terminal.  *Id.* ¶ 4.  Unless otherwise stated herein, the term "ATM Operator" shall refer to ATM terminals operated either by banks or independent ATM operators.

implement, and enforce the ATM Restraints. *Id.* ¶¶ 45, 72. This was not surprising: while they were ostensibly separate entities, the member banks hold ownership interests in the Network Defendants' subsidiaries and sit on their boards of directors. Both before and after the IPOs, the Network Defendants operated principally for the benefit of their member banks. *Id.* ¶¶ 44-46, 71-72. Indeed, the Network Defendants still refer to their bank customers as "members" of Visa and MasterCard. *Id.* Even after Visa and MasterCard's IPOs, the member banks, including the Bank Defendants and Bank Co-Conspirators, continued to agree to and enforce the ATM Access Fee Restraints with the full understanding that each other member bank would do the same. *Id.*

The Bank Defendants assert that the FAC should be dismissed as to them for three separate reasons, each of which should be rejected by the Court.

<u>First</u>, the Bank Defendants argue that the FAC fails to set forth any factual allegations from which the Court could reasonably infer that the Bank Defendants have entered into a horizontal conspiracy among themselves to adhere to the ATM Access Fee Restraints. (Defs.' Mem. at 13-18). Notably, the Bank Defendants do not dispute that the FAC alleges in detail express overt agreements entered into between the Bank Defendants and the Network Defendants in restraint of trade.

The thrust of the Bank Defendants' argument appears to be that the agreements they entered into to fix ATM Access Fees are vertical as opposed to horizontal in nature and therefore do not constitute a *per se* violation of § 1 of the Sherman Act. But this argument ignores Plaintiffs' well-pleaded allegations that the ATM Access Fee Restraints were imposed by the Network Defendants, Bank Defendants and Bank Co-Conspirators long before the IPOs, when the Network Defendants were jointly owned and operated by the Bank Defendants and Bank Co-Conspirators who were and still are competitors of one another in the ATM Services market.

The FAC alleges that the Defendants' unlawful horizontal agreement to fix ATM Access Fees continued post-IPOs in the exact same manner as it had before.

Moreover, as to the period post-IPOs, the FAC contains factual allegations sufficient to infer the existence of a hub-and-spoke conspiracy with the Network Defendants as the "hub" and the Bank Defendants and Bank Co-Conspirators as the spokes. Finally, even had the ATM Access Fee Restraints not originated prior to the ostensible transformation of the former bankcard associations into publicly traded corporations, the agreement among Defendants would still be horizontal in light of the fact that the Bank Defendants ceded the responsibility to set ATM Access Fees to the Network Defendants, thereby "'depriv[ing] the marketplace of independent centers of decisionmaking.'" *Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2213 (2010).

Second, the Bank Defendants argue that the FAC fails to plausibly allege both antitrust injury and injury in fact suffered by Plaintiffs. This argument is belied by the FAC's well-pleaded factual allegations. Plaintiffs allege that Defendants' unlawful agreement fixes the price of ATM Access Fees in a manner that prevents ATM customers from getting the financial benefit of using lower-cost ATM network services. FAC ¶¶ 4, 74-80. By unlawfully insulating the Visa and MasterCard networks from competition in providing ATM services, the ATM Access Fee Rules unlawfully increase ATM Access Fees above reasonably competitive levels, reduce output and the number of ATM terminals deployed, harm the competitive process, raise barriers to entry and expansion, and impede innovation and investment. FAC ¶ 107. Plaintiffs thus have been monetarily injured. Among other effects, the ATM Access Fee Restraints prevent them from paying the lower ATM Access Fees that would result from an unrestrained competitive market. ¶ 109. Plaintiffs have been forced to pay inflated and supra-competitive

ATM Access Fees resulting from Defendants' unlawful imposition of the ATM Access Fee Restraints. *Id.* ¶ 111. These allegations raise a plausible inference that Plaintiffs have suffered antitrust injury and injury in fact.

Third, the Bank Defendants mischaracterize Defendants' agreement to impose ATM Access Fee Restraints as a Most Favored Nations ("MFN") agreement, and assert that either: (1) such agreements are always procompetitive and thus inactionable as a matter of law, or (2) at the very least, such agreements do not to constitute a *per se* violation of Section 1 the Sherman Act. Bank Defs.' Mem. at 8-12. The Bank Defendants cite no authority (nor did Plaintiffs find any such authority) in which a court characterized an agreement similar to that alleged here as an MFN subject to the rule of reason. Nor do the Bank Defendants cite a single case in which a court dismissed a complaint for failure to plead the anticompetitive effects of an MFN. Indeed, the two cases that the Bank Defendants cite which upheld MFNs, aside from being inapposite, did so after a full trial on the merits. Here, Plaintiffs' allegations make clear that Defendants' agreement to fix the price of ATM Access Fees was a naked horizontal price-fixing agreement, which constitutes a *per se* violation of § 1 of the Sherman Act.

## ARGUMENT

### I.    Standard Of Law

On a motion to dismiss, courts must "liberally construe the complaint in the plaintiff's favor and grant the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 805 (D.C. Cir. 2001). This Court has articulated the standard as follows:

> "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks omitted), quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570

(2007).  In *Iqbal,* the Supreme Court reiterated the two principles underlying its decision in *Twombly:* "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  129 S.Ct. at 1949.  And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 1950.

\* \* \*

When considering a motion to dismiss under Rule 12(b)(6), "the complaint is construed liberally in plaintiff['s] favor, and [the Court] should grant [the] plaintiff[ ] the benefit of all inferences that can be derived from the facts alleged."  *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994).

*Howell v. Gray*, No. 11-01177, 2012 WL 456487 at \*3-4 (D.D.C. Feb. 14, 2012) (Jackson, A.).

When assessing Plaintiffs' claims, the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss . . . ."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Therefore, the Court's inquiry is "whether *all* of the facts, taken collectively," state a valid claim for relief, "not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323 (citations omitted).

## II.     Plaintiffs Adequately Plead That The Bank Defendants Have Engaged In A Horizontal Agreement In Restraint Of Trade

### A.     Plaintiffs Adequately Plead Concerted Action

Tellingly, the Bank Defendants recognize that the "FAC alleges that each bank defendant has . .  adhere[d]" to the Network Defendants' rules and operating regulations that require ATM Access Fees to be fixed at a certain level.  Defs.' Mem. at 2.

Yet despite their acknowledgment of the core of Plaintiffs' Section 1 claim, the Bank Defendants nonetheless urge dismissal of the FAC on the ground that Plaintiffs "have failed to allege facts from which this Court could infer that the bank defendants actually ***agreed among themselves*** to adhere to the networks [ATM Access Fee Rules]."  *Id.* (emphasis added).

It is well-settled that "[a] plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two. If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010).

The FAC unquestionably provides well-pleaded allegations of a challenged agreement that consists of written rules together with the Network Defendants' "contracts, agreements, rules, and undertakings with the Bank Defendants and the Bank Co-Conspirators, who, in turn, secure compliance by their customers and suppliers." FAC ¶ 86. Indeed, the FAC quotes *verbatim* from the two key price-fixing clauses incorporated in the written agreements entered into between the Network Defendants and each of the Bank Defendants and the Bank Co-Conspirators. FAC ¶¶ 69-70. The FAC alleges that the Network Defendants "implement and enforce the ATM restraints," which "constrains all consumers of ATM services and results in supra-competitive ATM Access Fees." *Id*. ¶¶ 86-87. Indeed, unless each ATM Operator expressly agreed to abide by these rules, it would not be permitted to access the Network Defendants' networks.

Where as here, the FAC contains factual allegations of an express written agreement between the Bank Defendants on the one-hand and the Network Defendants on the other, the Bank Defendants cannot reasonably dispute that Plaintiffs have adequately alleged that "the challenged conduct constitute[s] concerted action rather than independent or unilateral conduct." Defs.' Mem. at 13 (quoting *Monsanto Co v. Spray-Rite Service Corp*, 465 U.S. 752 (1984)).

Tacitly recognizing that the FAC adequately alleges an agreement between the Bank Defendants and the Network Defendants in restraint of trade, the Bank Defendants take issue

with the FAC's allegations that the agreement is horizontal in nature.[6]  That is to say, the Bank

Defendants challenge whether the FAC adequately alleges that "the bank defendants actually

***agreed among themselves*** to adhere to the networks [ATM Access Fee Rule]".  Defs.' Mem at 2

(emphasis added).  As set forth below, Plaintiffs adequately allege a horizontal agreement

between the Network Defendants, the Bank Defendants and the Bank Co-Conspirators.

**B.      Plaintiffs Adequately Plead A Horizontal Agreement Between The
Network Defendants, The Bank Defendants And The Bank Co-Conspirators**

**1.      Defendants Have Participated In A Continuing Horizontal
Agreement That Predates The Network Defendants' IPOs**

The Bank Defendants contend that Plaintiffs do not adequately allege a horizontal

agreement among the Network Defendants, the Bank Defendants and Bank Co-Conspirators

because "no factual allegations in the [FAC] even suggest that the bank defendants exert any

control over either network following each network's IPOs."  Defs.' Mem. at 17.  That argument

is premised on the erroneous assumption that Defendants' pre-IPO conduct is irrelevant in this

context.  However, long before the Network Defendants' IPOs, the Network Defendants'

member banks – including the Bank Defendants and Bank Co-Conspirators – through Visa and

MasterCard, entered into horizontal agreements to adhere to rules and operating regulations that

require ATM Access Fees to be fixed at a certain level.  FAC ¶¶ 44-46, 71-72.  Indeed, prior to

the IPOs, the Network Defendants themselves were nothing more than an aggregation of the

Bank Defendants and the Bank Co-Conspirators.  *Id.*  ¶¶ 44, 71.

---

[6]      Courts interpret the "contract, combination, or conspiracy" requirement of § 1 broadly to include
agreements that are purely horizontal in nature, purely vertical, and hybrids of the two.  *New York ex rel Abrams v.
Anheuser-Busch, Inc.*, 811 F. Supp. 848, 869 (E.D.N.Y. 1993); *Toys "R" Us Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th
Cir. 2000).  Horizontal agreements to fix prices or allocate territories are "classic examples" of an antitrust violation
and obviously subject to § 1.  *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).  At the other end
of the spectrum, it is "axiomatic" that a vertical agreement between a manufacturer and its wholesalers meets the
"agreement" threshold of § 1.  *See* Anheuser-*Busch*, 811 F. Supp. at 869; *U.S. v. AT&T Co.*, 524 F. Supp. 1336,
1373, (D. D.C. 1981) ("[W]hen activity among vertically-related affiliates restrains trade it violates the antitrust
laws.").

The Network Defendants cannot and do not dispute that such pre-IPOs conduct constituted a horizontal contract, combination or conspiracy within the meaning of Section 1 of the Sherman Act. In fact, as the Second Circuit recognized, prior to their respective IPOs, the Network Defendants were structural conspiracies.

> Visa U.S.A. and MasterCard, however, are not single entities; they are consortiums of competitors. They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions. These 20,000 banks set the policies of Visa U.S.A. and MasterCard…. The restrictive provision is a horizontal restraint adopted by 20,000 competitors.
>
> … Each has agreed not to compete with the others in a manner which the consortium considers harmful to its combined interests. Far from being "presumptively legal," such arrangements are exemplars of the type of anticompetitive behavior prohibited by the Sherman Act.

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003); *see also Visa U.S.A., Inc. v. First Data Corp.*, No. 02-01786, 2005 WL 3274105 at \*4 (N.D. Cal. Aug. 16, 2005) (holding that the pre-IPO promulgation and administration of the rules for authorization, clearing, and settlement of transactions by the competing member banks that sat on the Board of Directors of Visa constituted agreements among competitors).

The Visa and MasterCard networks were not created as a result of the IPOs. The Network Defendants, which the Second Circuit determined to be "consortiums of competitors" did business for many years before the IPOs as bank-controlled joint ventures. FAC ¶ 44, 71. The fact that the Network Defendants, which continue to fix the rates at which the Bank Defendants and Bank Co-Conspirators can set ATM Access Fees, are now public companies ostensibly independent of the banks is not relevant to deciding whether the Bank Defendants' conduct is subject to § 1. The Bank Defendants ignore these critical facts in arguing that Plaintiffs do not allege horizontal agreements among the Bank Defendants and Network

Defendants after the IPOs. To the contrary, Plaintiffs allege that when the member banks caused the creation of the new Visa and MasterCard companies through the IPOs, they did so with the prior knowledge that each member bank agreed to continue to abide by the ATM Access Fee Rules. Indeed, it is undisputed that the ATM Access Fees were set precisely as before. Nothing changed post-IPOs.

> These restraints originated in the rules of the former bankcard associations agreed to by the banks themselves. By perpetuating this agreement, the banks collectively have ceded power and authority to the Network Defendants to design, implement, and enforce a horizontal price-fixing restraint in which they are knowing participants.

> In short, the violation in this case is a horizontal agreement among every bank that is a member of the Visa and/or MasterCard networks that charges ATM Access Fees on Foreign ATM Transactions.

FAC ¶¶ 45-46, 71-72. Defendants thus maintained and actively continued the unlawful *status quo* post-IPOs.[7]

After the IPOs, as before, the Network Defendants continued to operate principally for the benefit of their member banks. FAC ¶ 71. By knowingly and intentionally choosing to perpetuate the pre-existing unlawful anticompetitive arrangement with regard to ATM Access Fees, the Bank Defendants and Bank Co-Conspirators collectively ceded power and authority to the Network Defendants to design, implement, and enforce their horizontal price-fixing restraint in which they were and continue to be knowing participants and beneficiaries. FAC ¶¶ 44, 45,

---

[7] Nor can the Bank Defendants argue that the Network Defendants' IPOs constitute a withdrawal from the conspiracy. "A mere change of policy, a mere cessation of involvement, is not effective withdrawal from a conspiracy." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 616 (7th Cir. 1997) (Posner, J.); *accord Armco Steel Co. v. CSX Corp.*, 790 F. Supp. 311, 322 (D.D.C. 1991) ("Merely ceasing to participate in the ongoing activity of a conspiracy is not enough to demonstrate withdrawal."). In any event, withdrawal is a fact issue that is inappropriate for resolution on a motion to dismiss. *See id.* at 322-23 (citing *U.S. v. Stone*, 444 F. Supp.1254, 1256 (E.D. Wis. 1978)) ("resolution of issue of withdrawal on motion to dismiss inappropriate"); *see also U.S. v. Phillip Morris, Inc.*, 316 F. Supp. 2d 1, 6 (D.D.C. 2004) ("[a] determination of whether the challenged acts constitute withdrawal on the part of [the defendant] is a fact-intensive inquiry that can only be resolved at trial.").

71-72.  In short, following the IPOs, each member bank continued to abide by their pre-existing agreement with the Network Defendants to fix ATM Access Fees on Foreign ATM Transactions, and each knew that all the other member banks had agreed to do the same.  FAC ¶¶ 46, 72.  Simply put, the IPOs do not constitute a get-out-of-jail-free card for the unlawful continuing conduct of the Bank Defendants.

> **2.** **Plaintiffs Have Adequately Alleged A Hub-and-Spoke Conspiracy Post-IPOs Between The Network Defendants, The Bank Defendants And The Bank Co-Conspirators**

To the extent, *arguendo*, that the IPOs are at all relevant here, the FAC plausibly alleges a hub-and-spoke conspiracy post-IPOs.  It is well-established that Plaintiffs need not prove any direct communications among competitors to prove a horizontal agreement in the form of a hub-and-spoke conspiracy[8], where the agreement can be inferred from other circumstances.  *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939); *Toys "R" Us,* 221 F.3d 928.  "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."  *Interstate Circuit*, 306 U.S. at 227 (citations omitted).  Following the Network Defendants' IPOs, the Bank Defendants' continued agreement to participate in a scheme with a hub or ringmaster – in this case, the Network Defendants – combined with the knowledge that their competitors would also participate, and the necessity of their participation to effectuate the conspiracy, are by themselves sufficient to establish a horizontal agreement.  *Id*.; *Toys "R" Us*, 221 F.3d at 936.

---

[8]    A "hub-and-spoke" conspiracy exists when competitors make agreements with a common "hub" with the knowledge that their competitors are also participating and the competitors' participation is necessary to effectuate the agreement.  *Kotteakos v. United States*, 328 U.S. 750, 755 (1946); *see Toys "R" Us*, 221 F.3d at 936 (noting potential conspiracy where "the only condition on which each toy manufacturer would agree to [retailer's] demands was if it could be sure its competitors were doing the same thing").

In *Interstate Circuit*, the Supreme Court inferred a horizontal agreement among movie distributors who never communicated with each other. Interstate Circuit, the hub of the conspiracy, sent a single letter to each of eight movie distributors, asking them to maintain a minimum price for first-run theaters and refrain from showing night-time double features. 306 U.S. at 215-17. Each distributor knew that the scheme would not work unless all agreed to it, even though they never communicated with each other. *Id.* at 222. But each movie distributor agreed to the uniform terms. The Supreme Court found a horizontal agreement based on the circumstances of the proposal, despite the lack of communications between the horizontal conspirators. *Id.* at 225-27.

Similarly, in *Toys "R" Us*, the court found a horizontal agreement to boycott sales to warehouse stores, without any communication between the horizontal competitors. In that case, Toys "R" Us, acting as the hub, engineered vertical agreements with manufacturers to boycott warehouse clubs. 221 F.3d at 934. Each of the manufacturers was concerned that its competitors would cheat on the boycott to gain a competitive advantage. *Id.* at 936. The manufacturers would not agree to boycott warehouse stores unless they could be assured that their competitors were doing the same. *Id.* The manufacturers never communicated this condition to each other. Rather, they depended upon Toys "R" Us to construct an agreement on the common understanding that it would enter into similar agreements with all of the competing manufacturers. Because each of the vertical agreements was effected with this common understanding, the court found a horizontal agreement. *Id.*

Likewise, in this case, a horizontal agreement among the Network Defendants, the Bank Defendants and Bank Co-Conspirators after the IPOs can be inferred from the surrounding circumstances. However, unlike *Interstate Circuit* and *Toys "R" Us*, in which the ringleaders

organized hub-and-spoke conspiracies in what had been competitive markets, here the conspiracies were ongoing as of the commencement of the hub-and-spoke conspiracies. For that reason, the Bank Defendants and Bank Co-Conspirators did not have to rely on the Network Defendants to manufacture an agreement among all bank members to prevent cheating on the conspiracy, and they did not have to expressly condition their participation on assurances that others would agree to abide by the rules. The Bank Defendants, Bank Co-Conspirators and each Network Defendant merely agreed to continue to enforce the same pre-existing rules and restraints under a new structure post-IPOs, with precisely the same anticompetitive consequences to customers. Based on these circumstances, it is plausible to infer that the banks had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764.

The cases upon which the Bank Defendants rely – *PSKS, Inc v. Leegin Creative Leather Prods, Inc.*, 615 F.3d 412, 420 (5th Cir. 2010); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010), and *United States v. Mathis*, 216 F.3d 18, 24 (D.C. Cir. 2000) – for the proposition that Plaintiffs fail to adequately allege a hub-and-spoke conspiracy, are readily distinguishable.[9]

---

[9] Specifically, the Bank Defendants argue that Plaintiffs fail to adequately plead a horizontal hub-and-spoke conspiracy because Plaintiffs fail to plausibly allege facts that "could establish a horizontal agreement among the competing members of the association – the 'wheel' or 'rim' – and not just the vertical 'spoke' agreements between individual members and the association itself." Defs.' Mem. at 16; *see, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction."). For the reasons set forth, *supra*, Plaintiffs have unequivocally alleged a connection between the Bank Defendants, the Bank Co-Co-Conspirators and the Network Defendants..

Moreover, courts have held that a series of vertical agreements between an upstream supplier and manufacturers are subject to § 1 scrutiny, even without evidence of a "rim" of agreements among the manufacturers. *Dickson*, 309 F.3d at 204-205 (analyzing "rimless" agreements between Microsoft and various PC manufacturers under the rule of reason); *Pepsico, Inc. v. The Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (analyzing agreements between Coca Cola and its wholesalers under the real of reason after holding that they did not constitute a *per se* horizontal agreement).

In *PSKS*, the Fifth Circuit found that plaintiff was barred by the "mandate rule" from asserting a claim based on a horizontal restraint because the theory had not been raised until it reached the Supreme Court, which expressly refused to consider it, confining itself to the alleged vertical conspiracy before it. *PSKS, Inc.*, 615 F.3d at 420. Nevertheless, in *dicta*, the Fifth Circuit held that plaintiff had not properly alleged a horizontal restraint because, unlike the FAC here, plaintiff had failed to allege an agreement among competitors to implement the price-fixing. *Id.*

In *In re Ins. Brokerage Antitrust Litig.*, the Court held that, without more, a horizontal agreement among a broker's insurer-partners could not be plausibly inferred from the mere fact that each insurer entered into a similar contingent commission agreement with the broker. 618 F.3d at 327.

In *Mathis*, a criminal case that did not involve the application of the antitrust laws, the court concluded that because the evidence at trial established multiple conspiracies instead of one conspiracy, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another. 216 F.3d at 24.

The Bank Defendants also cite *Federal Prescription Services, Inc. v. American Pharmaceutical Association*, 663 F.2d 253 (D.C. Cir. 1981), *Retail Travel Agents, Ltd. v. Air Transportation Association of America*, 635 F. Supp. 534, 536 (D.D.C. 1986), *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999), *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) and *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* No. 05-MD-1720, 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008) for the unremarkable proposition that allegations that a defendant is merely a member of an association, without more,

are not sufficient to establish participation in a conspiracy with other members of the association. These cases too are readily distinguishable.

In *Federal Prescription Services, Inc.*, 663 F.2d at 265, the D.C. Circuit found that an association could not be held liable for the conduct of its individual members absent evidence that the members were acting with apparent authority conferred upon them by the association. Here, the FAC contains detailed allegations of an overt agreement between the Network Defendants and their member banks to fix ATM Access Fees on Foreign ATM Transactions.

In *Retail Travel Agents, Ltd.*, this Court found that a defendant's counterclaims, alleging a conspiracy between plaintiff travel association and its members to interfere with defendant's travel agency program, were insufficient where the complaint provided no basis to infer an agreement between the travel association and its members. 635 F. Supp. at 536 (D.D.C.). Once again, here, there is no dispute that Plaintiffs adequately allege that the Network Defendants entered into overt, express written agreements with their member banks to fix ATM Access Fees on Foreign ATM Transactions.

*AD/SAT*, unlike this case, was decided on summary judgment following "more than 70 depositions" and the exchange of "approximately 40,000 pages of documents." 181 F.3d at 224. Unlike here, plaintiff in *AD/SAT* did not allege an overt express agreement between defendants, but instead attempt to **prove** concerted action based on circumstantial **evidence**. Following a thorough review of the **evidence**, the court granted summary judgment in defendants' favor because the **evidence** "strongly suggested that the [] defendants had no rational economic motive to join the alleged conspiracies." *Id.* at 235.

This case also shares little in common with *Kendall*, apart from the fact that Visa and MasterCard were also defendants there. In *Kendall*, the plaintiffs alleged that Visa and

MasterCard conspired with their member banks to fix minimum prices on two types of fees the bank defendants charged to merchants. 518 F.3d at 1045. The court, having searched in vain for evidence of agreement, noted that even after conducting discovery the plaintiffs still could not plausibly allege agreement. *Id*. at 1048-50. There was no allegation in *Kendall* of any overt, written arrangement for fixing prices and the mechanism by which the alleged conspirators allegedly set fees was entirely speculative. *Id*. at 1046-50. By contrast, the ATM Access Fee Rules here by their express terms prohibit price competition. FAC ¶ 75 (The ATM Access Fee Rules "deprive independent (non-bank owned) ATM operators of the ability to deviate from the agreed-upon rules").

Finally, in *Interchange*, the court dismissed a complaint alleging that MasterCard's purported transformation from a joint venture to a "single entity" constituted a conspiracy between MasterCard and its member banks in violation of Section 1 of the Sherman Act as well as a violation of Section 7 of the Clayton Act. 2008 WL 5082872. The plaintiffs in *Interchange* alleged that with effective control of the post-IPO MasterCard enterprise, MasterCard's member banks would be free to impose restraints that previously violated the antitrust laws because under the post-IPO corporate subterfuge, such conduct would be deemed unilateral under the Sherman Act. *Id*. The court dismissed the complaint with leave to replead because it found that the complaint did not plausibly allege that MasterCard would continue to impose the restraints following its IPO. *Id* at *10. Notably, the court's decision in *Interchange* did not address the question of whether MasterCard and its member banks continued to engage in a contract, combination or conspiracy in violation of Section 1 of the Sherman Act post-IPO. Plaintiffs' allegations that MasterCard, Visa and their member banks continued to engage in a horizontal

contract combination or conspiracy to fix the price of interchange fees charged by each network post-IPOs are set forth in an amended complaint and are currently being litigated in that case.

Unlike the cases cited by the Bank Defendants, the FAC alleges that the Bank Defendants, the Bank Co-Conspirators and each Network Defendant continued to agree to implement and follow the identical rules and restraints as they did pre-IPO, with precisely the same benefit to the member banks and the same anticompetitive consequences to ATM customers. In essence, following the Network Defendants' IPOs nothing changed. Based on these circumstances, it is plausible to infer that the Bank Defendants had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764.

### 3. The FAC Adequately Alleges A Horizontal Conspiracy Between The Bank Defendants, The Bank Co-Conspirators And The Network Defendants Under *American Needle*

Even had the ATM Access Fee Restraints not originated prior to the transformation of the former bankcard associations into publicly traded corporations, the agreement among Defendants would still be horizontal. A cartel that collectively surrenders its freedom to maneuver in a competitive market to a third-party authorized to administer anticompetitive rules and collect monopoly rents on the cartel's behalf is nonetheless implementing an unlawful horizontal agreement to which the cartel has agreed, albeit one in which enforcement, collection, and liability for the cartel's transgressions has been outsourced.

Plaintiffs respectfully submit that the restraints alleged in the FAC are the product of a cognizable unlawful horizontal agreement in restraint of trade for precisely the same reasons that the Supreme Court condemned in *American Needle*, 130 S.Ct. at 2213.

As in the present case, *Am. Needle* involved an overt agreement that ran afoul of § 1. In *Am. Needle*, concerted action existed because the NFL teams – potential competitors in the

licensing of merchandise – outsourced their competitive decisions to a third-party, NFLP. *Id.*

NFLP then had the exclusive right to sell the collective intellectual property of the teams – a

function that the Court reasoned should naturally be subject to competition among the teams.

Despite its status as an independent entity, the Supreme Court nonetheless held that

"decisions by the NFLP regarding the teams' separately owned intellectual property constitute

concerted action." *Am. Needle*, 130 S.Ct. at 2215. The NFLP rule was an unreasonable restraint

of trade under Section 1 because, just like the bank members of Visa and MasterCard, NFL

"teams are acting as 'separate economic actors pursuing separate economic interests,' and each

team therefore is a potential 'independent cente[r] or decisionmaking.'" *Am. Needle*, 130 S.Ct.

at 2213 (quoting *Copperweld v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)); *see also United

States v. Masonite Corp.*, 316 U.S. 265 (1942) ("The fixing of prices by one member of a group

pursuant to express delegation, acquiescence, or understanding is just as illegal as the fixing of

prices by direct, joint action."); *Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210,

214 (D.C. Cir. 1986) (holding that a group of moving companies entered into a horizontal

agreement by adhering to the prices and territorial restraints of a national network of movers).

Just as NFLP prevents each team from "making its own market decisions," the Network

Defendants' ATM Access Fee Rules deprive the market of competition. In the absence of the

ATM restraints established by the Network Defendants and agreed to by the Bank Defendants

and Bank Co-Conspirators, ATM Operators would be able to steer consumers to alternative and

cheaper networks by charging lower ATM Access Fees or offering discounts to holders of Pin

Debit Cards that utilize those alternative networks. FAC ¶ 74.

Just as in *American Needle*, the long-standing nature of the ATM Access Fee Restraints

does nothing to overcome the fact that they are horizontal agreements among competitors

created, adopted, enforced, and maintained by the Network Defendants, Bank Defendants, and the Bank Co-Conspirators. "[A] history of concerted activity does not immunize conduct from § 1 scrutiny." *Am. Needle*, 130 S.Ct. at 2213. Indeed, the Network Defendants, the Bank Defendants and the Bank Co-Conspirators renew and perpetuate the price fixing agreements every time they republish the rules, renew their membership agreements which require adherence to the rules, renew or enforce their sponsorship agreements with existing ATM operators that incorporate the rules, or enter into a new sponsorship agreement with an ATM Operator conditioned on compliance with the rules. FAC ¶¶ 44-45, 64, 71-72, 86 ("Visa and MasterCard implement and enforce the ATM restraints challenged herein and require compliance with them in their contracts, agreements, rules and undertakings with the Bank Defendants and the Bank Co-Conspirators, who, in turn, secure compliance by their customers and suppliers.").

The allegations of the FAC make clear that the Defendants' ATM Access Fee Restraints unquestionably prevent the exercise of discretion by otherwise "independent centers of decisionmaking" regarding pricing by ATM Operators. *Am. Needle*, 130 S.Ct. at 2213. The Bank Defendants assert no rationale for why ATM Operators should not have the freedom to set their own prices for ATM transactions. The costs of individual transactions at a single ATM vary according to the network that processes the transaction, so the cost of a transaction handled by Visa's Plus network is different from the cost at the same ATM for a transaction handled by MasterCard's Cirrus network, as well as from non-Defendant networks, such as NYCE, Pulse, or Star, among others. FAC ¶¶ 4, 66 75, 77. However, while the network processing costs are different, the ATM Access Fees must be the same.

As the *American Needle* Court observed, "[a]n ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label." 130 S.Ct. at 2213. The Bank

Defendants' Motion to dismiss the FAC on the grounds that its allegations are insufficient to state the elements of a § 1 violation should be denied.

### III.     Plaintiffs Adequately Plead the Factual Basis for Anticompetitive Injury

#### A.     Antitrust Injury Is An Anticompetitive Effect Of Conduct That Violates The Antitrust Laws

A plaintiff seeking damages under the antitrust laws must prove that the defendant has caused the plaintiff "antitrust injury," meaning an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008); *Andrx Pharms.,* 256 F.3d at 806; Philip E. Areeda & Hebert Hovenkamp, *Antitrust Law* ("*Areeda & Hovenkamp*") ¶¶ 337, 338 (3d ed. 2007).  A private antitrust plaintiff hence must allege more than threatened loss or damage that is merely "causally linked" to the defendant's anticompetitive behavior.  *Brunswick*, 429 U.S. at 489.  A plaintiff must additionally allege that its threatened injury "reflect[s] the anticompetitive effect either of the [antitrust] violation or of anticompetitive acts made possible by the violation." *Id.*

A plaintiff alleging a Sherman Act violation may allege antitrust injury either by alleging that defendant's engaging in antitrust violations caused plaintiff's injury, or by alleging the antitrust violation was the necessary predicate for the injury.  *Bassett v. NCAA*, 528 F.3d 426, 434 (6th Cir. 2008); *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 909 (6th Cir. 2003). Generally, the class of plaintiffs capable of satisfying the antitrust-injury requirement includes consumers in the restrained market.  *West Penn Allegheny*, 627 F.3d at 102 (citing *Areeda & Hovenkamp*, *supra*, ¶ 339, at 123).

**B.** **Defendants' ATM Access Fee Restraints Cause Antitrust Injury By Functioning As An Agreement That Fixes Network Prices And Eliminates Consumer Choice**

**1.** **Defendants' ATM Access Fee Restraints Function As An Illegal Agreement To Fix Prices**

The first component of antitrust injury is conduct that is unlawful under the antitrust laws. *Brunswick*, 429 U.S. at 489. Defendants' agreement, which works to fix the price of access for a Pin debit card transaction at an ATM, satisfies this component. Requiring consumers to pay a higher price or denying them a choice among competing goods or services stemming from a refusal to compete are core antitrust injuries. Indeed, competitor agreements to restrain prices are a fundamental economic evil that the Supreme Court deems to be *per se* illegal under antitrust laws. *See, e.g.*, *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). To merit this *per se* status, such horizontal price fixing necessarily embodies "manifestly anticompetitive" effects and lacks "any redeeming virtue." *Id.* (quoting *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977), and *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289 (1985)). The Supreme Court similarly condemns a refusal to compete that restrains consumer choice between market alternatives. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983).[10]

Here, Defendants entered into a horizontal agreement to fix the price that consumers pay for completing a Foreign ATM Transaction. In a reasonably competitive market, ATM Operators would set ATM Access Fees at a level reflecting the cost of obtaining the network services and other inputs necessary to complete the transaction. ATM Operators would set ATM

---

[10] *See also Leegin Creative Leather Prods, Inc.*, 551 U.S. at 927 (Breyer, J., dissenting) (identifying "providing consumers with a free choice" about whether to choose lower prices or more services as "a basic antitrust objective"); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986).

Access Fees lower for transactions routed through lower-cost ATM networks relative to ATM Access Fees for transactions routed through higher-cost networks. FAC ¶ 77.

For instance, assume that the Network Defendants charge an ATM Operator one dollar to process a transaction over their networks and the ATM Operator has to charge its customers two dollars in order to make a profit. Assume further that competing networks such as STAR, Discovery or NYCE charge an ATM Operator 50 cents to process the same transaction. The ATM Operator could make the same profit for transactions processed over the alternative networks by charging only $1.50 (and probably less, because the lower price would drive more ATM customer volume).

In the above hypothetical, the ATM Operator would be incentivized to steer consumers to utilize the cheaper networks because it could charge lower discounted ATM Access fees to its customers while enjoying the same profit. Lower ATM Access Fees charged by ATM Operators would invariably result in increased business and increased profit for the ATM Operator as well as lower prices to the consumer. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition.").

But the market for ATM services is restrained and not competitive. Defendants have implemented a uniform horizontal agreement among the Bank Defendants and the Bank Co-Conspirators, facilitated by the Network Defendants, to fix ATM Access Fees in a manner ensuring that the ATM Access Fee for a transaction carried over a competing network is not less than the ATM Access Fee charged for a transaction carried over the more expensive competing Visa and MasterCard networks. FAC ¶73. The Bank Defendants and the Bank Co-Conspirators, members of the dominant Visa and MasterCard networks, have conferred on Visa and

MasterCard the broad and unfettered power to determine (i) the conditions under which Visa- and MasterCard-branded PIN Debit Cards may be used for ATM transactions, and (ii) the terms under which ATM Operators may access the Visa and MasterCard PIN Debit networks. *Id.* ¶ 67.

Defendants, along with the Bank Co-Conspirators, misuse this power to fix the ATM Access Fees charged for any transaction at a given ATM to be no less than the amount charged at that same ATM for a Visa or MasterCard transaction. *Id.* ¶¶ 68-70. This strips any incentive for non-dominant networks to try to increase market share by decreasing the cost to the ATM Operator to process a transaction over its network. FAC ¶ 68.

The Defendants' ATM Access Rules thus operate to suppress price discounting by eliminating any competitive advantage to do so. The rules insulate the Visa and MasterCard networks from the effects of unrestrained price competition. Although the rules are couched in terms of a price ceiling, they operate in fact to set *minimum* ATM Access Fees for all networks. Contrary to the Bank Defendants' argument, the price ceiling imposed by the ATM Access Fee Rules becomes the price floor for ATM Access Fees in the entire market.

Plaintiffs allege here that the ATM Access Fee Restraints imposed by the Network Defendants and agreed to by the Bank Defendants and Bank Co-Conspirators fix and maintain ATM Access Fees at the same level, irrespective of which network completes the transaction or what those services actually cost. *By collusively agreeing to set a price floor for all ATM Access Fees* at every ATM terminal throughout the country, the Network Defendants, Bank Defendants and the Bank Co-Conspirators shelter themselves from natural and beneficial price competition that otherwise would exist in a free market. FAC ¶ 78.

These unlawful restraints prevent (i) non-dominant networks from offering discounts or any other inducement for consumers to complete their transactions over their competing

networks and (ii) ATM Operators from offering any kind of rebate, discount or benefit to encourage consumers to use lower-priced networks.  The unlawful restraints support supra-competitive prices for ATM Access Fees.  But for the ATM Access Fee Restraints alleged herein, ATM Access Fees would be lower, the quantity of ATM services demanded would be greater, and economic output would increase.  FAC ¶¶ 75-76.  Because the ATM restraints break the essential economic link that would exist in a reasonably competitive market between the price charged to consumers for a service and the cost to the seller of providing it, they extinguish the incentive of cardholders to demand, and providers of ATM services to provide, lower-cost, more efficient services.  ¶ 79.  The ATM restraints, therefore, effectively constitute unlawful horizontal price fixing.

> ## 2. Defendants' ATM Access Fee Restraints Are Akin To Visa and MasterCard's Anti-Steering Rules Which Have Been Condemned As Anticompetitive

Defendants' ATM Access Fee Restraints are merely another iteration of anti-competitive policies that the Network Defendants (and their member banks) use to restrain competition and maintain supra-competitive prices.  The ATM Access Fee Rules function much like Visa and MasterCard's anti-steering rules imposed on merchants at the point of sale, which Visa and MasterCard are now abandoning under pressure by federal, state and private antitrust litigation. "Anti-steering restraints" are a group of rules promulgated by both Visa and MasterCard that prevent merchants from encouraging customers to use less expensive forms of payment.  *In re Interchange,* 2008 WL 5082872 at *5 (discussing allegations).  In a similar class action against American Express, the retailer plaintiffs alleged that, much like the ATM Access Fee Rules at issue here, anti-steering rules restrain competition by preventing them from steering consumers to less-costly payment methods:

24

> Plaintiffs claim that these so-called "anti-steering rules"
> (1) prevent them from imposing an additional surcharge on retail
> customers who use Amex cards to compensate for Amex's higher
> merchant discount fee, (2) prevent them from offering discounted
> prices to retail customers who use other less costly payment
> methods, and (3) prevent them from informing retail customers
> that the higher cost of using an Amex card results in higher retail
> prices for all customers.

*Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 261 (E.D.N.Y.

2010). The retailer plaintiffs urged that the anti-steering rules' intended purpose and actual effect

was to "almost totally insulate Amex from price competition from other providers of payment

card services to merchants."

The Antitrust Division of the United States Department of Justice ("DOJ") and numerous

states sued Visa, MasterCard and American Express for the anti-competitive consequences of the

their anti-steering rules and thereafter recently settled with Visa and MasterCard.  In settling,

Visa and MasterCard agreed in a consent judgment to jettison those rules immediately:

> The Amended Complaint in this action simply alleges that
> Defendants' anti-steering practices illegally restrained trade….
> The Proposed Final Judgment, meanwhile, broadly prohibits Visa
> and MasterCard from any anti-steering practice with respect to
> alternate forms of payment … and affirmatively requires Visa and
> MasterCard to alter their contracts with merchants to effectuate
> true anti-anti-steering practices – even going so far as to supply the
> exact contract language Visa and MasterCard must use in this
> regard ….

*United States v. Am. Express Co.*, No. 10-CV-4496, 2011 U.S. Dist. LEXIS 78835, at *14

(E.D.N.Y. July 20, 2011).  The consent judgment was explicit that its purpose was to prohibit

anti-steering practices, thereby enhancing competition and consumer choice:

> The purpose of this Section IV [entitled "Prohibited Conduct"] is
> to allow Merchants to attempt to influence the General Purpose
> Card or Form of Payment Customers select by providing choices
> and information in a competitive market.

*United States v. Am. Express Co.*, No. 10-CV-4496, 2011 U.S. Dist. LEXIS 87560, at *11 (E.D.N.Y. July 20, 2011). The consent judgment prohibited Visa and MasterCard from engaging in any practice or imposing any rule that limited merchants' ability to steer customers to lower-cost payment methods, including: (i) "offering the Customer a discount or rebate, including an immediate discount or rebate at the point of sale," (ii) "offering a free or discounted product," (iii) "offering a free or discounted or enhanced service," (iv) "offering the Customer an incentive, encouragement, or benefit," (v) "expressing a preference," (vi) "promoting a particular" card or form of payment, and (vii) "communicating to a Customer the reasonably estimated or actual costs" of various payment methods, all for the purpose of encouraging the customer to choose a lower-cost payment method. *See id.* at *11-13.

Visa and MasterCard had no viable defense to the DOJ's antitrust claims. Notice of their settlement with plaintiffs was filed concurrently with the initial complaint [11] and the consent judgment Decree was entered by the court on July 20, 2011. *Id.* at *14.

Here, the ATM Access Fee Rules restrain competition and restrict consumer choice at the point of sale similar to Visa and MasterCard's now-banned anti-steering practices. Both practices prevent sellers (whether merchants or ATM Operators) from steering customers to lower transaction costs via fees, discounts or other inducements reflecting the actual costs of different transaction options. The rules banned by the recent consent judgment prevented merchants from inducing customers to use a lower-cost payment option. The rules at issue here do precisely the same. While the mechanism is somewhat different, the anticompetitive effect is the same: higher transaction costs and restrained consumer choices. Accordingly, Plaintiffs sufficiently allege that Visa and MasterCard's ATM Access Fee Rules are anti-competitive.

---

[11] *United States v. Am. Express Co.*, No. CV-10-4496 (E.D.N.Y.), D.E. 4 (filed Oct. 4, 2010) ("Notice of Settlement Stipulation Concerning Entry of Proposed Final Judgment as to Defendants Visa and MasterCard").

### 3. The Agreement To Impose ATM Access Fee Restraints Causes Consumers To Pay A Fixed, Higher Price And Denies Them A Choice Of Lower-Cost Networks

The second half of antitrust injury is an injury caused by the unlawful conduct, which plainly encompasses price fixing that causes consumers to overpay for a good or service. *Brunswick*, 429 U.S. at 489. Plaintiffs allege that Defendants' unlawful agreement fixes the price of ATM Access Fees in a manner that prevents ATM customers from getting the benefit of using lower-cost ATM network services. By insulating the Visa and MasterCard networks from competition in providing ATM services, the agreement unlawfully increases ATM Access Fees above reasonably competitive levels, reduces output and the number of ATM terminals deployed, harms the competitive process, raises barriers to entry and expansion, and impedes innovation and investment. FAC ¶ 107. Plaintiffs thus have been monetarily injured. Among other effects, the ATM restraints prevent them from paying the lower ATM Access Fees that would result from an unrestrained competitive market. ¶ 109. Plaintiffs have been forced to pay inflated and supra-competitive ATM Access Fees resulting from Defendants' unlawful imposition of the ATM Access Fee Restraints. *Id.* ¶ 111.

The Bank Defendants argue that Plaintiffs fail to adequately plead antitrust injury because the FAC "contains no factual allegations to support plaintiffs' conclusory assertion that there are alternative, less expensive ATM networks to which ATM operators like the bank defendants would have steered consumers by discounting access fees in the absence of the [ATM Access Fee Restraints]." Defs.' Mem. at 20. Notably, the Bank Defendants fail to point to a single case which supports their novel argument that in order to adequately allege a price-fixing agreement, a plaintiff must identify defendants' competitors by name as well as the prices that they charge.

To the contrary, it is settled law that "'[a]bsence of actual competition may simply be a manifestation of the anticompetitive agreement itself.'" *Am. Needle, Inc*., 130 S.Ct. at 2213-14 (citations omitted). Plaintiffs plead that the ATM Access Fee Restraints operate to *prevent* ATM Operators from "offer[ing] discounts or any other benefit or inducement to persuade consumers to complete their transactions over competing, lower cost PIN-based networks" or from "offer[ing] a rebate or benefit that might circumvent the fixed ATM Access Fees." FAC ¶ 75. The Bank Defendants' argument that Plaintiffs are required to plead the existence of the differential pricing barred by the ATM Access Fee Restraints to state a valid claim is both circular and inconsistent with the law. *Am. Needle, Inc*., 130 S.Ct. at 2213-14 (citations omitted).

It is elementary that "decreased competition will almost invariably harm consumers." *Adams v. Pan Am. World Airways, Inc*., 828 F.2d 24, 27 (D.C. Cir. 1987). Plaintiffs plead many adverse impacts on competition caused by the ATM Access Fee Restraints, and detail precisely how the injuries flowing from that reduced competition directly impact consumers. *Id*. ¶¶ 72-80. Nothing further is required.

The Bank Defendants also assert that Plaintiffs' allegations are insufficient because the FAC does not contain factual allegations to suggest that consumers as opposed to ATM Operators choose the ATM network on which to complete a Foreign ATM Transaction. Defs.' Mem. at 21. For the reasons discussed above, whether consumers or ATM Operators ultimately choose the network on which to complete a Foreign ATM Transaction is a distinction without a difference. Absent the ATM Access Fee Restraints, both consumers and ATM Operators would be incentivized to complete Foreign ATM Transactions over the cheapest network, whether it be, *e.g.*, Visa, MasterCard, NYCE, Pulse, or Star. Put another way, Defendants' ATM Access Fee

Rules restrict competition and increase prices to consumers, irrespective of which network

ultimately completes the transaction or how much a given network's services cost.

> The ATM restraints imposed by the Network Defendants fix and maintain ATM Access Fees at the same level, irrespective of which network completes the transaction or what those services actually cost. By collusively agreeing to set a price floor for all ATM Access Fees at every ATM terminal throughout the country, the Bank Defendants and the Bank Co-Conspirators shelter themselves from natural and beneficial price competition that otherwise would exist in a free market.

FAC, ¶ 78.

Finally, the Bank Defendants argue that Plaintiffs fail to adequately plead injury in fact

because the FAC does not contain specific allegations pertaining to Plaintiffs' transactions such

as "which bank issued their ATM cards, which other banks charged them ATM access fees and

in what amounts, and whether those fees would have been lower in the absence of the challenged

rules." Defs.' Mem. at 21.[12] This argument is a red herring. Plaintiffs unequivocally allege that

Defendants' ATM Access Fee Restraints injure ***all consumers of ATM services***.

> Defendants' direct exercise of market power constrains ***all consumers of ATM services*** and results in supra-competitive ATM Access Fees. Defendants actively monitor and vigorously enforce the ATM restraints. Consumers of ATM services must accept and agree to pay inflated and supra-competitive ATM Access Fees as a condition of withdrawing money in Foreign ATM Transactions.

FAC ¶ 87 (emphasis added).

---

[12] The Bank Defendants also appear to take issue with Plaintiffs' Class definition, asserting that "not all ATM customers would be injured under Plaintiffs' theory." (Defs.' Mem. at 19). It is well-settled, however, that a motion to dismiss is an inappropriate vehicle for raising issues pertaining to class certification. *See Pfeffer v. HSA Retail, Inc.*, No. 11-CV-959, 2012 WL 280740 (W.D. Tex. Jan. 31, 2012 ) ("While it is true that a district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class, a Rule 12(b)(6) motion to dismiss is not the proper forum for such an analysis" (citations omitted)); *Rosenberg v. Avis Rent A Car Sys.*, No. Civ. 07–1110, 2007 WL 2213642, *4 (E.D. Pa. July 31, 2007) (denying motion to dismiss where plaintiff improperly used such motion "as an opportunity to attack the merits of the class itself"*); Brothers v. Portage Nat'l Bank*, No. Civ. A 3:06-94, 2007 WL 965835, *7 (W.D. Pa. Mar. 29, 2007) (a Rule 12(b)(6) motion must not be used "as a vehicle for preempting a certification motion").

Accordingly, the specifics of Plaintiffs' transactions are irrelevant.  The FAC makes clear that Plaintiffs were consumers of ATM services during the Class Period (FAC ¶¶ 12-15) and that Defendants' ATM Access Fee Rules restrained competition *for all consumers of ATM services*.  Plaintiffs entered into Foreign ATM transactions and thus paid for services in the relevant market during a period when that market was unlawfully restrained by a price-fixing agreement among Defendants.  These allegations, thus, plausibly state that Plaintiffs suffered injury as a result of Defendants' ATM Access Fee restraints.

## IV.    The Bank Defendants Mischaracterize Their Agreement To Impose ATM Access Fee Restraints As An MFN That Is Legal *Per Se*

The Bank Defendants mischaracterize their agreement to impose ATM Access Fee Restraints as an MFN agreement, and assert that either:  (1) such agreements are always procompetitive and thus inactionable as a matter of law, or (2) at the very least, such agreements do not to constitute a *per se* violation of Section 1 the Sherman Act.  Bank Defs.' Mem. at 8-12.

Defendants' ATM Access Fee Restraints are not comparable to MFN agreements.  MFN agreements are used to benefit a purchaser.  Such agreements typically arise in the health-care context, where insurers use them to ensure that health-care providers do not charge them higher rates than competing insurers.  *See, e.g.*, *United States v. Delta Dental of R.I.*, 943 F. Supp. 172, 175 (D.R.I. 1996); *Blue Cross & Blue Shield of Ohio v. Bingaman*, No. 1:94 CV 2297, 1996 WL 677094 (N.D. Ohio June 24, 1996).  Here, by contrast, the Network Defendants are sellers that use ATM Access Fee Rules to maximize the ATM Access Fees paid by consumers by denying competitors an opportunity to increase market share through lower ATM Access Fees.

Defendants cite no authority (nor did Plaintiffs find any such authority) in which a court characterized an agreement imposed by and benefiting the seller as an MFN clause subject to the rule of reason.  *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010)

(upholding complaint alleging that "seller-side MFNs" were suggestive of a *per se* violation of the antitrust laws). To the contrary, as discussed *supra*, the ATM Access Fee Restraints are the product of a horizontal agreement between the Bank Defendants, the Bank Co-Conspirators and the Network Defendants to fix prices which is *per se* illegal under § 1 of the Sherman Act. The Supreme Court has explained that when a "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output" rather than "one designed to 'increase economic efficiency and render markets more, rather than less, competitive,'" *per se* treatment is appropriate. *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19-20 (1979) (citing *United States v. United States Gypsum Co*., 438 U.S. 422, 441 n.14 (1978)). That is certainly the case here.

In any event, even if applicable here, the MFN label does not protect the Bank Defendants from § 1 liability. Courts and commentators recognize that MFN clauses can have anticompetitive impacts and hence each must be evaluated on their particular facts. In *Delta Dental of R.I.*, 943 F. Supp. at 190, the court explained that Delta was the largest dental insurer in Rhode Island and had contracts with some 90 percent of the dentists in the state, covering 35-45 percent of the state's residents. Delta entered into agreements that discouraged dentists from charging fees to patients covered by other insurance companies (and to uninsured patients) that were lower than those paid by Delta patients under reduced-cost plans. Almost all of the Delta dentists agreed to comply with the MFN agreements, leading them to refuse to contract at lower prices with limited-panel dental insurance plans that were trying to enter the Rhode Island market:

> Delta makes it abundantly clear to participating dentists that the only way to avoid the risk of lower Delta fees is to refuse to accept any fees lower than Delta's fee schedule…. [P]ursuant to this

> contractual clause, Delta dentists are well aware that charging
> lower fees may result in Delta lowering their reimbursement rate.

*Id.* at 175.

Evaluating the competitive effects of Delta's MFN clause required a fact-intensive inquiry. The district court first denied a motion to dismiss, rejecting Delta's argument that most MFN clauses are *per se* legal and agreeing with the Department of Justice that under certain conditions, including those before the court, MFNs may have substantial anticompetitive effects as determined under their particular circumstances:

> Delta's MFN clause is being challenged strictly under § 1's rule of
> reason, which, absent limited per se exceptions not alleged here,
> requires a fact intensive inquiry.

*Id.* at 189. *See also id.* at 178 ("[t]his analysis is fact-specific, requiring an examination of the anticompetitive effects of Delta's Prudent Buyer clause as compared to the clause's legitimate business benefits"). The case ultimately was settled by consent judgment, with Delta agreeing to drop the MFN, which was declared null and void. *See United States v. Delta Dental of R.I.*, No. Civ.A. 96-113P, 1997 WL 527669, at 2-3 (D.R.I. July 2, 1997). *See also United States v. Oregon Dental Serv.*, No. Civ. C95 1211, 1995 WL 481363, at *3 (N.D. Ca. July 14, 1995) (consent judgment enjoining enforcement of standard MFN clause imposed by dominant dental insurers, on § 1 grounds, as deterrents to dentists' providing discounts on fees); *U.S. v. Delta Dental Plan of Ariz., Inc.*, No. 94-1793, 1995 U.S. Dist. LEXIS 9752, at *3-5 (D. Ariz. May 19, 1995) (same).

Similarly, the court in *Blue Cross & Blue Shield of Ohio,* 1996 WL 677094, at 4-5 (N.D. Ohio June 24, 1996) explained how MFN agreements could be anticompetitive. Just as the Bank Defendants argue here, defendants there argued that MFN agreements as a matter of law do not violate the Sherman Act. The court rejected that argument, citing decisions that "noted the

anticompetitive effects that MFN clauses may have." *Id.* at *10- 11 (citing cases). Among those decisions was *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 623 & n.1 (1975), in which the Supreme Court "concluded that MFN clauses" before it "have the promise and effect of reducing or eliminating competition." *Blue Cross & Blue Shield of Ohio*, 1996 WL 677094, at *4. The *Blue Cross* court went on to conclude that whether a particular MFN agreement violated the Sherman Act is a question of fact. *Id.* at *4.[13]

The United States government and commentators have likewise observed that MFN agreements can have anticompetitive effects, and that each agreement must be examined under its unique factual circumstances. Indeed, over 55 years ago, the United States Attorney General's National Committee to Study the Antitrust Laws reported that MFN agreements can have the effect of fixing prices at uncompetitive, higher levels:

> [A] seller constrained by law to reduce prices to some only at the cost of reducing prices to all may well end up by reducing them to none.

*Report of the Attorney General's National Committee to Study the Antitrust Laws,* 335 (1955), (quoted in Arnold Celnicker, *A Competitive Analysis of Most Favored Nations Clauses in Contracts Between Health Care Providers and Insurers*, 69 N.C.L. Rev. 863, 885 (1991) ("*Celnicker*")).

Commentators similarly conclude that MFN agreements can "have the effect of unnecessarily raising consumer costs, reducing choice among providers, constraining access to care, and preventing the development of alternative health care delivery models." Beth Ann Wright, *How MFN Clauses Used in the Health Care Industry Unreasonably Restrain Trade Under the Sherman Act*, 18 J.L. & Health 29, 31 (2003/2004). Ms. Wright observes that "MFN

---

[13] *See also United States v. Blue Cross Blue Shield of Michigan*, No. 10-14155, 2011 U.S. Dist. LEXIS 89849, at *21 (E.D. Mich. Aug. 12, 2011) ("it is plausible that the MFNs entered into by Blue Cross … establish anticompetitive effects").

clauses may 'eliminate a dynamic mechanism by which prices are ratcheted down to the competitive level, reduce [output of medical services], and prevent the market from rewarding more efficient distribution systems.'" *Id.* at 39 (bracketed material in original). Those anticompetitive effects may include: "horizontal price-fixing, unreasonable restraints on vertical trade, elimination of price discrimination, preempting a genuine market floor price, deterrence of new market entrants, elimination or crippling of existing smaller insurers, preventing development of lower cost plans, depriving the market of innovative and alternative service delivery models, and depriving consumers of differentiated products." *Id.*

Ms. Wright concludes that an MFN agreement "unreasonably restrains trade in the market as a whole with detrimental effects on the price to consumers" because it "operates to prevent an otherwise free market from establishing a lower price paid by smaller insurance competitors, and ultimately lower prices paid by consumers, the MFN clause." *Id.* at 42. *See also Celnicker*, 69 N.C.L. Rev. at 885, 891-92 ("MFN clauses have substantial anticompetitive potential"); Susan E. Stenger, *Most-Favored-Nation Clauses and Monopsonistic Power: An Unhealthy Mix?*, 15 Am. J. L. & Med. 111, 127-28 (1989) ("In summary, the mere presence of a most-favored-nation clause in a health insurance contract should raise antitrust questions . . . Courts must realize that monopsonist institution of MFN clauses denies patient/subscribers the innovation, quality and efficiency produced by competition.").

The Bank Defendants' authorities, both of which involve post-trial decisions, do not compel dismissal here. The Bank Defendants rely first on the district court and appellate decisions in *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 692 F. Supp. 52 (D.R.I. 1988) and *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101 (1st Cir. 1989), which did not address an

MFN agreement under § 1 of the Sherman Act.  The courts ruled that plaintiff failed on the

merits to establish a different claim – unlawful monopoly under § 2 of the Sherman Act.

The plaintiff, Ocean State Physicians Health Plan ("Ocean State"), sued Blue Cross/Blue

Shield of Rhode Island ("Blue Cross") under § 2 of the Sherman Act, alleging that Blue Cross

"had acted unlawfully to exclude Ocean State from the health care insurance marketplace."

*Ocean State*, 883 F.2d at 1102.  Among other claims, Ocean State alleged that Blue Cross

adopted its "Prudent Buyer policy not in order to save money, but rather to induce physicians to

resign from Ocean State."  *Id.* at 1104.  After trial, the jury found that Blue Cross had violated

§ 2 of the Sherman Act, but the district court granted Blue Cross' motion for a judgment

notwithstanding the verdict.  The First Circuit agreed with the district court that this Prudent

Buyer policy did not, as a matter of law, violate § 2 of the Sherman Act.  *Id.* at 1110.

But § 2 requires proof of different elements than § 1:  (i) existence of monopoly power;

and (ii) "the willful acquisition or maintenance of that power as distinguished from growth or

development as a consequence of a superior product, business acumen, or historic accident."

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 480 (1992).  On appeal, the

narrow issue before the First Circuit was "whether Blue Cross maintained its monopoly power

through improper means."  *Ocean State*, 883 F.2d at 1110.  The First Circuit described its inquiry

as follows:

> We must ask whether Blue Cross's conduct "went beyond the
> needs of ordinary business dealings, beyond the ambit of ordinary
> business skill, and 'unnecessarily excluded competition'" from the
> health care insurance market.

*Id.* (quoting *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir. 1983)).

That inquiry has little bearing here.  Plaintiffs' § 1 claim requires a showing of (i)

concerted activity that (ii) unreasonably restrains trade.  *Standard Oil Co. of N.J. v. United*

*States*, 221 U.S. 1, 59-60 (1911); *GTE New Media Services Inc. v, Ameritech Corp.*, 21

F. Supp. 2d 27, 42-43 (D.D.C. 1998); *Mardirosian v. The American Institute of Architects*, 474

F. Supp. 628, 636 (D.D.C. 1979).  In rejecting *Ocean State's* applicability to the § 1 claim before

it, the court in *Delta Dental* found that *Ocean State* did not address either prong of § 1 and that

the second element of § 1 required a factual inquiry into the MFN agreement's actual effects:

> This analysis is fact-specific, requiring an examination of the
> anticompetitive effects of Delta's Prudent Buyer clause as
> compared to the clause's legitimate business benefits.  This inquiry
> is more fact-intensive than the inquiry the First Circuit conducted
> in *Ocean State*.  Because of the different inquiries involved, the
> First Circuit's decision in Ocean State does not necessarily control
> the decision here.

*Delta Dental of R.I.*, 943 F. Supp. at 178.

The court also noted that to the extent that the court in *Ocean State* may have "canvassed

the effects" of the Prudent Buyer clause, it "'did not undertake a searching inquiry into their

severity, as would be appropriate under a § 1 rule of reason analysis, as such a claim was simply

not before it."  *Id.* (quoting Report and Recommendation).  In *Delta Dental*, however, as here,

plaintiff alleged actual anticompetitive effects, which were "sufficient to overcome a Rule

12(b)(6) motion to dismiss regarding the 'unreasonable restraint' on trade arising from" the

defendant's MFN agreement.  *Id.* at 179-80.

The Bank Defendants next cite *Blue Cross & Blue Shield United of Wisconsin v.

Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995), in which Compcare, a Blue Cross HMO

subsidiary, alleged collusion and price-fixing between Marshfield Clinic and its affiliated

physicians.  Compcare argued that the Clinic had an agreement under which it would not pay

affiliated physicians more than what these physicians charge their other patients.  Compcare

argued that this agreement "put a floor underneath these physicians' prices."  *Id.* at 1415.  The

physician affiliates were penalized for accepting lower prices from other patients because the

Clinic rate automatically declined to the lowest price offered to any competitor. The Court of Appeals called this MFN argument "ingenious but perverse." *Id.* at 1415. But the Seventh Circuit did not declare MFN clauses procompetitive as a matter of law, deferring instead to the particular facts before it. The court acknowledged the Department of Justice's position that these clauses can be "misused to anticompetitive ends" but concluded "there is no evidence of that in this case." *Id.*

In order to deny the Bank Defendants' Motion, the Court here need not decide whether Plaintiffs' allegations amount to a *per se* violation (as Plaintiffs have shown) or could only be deemed illegal after a rule of reason analysis (as the Bank Defendants argue). In other words, for the Bank Defendants, at best, this determination would depend on the facts of the case, thus rendering dismissal inappropriate here.

## V.     If The Court Grants The ATM Defendants' Motion In Whole Or In Part, Plaintiffs Request Leave To Amend

If the Court finds the FAC lacking in any way, Plaintiffs respectfully request leave to amend. Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1083-84 (D.C. Cir. 1998); *In re Vitamins Antitrust Litig.*, 217 F.R.D. 30, 32 (D.D.C. 2003). Once a complaint has been amended, it is within the discretion of the District Court as to whether or not to grant leave for an additional amendment. *See Caribbean Broadcasting System, Ltd.*, 148 F.3d at 1084-85. In this case, amendment would be neither futile, nor in bad faith, nor dilatory. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Bank Defendants'

Motion should be denied.

Dated:  February 29, 2012

LABATON SUCHAROW LLP

By:___/s/ Bernard Persky_____
     Bernard Persky (*pro hac vice*)
     William V. Reiss (*pro hac vice*)
     140 Broadway
     New York, NY 10005
     (212) 907-0700
     bpersky@labaton.com
     wreiss@labaton.com

HAGENS BERMAN SOBOL SHAPIRO LLP

By:___/s/ George W. Sampson_____
     George W. Sampson (*pro hac vice*)
     Steve W. Berman (*pro hac vice*)
     Anthony D. Shapiro (*pro hac vice*)
     Erin K. Flory
     1918 Eighth Avenue, Suite 3300
     Seattle, WA  98101
     Telephone:  (206) 623-7292
     Facsimile:   (206) 623-0594
     george@hbsslaw.com
     steve@hbsslaw.com
     tony@hbsslaw.com
     erin@hbsslaw.com

**MEHRI & SKALET, PLLC**
Craig Briskin
1250 Connecticut Avenue NW, Suite 300
Washington, DC  20036
Tel: 202-822-5100
Fax: 202-822-4997
Cbriskin@Findjustice.com

John W. Kern
1201 Fifteenth Street, N.W., Suite 400
Washington, D.C.  20005-2842
Telephone:  (202) 207-1151
jklaw@comcast.net

**HUDSON, MALLANEY, SHINDLER &
    ANDERSON, P.C.**
J. Barton Gopelrud
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265

**THE PAYNTER LAW FIRM PLLC**
Stuart M. Paynter (D.C. Bar # 226147)
1200 G Street N.W., Suite 800
Washington, DC  20005
Telephone:  (202) 626-4486
Facsimile:  (866) 734-0622
stuart@smplegal.com

*Attorneys for Plaintiffs and the Proposed Classes*