# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANDREW MACKMIN
     500 Central Ave., Apt. 612
     Union City, NJ 07087,

BARBARA INGLIS
     139 Woodhull Road
     Huntington, NY 11743,

     and

SAM OSBORN
     1713 U Street NW, Apt. 1D
     Washington, DC 20009,

          Plaintiffs,

     v.

VISA INC., VISA U.S.A. INC., VISA
INTERNATIONAL SERVICE
ASSOCIATION, and PLUS SYSTEM, INC.
     595 Market Street
     San Francisco, CA 94105-2802,

MASTERCARD INCORPORATED and
MASTERCARD INTERNATIONAL
INCORPORATED d/b/a Mastercard
Worldwide
     2000 Purchase Street
     Purchase, NY 10577,

BANK OF AMERICA, NATIONAL
ASSOCIATION
     Bank of America Corporate Center
     Charlotte, NC 28255,

NB HOLDINGS CORPORATION
     401 North Tryon Street
     Charlotte, NC 28202,

C.A. No.:  11-cv-1831
Assigned to:  Amy Berman Jackson
Assign Date:  10/12/2011
Description:  Antitrust

**SECOND AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

(caption continues on next page)

BANK OF AMERICA CORPORATION
    Bank of America Corporate Center
    100 North Tryon Street
    Charlotte, NC 28255,

CHASE BANK USA, N.A. and JPMORGAN
CHASE & CO.
    270 Park Avenue
    New York, NY 10017,

JPMORGAN CHASE BANK, N.A.
    1 Chase Manhattan Plaza
    New York, NY 10081,

    and

WELLS FARGO & COMPANY and WELLS
FARGO BANK, N.A.
    420 Montgomery Street
    San Francisco, CA 94163,

        Defendants.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................1

II.  JURISDICTION AND VENUE ................................................................3

III.  THE PARTIES.........................................................................................4

    A.  Plaintiffs.......................................................................................4

    B.  Defendants ...................................................................................5

IV.  THE NETWORK DEFENDANTS..........................................................5

    A.  Visa ..............................................................................................5

    B.  MasterCard...................................................................................5

V.  THE BANK DEFENDANTS....................................................................6

    A.  Bank of America...........................................................................6

    B.  Chase............................................................................................7

    C.  Wells Fargo ..................................................................................8

VI.  NON-PARTY BANK CO-CONSPIRATORS .........................................9

VII.  OTHER NON-PARTY CO-CONSPIRATORS .....................................10

VIII.  TRADE AND INTERSTATE COMMERCE ........................................10

IX.  FACTUAL BACKGROUND.................................................................11

    A.  PIN Debit Cards and ATM Transactions...................................11

    B.  Foreign ATM Transactions.......................................................12

    C.  ATM Networks ..........................................................................14

    D.  Defendants' Horizontal Conspiracy...........................................16

X.  ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY  RESULTING FROM THE RESTRAINTS .............................................22

XI.  THE ELEMENT OF AGREEMENT .....................................................25

XII.    THE RELEVANT MARKET ..............................................................................28

XIII.   DEFENDANTS' MARKET POWER ...............................................................28

XIV.    NATIONWIDE DIRECT PURCHASER CLASS ALLEGATIONS..............................29

XV.     INDIRECT PURCHASER CLASS ALLEGATIONS ......................................................32

        FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:  SHERMAN ACT,
        SECTION 1, 15 U.S.C. § 1 (*PER SE* AGREEMENT TO FIX PRICES OR
        UNREASONABLE RESTRAINT OF TRADE)................................................................39

        SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:  SHERMAN
        ACT, SECTION 1, 15 U.S.C. § 1 (VERTICAL AGREEMENT AMONG VISA,
        BANK DEFENDANTS, AND BANK CO-CONSPIRATORS TO FIX PRICES OR
        UNREASONABLE RESTRAINT OF TRADE)................................................................40

        THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:  SHERMAN ACT,
        SECTION 1, 15 U.S.C. § 1 (VERTICAL AGREEMENT AMONG MASTERCARD,
        BANK DEFENDANTS, AND BANK CO-CONSPIRATORS TO FIX PRICES OR
        UNREASONABLE RESTRAINT OF TRADE)................................................................42

        FOURTH CLAIM FOR RELIEF AGAINST NETWORK DEFENDANTS:
        VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS .......44

        FIFTH CLAIM FOR RELIEF AGAINST NETWORK DEFENDANTS:
        VIOLATIONS OF STATE CONSUMER PROTECTION AND UNFAIR
        COMPETITION LAWS ................................................................................................65

XVI.    REQUEST FOR RELIEF ................................................................................................77

XVII.   JURY DEMAND ............................................................................................................78

Plaintiffs Andrew Mackmin, Barbara Inglis, and Sam Osborn ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class" as defined herein), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, based on the investigation of counsel, bring this class action for damages, injunctive relief and other relief pursuant to the federal and state antitrust laws, demand a trial by jury, and allege as follows:

## I.      INTRODUCTION

1.      This lawsuit is brought as a proposed class action against Defendants for orchestrating, implementing, and facilitating a conspiracy to fix the fees ATMs charge to customers at the time they withdraw cash, called "ATM access fees."

2.      Central to this scheme are contractual restraints originated by banks, and maintained by Visa and MasterCard, which disallow ATMs from offering discounts for withdrawals processed over their competitors' networks (the "Restraints"), to reflect the lower net cost of processing the transaction.  This is particularly significant, because as shown below, Visa and MasterCard consistently compensate ATM operators at lower levels than any of their network competitors.

3.      In addition, Defendants have pursued a program of issuing "single-bug" debit cards, which can only access Visa and MasterCard's networks, and not those of their competitors.  This exclusionary practice furthers Defendants' scheme by retarding the growth of competing networks.

4.      The result of Defendants' illegal activities is that ATM access fees rose to their highest level ever in 2012, according to an April 2013 report by the General Accounting Office.

5.      It is sometimes the case that a business will attempt to restrict what resellers can charge for its own product or service.  But it is highly unusual and anticompetitive for a business

to restrict what others can charge for its *competitor's* product or service.  That is exactly what the Restraints are.  There is no economic or pro-competitive justification for the Restraints, and the markets would function far more fairly and efficiently if they were abolished.  That is the relief Plaintiffs seek in this case.

6.      Defendants' unlawful agreements effectively set a price floor for all ATM access fees throughout the country, and deprive consumers of the benefits of natural price competition. Defendants have succeeded in restricting interbrand competition, restraining output, and charging artificially inflated fees to the class for use of ATMs.  Their anticompetitive activity constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  It also constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and state antitrust laws.

7.      In the absence of the ATM Restraints, Plaintiffs would have paid lower foreign transaction fees at Bank ATMs.  Price competition between ATM Networks, and between ATM Operators, would result in lower ATM Access Fees across the board, including consumers with "single bug" ATM cards.

8.      Plaintiffs bring this action on behalf of themselves and others who have paid artificially inflated, supra-competitive ATM Access Fees to the Bank Defendants.  Plaintiffs seek damages for themselves and the classes resulting from Defendants' unlawful antitrust violations. They also seek an injunction that would terminate Defendants' unlawful agreements.  If Plaintiffs prevail, Defendants will have to compete with each other and other providers, resulting in lower prices, increased volume of transactions, and greater convenience to consumers.  These are precisely the purposes the antitrust laws were designed to serve.

## II.   JURISDICTION AND VENUE

9.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover treble damages and the costs of this suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and the members of the Nationwide Direct Purchaser Class (defined below) by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to obtain injunctive relief from Defendants' ongoing and continuing violations of Section 1.

10.     In the alternative, Plaintiffs also bring this action pursuant to state antitrust, unfair competition and consumer protection laws to recover damages, restitution, disgorgement, costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and the members of Indirect Purchaser Classes (defined below) by reason of Defendants' violations of those laws.

11.     This court has subject-matter jurisdiction over this action under Section 4 of the Clayton Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337.

12.     This Court also has subject-matter jurisdiction over the state-law claims pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiffs is a citizen of a state different from any Defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs."  This Court also has jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of a state within the United States and one or more of the Defendants is a citizen or subject of a foreign state."

13.     Venue in the District of Columbia is proper under 28 U.S.C. § 1391 because each Defendant transacts business and/or is found within this District.  A substantial part of the

interstate trade and commerce involved in and affected by the violations of the antitrust laws alleged herein was and is carried out within this District.  The acts complained of have had, and will have, substantial anticompetitive effects in this District.

14.     Jurisdiction over Defendants comports with the United States Constitution and with 15 U.S.C. §§ 15, 22, and 26.

### III.     THE PARTIES

**A.     Plaintiffs**

15.     Plaintiff Andrew Mackmin is a resident of Union City, New Jersey and has paid at least one ATM Access Fee during the relevant time period.  Plaintiff Mackmin has a Visa-branded Bank of America debit card, with no bugs on the back.  He has incurred several access fees for withdrawals during the relevant period, including at Wells Fargo, Chase, and Citibank.

16.     Plaintiff Barbara Inglis is a resident of Huntington, New York and has paid at least one ATM Access Fee during the relevant time period.  Plaintiff Inglis has a Teachers' Federal Credit Union pin debit card, with several bugs on the back:  NYCE, Plus, and Visa.  She has incurred access fees in connection with cash withdrawals from Defendant Banks.

17.     Plaintiff Sam Osborn is a resident of Washington, DC and has paid at least one ATM Access Fee during the relevant time period.  Plaintiff Osborn has a Capital One MasterCard debit card.  It shows no other network "bugs" on the card.  For example, on May 5, 2011, he withdrew $60 from a Wells Fargo ATM near Dupont Circle in Washington, DC, and was charged a $3 access fee by Wells Fargo, which amount was automatically withdrawn from his account.  In November 2011 he withdrew $60 from another Wells Fargo ATM near Dupont Circle, and was assessed a $3 access fee by Wells Fargo.

**B.**    **Defendants**

The anticompetitive behavior by the Network Defendants (defined below), the Bank Defendants (defined below), and the Bank Co-Conspirators (defined below) has caused antitrust injury common to the Plaintiffs and the members of the Classes.

## IV.    THE NETWORK DEFENDANTS

**A.**    **Visa**

18.    Defendant, VISA INC. ("Visa Inc.") is a publicly traded Delaware corporation with its principal place of business in San Francisco, California.

19.    Defendant VISA U.S.A. INC. is a Delaware corporation with its principal place of business in San Francisco, CA and is owned and controlled by Visa Inc.

20.    Defendant VISA INTERNATIONAL SERVICE ASSOCIATION is a Delaware corporation with its principal place of business in San Francisco, California and is owned and controlled by Visa Inc.

21.    Defendant PLUS SYSTEM, INC. is a Delaware corporation with its principal place of business in San Francisco, California and is owned and controlled by Visa Inc.

22.    Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc. are collectively referred to herein as "Visa."  During the relevant time period and until the Visa corporate re-structuring, Visa was governed by a board of directors comprised of bank executives selected from its member banks, including certain Bank Defendants and Bank Co-Conspirators.

23.    Visa engages in interstate commerce and transacts business in this judicial district.

**B.**    **MasterCard**

24.    Defendant MASTERCARD INCORPORATED ("MasterCard Incorporated") is a Delaware corporation with its principal place of business in Purchase, New York.

25.     Defendant MASTERCARD INTERNATIONAL INCORPORATED

("MasterCard International") is a Delaware non-stock (membership) corporation with its

principal place of business in Purchase, New York and is owned and controlled by MasterCard

Incorporated.  MasterCard International consists of more than 23,000 member banks worldwide

and is the principal operating subsidiary of MasterCard Incorporated.

26.     MasterCard Incorporated and MasterCard International are collectively referred to

herein as "MasterCard."

27.     MasterCard engages in interstate commerce and transacts business in this judicial

district.

28.     Defendants Visa and MasterCard are herein collectively referred to as the

"Network Defendants."

## V.     THE BANK DEFENDANTS

**A.     Bank of America**

29.     Defendant BANK OF AMERICA, NATIONAL ASSOCIATION is a national

banking association with its principal place of business in Charlotte, North Carolina.  Bank of

America, National Association is a wholly owned subsidiary of Defendant NB Holdings

Corporation, and provides banking products and services through its branches.

30.     Defendant NB HOLDINGS CORPORATION is a Delaware corporation with its

principal place of business in Charlotte, NC and is wholly owned by Defendant Bank of America

Corporation.

31.     Defendant BANK OF AMERICA CORPORATION is a Delaware corporation

with its principal place of business in Charlotte, North Carolina.

32.     Defendants Bank of America, National Association, NB Holdings Corporation,

and Bank of America Corporation are herein collectively referred to as "Bank of America."

33.     Bank of America is a member of both the Visa and MasterCard networks.  It engages in interstate commerce and transacts business in this judicial district.  Between 2000 and 2005, it was represented on the Visa U.S.A. Board of Directors.  It is currently and/or has been represented on the Visa Board of Directors.

**B.     Chase**

34.     Defendant CHASE BANK USA, N.A. is a New York bank with its principal place of business in New York, New York.  It is the successor to Chase Manhattan Bank USA, N.A., and a wholly owned subsidiary of Defendant JPMorgan Chase & Co.

35.     Defendant JPMORGAN CHASE & CO. is a Delaware corporation with its principal place of business in New York, New York.

36.     Defendant JPMORGAN CHASE BANK, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co, and is the private banking and wealth management division thereof.  JPMorgan Chase Bank, N.A. is organized under the banking laws of the United States with its principal place of business in New York, New York.  JPMorgan Chase Bank, N.A., acquired the credit-card operations and receivables of Washington Mutual Bank from the FDIC on September 25, 2008.  By acquiring these assets, JPMorgan Chase Bank, N.A. became the successor-in-interest to the liabilities that are associated with this litigation.

37.     Defendants Chase Bank USA, N.A., JP Morgan Chase & Co., and JPMorgan Chase Bank, N.A. are collectively referred to herein as "Chase."

38.     Chase is a member of both the Visa and MasterCard networks.  It engages in interstate commerce and transacts business in this judicial district.  Between 2000 and 2003, Chase was represented on the MasterCard Board of Directors for the United States.  Between 2003 and 2006, it was represented on the Visa U.S.A. Board of Directors.

39.      In July 2004, Chase completed its acquisition of Bank One Corporation and Bank One Delaware, N.A.  From at least 2000 until its acquisition by Chase, Bank One was represented on the Visa U.S.A. Board of Directors.

**C.      Wells Fargo**

40.      Defendant WELLS FARGO & COMPANY is a Delaware corporation with its principal place of business in San Francisco, California.

41.      Defendant WELLS FARGO BANK, N.A. is a federally chartered bank with its principal place of business in San Francisco, California.

42.      Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. are collectively herein referred to as "Wells Fargo."

43.      Wells Fargo is a member of both the Visa and MasterCard networks.  It engages in interstate commerce and transacts business in this judicial district.  During parts of the relevant time period, it was represented on the Visa U.S.A. Board of Directors.

44.      Wells Fargo ATMs display the bugs of several networks to the left of the screen, including Star, Pulse, MasterCard, Maestro, Cirrus, Plus, and Visa.

45.      Defendants Bank of America, N.A., NB Holdings Corporation, Bank of America Corporation, Chase Bank USA, N.A., JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., Wells Fargo & Company, and Wells Fargo Bank, N.A. (collectively, "Bank Defendants") are members of the Visa and MasterCard networks.  All of the Bank Defendants are actual or potential competitors for the provision of ATM services.  All of the Bank Defendants belong to both networks, have periodically served on the board of directors of each Network Defendant, and have conspired with each other and with the Network Defendants to fix ATM Access Fees.

## VI.   NON-PARTY BANK CO-CONSPIRATORS

46.     The Network Defendants are descendants of bankcard associations formerly jointly owned and operated by a majority of the retail banks in the United States.  Visa, Inc. became a publicly held corporation after an initial public offering of its stock began trading on the New York Stock Exchange on March 18, 2008.  MasterCard, Inc. became a publicly held corporation after an initial public offering of its stock began trading on the exchange on May 24, 2006.   Nonetheless, banks continue to hold non-equity membership interests in the Network Defendants' subsidiaries and the largest among them also hold equity interests and seats on the Network Defendants' boards of directors.

47.     The Network Defendants continue to refer to their bank customers as "members" of Visa and MasterCard and continue to operate principally for the benefit of their member banks.  The unreasonable restraints of trade in this case are horizontal agreements among the Bank Defendants and the Network Defendants, and their members, to adhere to rules and operating regulations that require ATM Access Fees to be fixed at a certain level.  These restraints originated in the rules of the former bankcard associations agreed to by the banks themselves.  By perpetuating this arrangement, the banks collectively have ceded power and authority to the Network Defendants to design, implement, and enforce a horizontal price-fixing restraint in which they are knowing participants.

48.     In short, the violation in this case is a horizontal agreement among every bank that is a member of the Visa and/or MasterCard networks that charges ATM Access Fees on Foreign ATM Transactions.  These co-conspirators are collectively referred to herein as the "Bank Co-Conspirators."

## VII.   OTHER NON-PARTY CO-CONSPIRATORS

49.     Various persons, partnerships, firms, and corporations not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offense alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal combination and conspiracy.

## VIII.   TRADE AND INTERSTATE COMMERCE

50.      "PIN debit payment cards" are issued by banks and depository institutions, including the Bank Defendants and Bank Co-Conspirators, and are utilized in an enormous volume of ATM transactions involving a substantial dollar amount of commerce.  These cards are marketed, sold and used in the flow of interstate commerce.  A PIN debit payment card is any card that requires entry of a "personal identification number," a cardholder's unique 4-digit code, to authenticate a debit transaction at the point of the transaction.

51.     During the relevant period, the Bank Defendants and the Bank Co-Conspirators issued Visa and MasterCard PIN debit payment cards.

52.     Visa provides ATM services for cards branded with the Visa, Visa Electron, Interlink, and PLUS service marks at ATMs and terminals connected to the Visa, PLUS, and Interlink networks.  In 2007, U.S. cardholders used Visa's PIN-based platform to access $395 billion in cash.

53.     MasterCard provides ATM services for cards branded with the MasterCard, Maestro or Cirrus service marks at ATMs and terminals participating in the MasterCard Worldwide Network.  Excluding Cirrus- and Maestro-branded cards, cardholders used MasterCard-branded cards to access $202 billion in cash in the U.S. in 2007.

## IX.   FACTUAL BACKGROUND

**A.   PIN Debit Cards and ATM Transactions**

54.   ATM transactions are initiated by use of a PIN debit card.  PIN debit cards include "pay now," "pay later," and "pay before" cards.  "Pay now" cards allow a cardholder to effect an automatic debit from a checking, demand deposit, or other financial account.  A "pay later" card requires payment within an agreed-upon period of time.  Finally, "pay before" cards are pre-funded up to a certain monetary value.

55.   All ATM transactions are PIN debit transactions, and only cards with PIN debit capability may be used in an ATM.   For purposes of this Complaint, any payment card that can be used in an ATM is referred to as a "Debit Card."

56.   A debit cardholder can obtain cash, monitor account balances, or transfer balances at an ATM.  Some ATMs also accept deposits or dispense items of value other than cash, such as stamps or travelers checks.

57.   An overwhelming majority of Debit Cards issued by the Bank Defendants and the Bank Co-Conspirators, and used for ATM transactions, are Visa- or MasterCard-branded bank account-linked PIN Debit Cards.

58.   Some but not all Visa- and MasterCard-branded PIN debit cards are capable of effecting cash withdrawals over non-Visa and non-MasterCard EFT networks, including Star (owned by First Data), Pulse (Discover Card), NYC Payment Network LLC, ACCEL/Exchange Network, Credit Union 24, Co-op Financial Services, Shazam Inc., Jeanie, and TransFund.  When Visa- and MasterCard-branded cards offer access to one or more of these alternative PIN-debit networks, the reverse side of the card bears a service mark, or "bug," belonging to the alternative network.  In addition, ATMs routinely display the networks they can access.  As

explained further below, Visa and MasterCard have sought to limit or eliminate the "bugs" on the back of branded PIN debit cards, in order to steer more traffic to their networks.

59.     When an ATM has access to multiple networks that match the bugs on the customer's card, the ATM operator's processor can and will choose the Network over which to route the transaction.  The ATM operator can and will automatically choose the network that it expects will pay the ATM the highest net interchange fee.

**B.     Foreign ATM Transactions**

60.     Foreign ATM Transactions involve a customer of one bank withdrawing money from his or her account by using an ATM owned and/or operated by another bank.

61.     Such Foreign ATM Transactions involve four parties:  (1) the "cardholder," *i.e.*, the customer who retrieves money from the ATM machine; (2) the "card-issuer bank," *i.e.*, the bank at which the customer holds an account and from which the customer has received an ATM card; (3) the ATM Operator, *i.e.*, the bank that owns or operates the ATM machine from which the customer withdraws money from his account; and (4) the "ATM network," *i.e.*, an entity that owns a network that connects ATM Operators with the card-issuing banks.

62.     The ATM network administers agreements between various card-issuer banks and ATM Operators and thereby ensures that customers can withdraw money from one network member's ATM as readily as from another.

63.     A single Foreign ATM Transaction may generate up to five fees.  Generally, a customer will pay two fees, which are automatically withdrawn from the customer's account – one to the ATM Operator for use of that entity's ATM machine, *i.e.*, the Surcharge or ATM Access Fee, and one to the bank at which he has an account, *i.e.*, the Foreign ATM Fee.  The card-issuer bank also pays two fees.  It pays a "Switch Fee" to the ATM network that routed the

transaction.  It also pays an "Interchange Fee" to the owner of the foreign ATM.  The acquiring

bank may also pay an "acquiring fee" to the network.

64.     The following table, from a study by the GAO titled "Automated Teller

Machines," Report No. 13-266, describes the fees involved in an ATM transaction, who pays

them, and who receives them:

**Table: Fees Paid by Consumers, Financial Institutions, and ATM Owners to Process ATM Transactions**

| Fee | Who pays | Who receives | Description |
|---|---|---|---|
| Surcharge fee | Consumer | ATM owner | Paid to the ATM owner by the consumer when using an ATM not owned by his or her financial institution. |
| Foreign fee | Consumer | Consumer's financial institution | Paid to the consumer's financial institution by the consumer when using an ATM not owned by the card-issuing financial institution. |
| Interchange fee | Consumer's financial institution | ATM owner | Paid to the ATM owner for the costs of operating and maintaining the ATM. |
| Switch fee | Consumer's financial institution | EFT networks | Paid to the EFT networks for routing transaction information over the network. |
| Acquiring fee | ATM owner | EFT networks | Paid to the EFT networks for the use of the network by the ATM owner. |

65.     In the past, ATM fees were limited to Interchange Fees and Foreign ATM Fees.

ATM Operators were prohibited from charging cardholders for the ATM service they were

providing.  They received only the fixed Interchange Fees that the ATM networks set and the

card-issuer banks paid.

66.     Beginning in 1996, state laws and network rules (including those of Visa and

MasterCard) prohibiting ATM operators from charging access fees were abolished.  Access fees

allowed these ATMs to recover the cost of providing ATM services.  ATM screens would

disclose the amount of the Surcharge and, with the cardholder's approval, the ATM Operator

would add the surcharge to the amount of cash withdrawn, which would be debited against the

cardholder's account at his bank.

67.     All the Bank Defendants and the Bank Co-Conspirators impose Surcharges, or

ATM Access Fees, at their ATM terminals for Foreign ATM Transactions.

## C.     ATM Networks

68.     Generally, banks participate in ATM networks, such as the Visa or MasterCard

PIN-based networks.  While a bank can deploy its own ATMs, the advantage in participating in

an ATM network is that a bank's depositors are thereby able to use ATMs at many more

locations than one bank alone could support.  A bank must offer access to other banks' ATMs to

provide its customers with convenient access to their accounts.  Visa and MasterCard provide the

only networks with nationwide reach.

69.     To accept a Visa- or MasterCard-branded PIN Debit Card, the ATM Operator

must have access to the Visa or MasterCard PIN-based networks.  As members of Visa or

MasterCard, the Bank Defendants and the Bank Co-Conspirators have access to their PIN-based

networks for bank-operated ATMs.  By contrast, "non-banks," such as independent ATM

operators and firms that provide the equipment and physical infrastructure for the authentication,

clearing, or settlement of transactions ("processors") ("ISOs"), are not Visa or MasterCard

members.  Before being granted access to the networks, therefore, a non-bank first must be

sponsored by a "sponsoring financial institution," or must affiliate itself with a sponsored entity.

Sponsoring institutions are Visa or MasterCard member banks that specialize in providing

Independent ATM Operators with access to the Visa and MasterCard PIN-based networks.

70.     ATM networks began in the 1970s as proprietary networks of single banks, which

only one bank's customers could access.  Banks soon realized that by sharing ATMs, they could

spread the costs of the machines over more customers and transactions, and increase convenience

to their customers.  The first shared ATM networks were mostly joint ventures of banks in

various regions of the country.  The number of ATM networks increased rapidly, peaking in 1986 at close to 200.

71.     Larger networks began to appear in the 1980s, and offered the promise of economies of scale, beginning a trend of consolidation that has continued to this day.  The largest networks were the Plus and Cirrus networks, which Visa and MasterCard acquired in the mid-1980s in order to control the PIN debit market.  They wanted to fend off competition from growing ATM networks that promoted PIN debit as a safer, faster and cheaper method of retail payment, threatening Visa and MasterCard's revenue from their high-interchange credit cards.  Visa and MasterCard wished to displace PIN debit with "signature debit," an offline form of payment more akin to credit cards, which would pay high interchange fees to Visa and MasterCard, instead of paying (lower) interchange fees to merchants.

72.     In 1990, the Plus and Cirrus networks entered an agreement of "duality," by which an ATM owner could belong to just one of the networks and process withdrawals for cardholders of the other without having to pay additional fees.  This agreement encouraged ATMs to end their relationships with regional networks, resulting in further consolidation.

73.     Visa and MasterCard have a long history of anticompetitive practices intended to generate higher fees for them.  They imposed an "Honor All Cards" rule on retailers, forcing them to accept their high-priced signature debit cards, if they also wanted to process Visa and MasterCard credit cards.  In 2003, retailers obtained a $3 billion settlement against Visa and MasterCard, requiring them to drop their Honor All Cards rule, and lower interchange fees for signature debit transactions.  MasterCard acknowledged in a 2010 SEC filing, "our business and revenues could be impacted adversely by the tendency among U.S. consumers and merchants to

migrate from offline, signature-based debit transactions to online, PIN-based debit transactions because we generally earn less revenue from the latter types of transactions."

74.    An overwhelming majority of cards used for ATM transactions are Visa- or MasterCard-branded account-linked PIN-debit cards.  As VISA states on page 17 of its Form 10-K, filed with the U.S. Securities and Exchange Commission for the fiscal year ended September 30, 2010, "[i]n the debit card market segment, Visa and MasterCard are primary global brands." By 2002, Visa and MasterCard networks extended to almost every ATM in the country.  ATM operators essentially have no choice but to maintain access to Visa and MasterCard networks, or they will have to turn away an increasing percentage of customers, whose cards cannot access any other network, or can only access networks that the ATM cannot.

75.    Some ATM transactions using Visa- and MasterCard-branded PIN Debit Cards may be completed over alternative networks originally designed for electronic fund transfers ("ETFs").  Visa- and MasterCard-branded cards that offer access to an alternative PIN Debit network indicate as much on the reverse side of the card, in the form of a service mark belonging to the alternative network, such as STAR, NYCE Payment Network LLC, ACCEL/Exchange Network, Credit Union 24, CO-OP Financial Services, Shazam Inc., Jeanie, or TransFund.

**D.    Defendants' Horizontal Conspiracy**

76.    The Bank Defendants and the Bank Co-Conspirators, members of the Visa and MasterCard networks, have colluded with Visa and MasterCard to increase the ATM access fees charged to consumers.  They have effectuated this scheme through two primary actions:  routing more transactions over Visa and MasterCard's networks, and restricting any ATM from offering discounts for transactions completed using competing networks.

77.    The Visa Plus System, Inc. Operating Regulations sets forth the following restraint on the exercise of discretion by ATM Operators to charge an ATM Access Fee they deem commercially appropriate:

**4.10A Imposition of Access Fee**

An ATM Acquirer may impose an Access Fee if:

It imposes an Access Fee on all other Financial Transactions through other shared networks at the same ATM;

The Access Fee is not greater than the Access Fee amount on all other Interchange Transactions through other shared networks at the same ATM ....

78.    Similarly, MasterCard's Cirrus Worldwide Operating Rules (current edition December 21, 2012) applicable to the United States Region (Chapter 20) sets forth the same restraint on the exercise of discretion by ATM Operators to set ATM Access Fees as they deem commercially appropriate:

**7.14.1.2 Non-Discrimination Regarding ATM Access Fees**

An Acquirer must not charge a ATM Access Fee in connection with a Transaction that is greater than the amount of any ATM Access Fee charged by that Acquirer in connection with the transactions of any other network accepted at that terminal.

79.    Defendants' horizontal conspiracy is rooted in the historical context in which the Network Defendants emerged as described more fully below.  In sum, Visa and MasterCard are descendants of bankcard associations formerly jointly owned and operated by a majority of the retail banks in the United States, including the Bank Defendants and the Bank Co-Conspirators. The Network Defendants continue to operate principally for the benefit of these member banks.

80.    Visa and MasterCard adopted the Restraints when they were still associations of member banks, and those banks owned virtually all ATMs.  The purpose behind the Restraints was to relieve banks of the rigors of competition, and to thwart price competition from

independent ATMs, after ATM access fees were first permitted in 1996.  In this way, banks were assured that their MasterCard customers would not have to pay more in fees than their Visa cardholders, and they would not face competition at the network level.  Visa and MasterCard exploited their position as nationwide networks to collect more fees, pay ATMs less in net interchange to process transactions, and contain the growth of rival ATM networks.

81.     The unreasonable restraints of trade in this case are horizontal agreements among the Bank Defendants and the Bank Co-Conspirators to adhere to rules and operating regulations that require ATM Access Fees to be fixed at a certain level.  As discussed above, these restraints originated in the rules of the former bankcard associations agreed to by the banks themselves.

82.     The Bank Defendants and the Bank Co-Conspirators have perpetuated this arrangement, in agreement with the Network Defendants, to enforce a horizontal price-fixing arrangement for their mutual benefit.

83.     In conjunction with the Restraints, Visa and MasterCard have consistently encouraged issuers to maintain "single-bug" cards, and reduce or eliminate their customers' access to alternative networks.  In 1996, in consultation with Arthur Andersen, Visa devised the "Deposit Access 2001 Mainstreaming Debit Strategy," which called for Visa to meet with the top five or six banks issuing debit cards and convince them to drop all Regional Network PIN debit marks from their debit cards.  In 1998, Visa and Bank of America agreed that Bank of America would promote only Visa-branded debit cards, and exclude regional networks, in exchange for an undisclosed sum from Visa.  A year later, Bank of America dropped the Regional Network marks from the debit cards it issued in certain regions, and in 2001, dropped STAR from all of its approximately 18 million debit cards.

84.     On its website, Visa openly encourages banks to use only Visa, stating, it is "The Only Network You Need."  It further states, "When you consolidate your ATM activity under the Visa®/Plus® brand mark, you're not just reducing costs and simplifying operations, you're meeting your cardholders' highest service expectations."  Visa makes clear that banks will provide ATM access "through a single network," and that the bank "[e]liminates redundant costs and procedures associated with participation in multiple ATM networks by consolidating ATM access under the Visa/Plus brand with the Visa/Plus network and a single brand strategy."  In exchange, the bank will obtain "Issuer benefits from favorable switch fees and interchange rates."  In essence, Visa will shift the costs from the bank to the consumer.

85.     Defendants Wells Fargo and Chase have entered similar exclusive deals with Visa.  Wells Fargo states on its website that its debit cards allow consumers to obtain "cash at more than 12,000 Wells Fargo ATMs nationwide and over 1.5 million Visa® and Plus® network ATMs worldwide."  Chase promotes Visa ATM/debit cards on its website and in marketing materials.  As part of their deals with Visa and MasterCard, banks replaced ATM cards with Visa- and MasterCard-branded check cards.

86.     Similarly, MasterCard promotes its branded debit cards to banks, devoid of any rival networks' insignia.  It explains on its website that such cards may be used only at an ATM that displays the MasterCard, Maestro or Cirrus emblem, and provides an ATM locator to help customers find such ATMs.

87.     MasterCard has entered similar deals.  For example, Capital One and Fifth Third banks offer MasterCard debit cards, with no competing bugs on the back.

88.     Visa and MasterCard pay ATM operators the lowest net interchange fees of any major network.  Visa and MasterCard promise issuing banks lower interchange rates if they

agree to direct more or all of their customers' withdrawals through Visa and MasterCards'

networks.  ATM Operators have no choice but to accept Visa and MasterCard's low net

interchange rates.  The only way they can make up the difference is by raising access fees.

89.     MasterCard announced a dramatic reduction in net interchange fees in 2010.

Cardtronics, the largest non-bank owner of ATMs, and a major provider of ATMs for retail

businesses, reported in a May 7, 2010 SEC filing that MasterCard's new "tiered" interchange

rate reductions would reduce its gross profit by nearly $2 million during the remainder of the

year.  By paying ATMs less, Visa forced these ATMs to charge customers more in ATM access

fees, for all transactions.

90.     Visa followed MasterCard with a significant reduction in its interchange rate in

the fall of 2011.  One study by Tremont Capital Group found that these changes could result in a

reduction of the net interchange of up to 43 percent, or a loss of between $7.8 million and $11.9

million in domestic interchange income.  The CEO of the ATM Industry Association commented

that this report "show[ed] graphically the scale of economic devastation caused by continuous

and significant interchange reduction in the huge U.S. ATM market.  The fact that this is

happening in times of a national economic crisis is simply an embarrassing and sad reflection on

how the industry is currently being unfairly dominated."

91.     Data demonstrating the relative costs of ATM transactions over the various

networks is not made public by the networks, or by banks.  However, Plaintiffs have a good-faith

basis to believe that the following table, which summarizes three disparate sets of data from

ATM operators covering the year 2012, one for the month of October 2012, and one for the

month of February 2013, provides a reasonable approximation of the variation in net-per-

transaction interchange revenue received by a typical ATM ISO after deduction for network

services fees, and may also approximate the relative interchange paid to acquiring banks.

| | Data Set #1 - 2012 | | | Data Set #2 – October 2012 | | | Data Set #3 - February 2013 | | |
|---|---|---|---|---|---|---|---|---|---|
| | tl # txns | network fee $ | net intchg $ | tl # txns | network fee $ | net intchg $ | tl # txns | network fee $ | net intchg $ |
| MC* | 28.0% | 0.34 | 0.06 | 15.7% | 0.18 | 0.29 | 27.0% | 0.41 | 0.05 |
| VISA** | 31.5% | 0.22 | 0.21 | 25.4% | 0.18 | 0.29 | 27.0% | 0.33 | 0.17 |
| PULSE | 9.2% | 0.00 | 0.28 | 2.4% | 0.04 | 0.46 | 11.2% | 0.00 | 0.28 |
| NYCE | 6.6% | 0.00 | 0.36 | 3.3% | 0.03 | 0.48 | 8.4% | 0.00 | 0.38 |
| STAR | 12.1% | 0.05 | 0.39 | 30.9% | 0.04 | 0.51 | 15.1% | 0.07 | 0.38 |
| EXCHANGE Network | 4.4% | 0.00 | 0.41 | 20.1% | 0.00 | 0.52 | 6.8% | 0.00 | 0.42 |
| Armed Forces Fin Network | 6.6% | 0.00 | 0.44 | 2.1% | 0.02 | 0.52 | 3.2% | 0.00 | 0.44 |
| Credit Union 24 | 1.7% | 0.00 | 0.54 | 0.04% | 0.00 | 0.67 | 1.3% | 0.00 | 0.54 |

92.     In the table, "MC" reflects the average of ATM data for all MasterCard networks,

including Maestro International, MasterCard International, Cirrus International, Cirrus, Maestro

and Cirrus MasterCard.  "Visa" reflects the average of all ATM data for all Visa networks,

including Plus, Plus International, Plus International (Canada), VisaNet, Visa International, Visa

International (Canada).  The figures are averages.  Important to note is that transactions over

Visa and MasterCard's international networks can bear a *negative* interchange, resulting in a net

additional cost of ATM ISOs.  Visa and MasterCard's rules prohibit registered ISOs from

refusing international transactions, so they are included in the average interchange.

93.     High network fees by Visa and MasterCard (charged to the acquiring bank) result

in significantly lower net interchange from the networks to the ATM.  Visa and MasterCard

remit the lowest net interchange of any of the networks.

### X.    ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY RESULTING FROM THE RESTRAINTS

94.     The Restraints harm competition in many ways.  By restricting the networks' ability to price their services as they see fit, Defendants protect themselves from competition at the expense of independent ATMs and ATM customers.

95.     Because of the Restraints, ATM Operators cannot offer discounts or any other benefit or inducement to persuade consumers to complete their transactions over competing, lower cost PIN-based networks, nor do ATM Operators offer any kind of rebate or benefit that might circumvent the fixed ATM Access Fees imposed by the networks' rules.

96.     Because the ATM restraints break the essential economic link that would exist in a reasonably competitive market between the price a consumer is charged for a service and the cost to the seller of providing it, they extinguish the incentive of cardholders to demand, and providers of ATM services to provide, lower-cost, more efficient services.

97.     In a competitive market, ATMs would be able to make up the cost of low interchange rates differentially.  ATMs already route the transaction over the network that best offsets their costs.  But they have to charge the same amount for a withdrawal processed over the Credit Union 24 network, which may pay 67 cents in net interchange, as they charge for MasterCard, which may pay only 5 cents.  The ATM has to raise its charge for the Credit Union 24 withdrawal to a level that will allow it to balance out the close-to-zero compensation it is receiving from MasterCard.  Because the ATM has to charge more for competitor networks' transactions than it otherwise would, their service is less attractive to consumers, volumes drop, increasing the ATM cost per transaction, which also causes a rise in access fees.  Competitor networks obtain less competitive benefit for pricing competitively, and they lose volume to Visa and MasterCard, who have roped off a larger share of the market with their single-bug cards.

Customers have no reason to desire a card that works over multiple networks and results in lower access fees, because they see no difference in price, so they accept the single-bug debit card that they are issued.

98.     This horizontal conspiracy is only effective because the Bank Defendants and Bank Co-Conspirators know that their competitors are also complying.  It would be contrary to any one bank's self-interest independently to agree to the Restraints, unless it knew that its competitors were also agreeing to it.  A bank that was not bound by the Restraints could charge lower prices for transactions conducted over networks that pay a higher net interchange fee, and attract customers away from banks that complied with the Restraints.  In any event, it appears that even if any bank were inclined to violate the Restraints, Visa and MasterCard could easily and readily detect it, and would terminate or take other action against such a violator.

99.     Indeed, in 2012, ATM access fees broke all prior records.  An April 2013 Government Accountability Office report, titled "AUTOMATED TELLER MACHINES: Some Consumer Fees Have Increased," found a dramatic increase in ATM access fees over the last five years, from $1.75 in 2007 to $2.10 in 2012, a 20 percent increase.  The report found that large banks were more likely to charge higher access fees than community banks or credit unions. "This report makes clear that consumers are facing ever increasing fees to access their own money.  A consumer could pay as much as $5.00 to $10.00 dollars each time they use an ATM, and these fees could be particularly difficult to avoid in rural and underserved areas.  These fees are outrageous, are anti-consumer, and they need to be reined in," said Senator Tom Harkin, commenting on the study.

100.     The financial research firm Bankrate.com recently confirmed that ATM access fees rose for the eighth straight year, up 4% to an all-time record high of $2.50.

101.    As a result of Defendants' exclusionary practices, Visa and MasterCard's share of the ATM services market has grown.  According to the EFT Data Book, 2006 edition, the Visa/Plus network had a 14.9% share of transactions in March 2005, growing to 18.2% in March 2006.  By 2012, Visa's market share had roughly doubled from its 2005 level, according to data obtained from ATM operators.  MasterCard nearly equaled Visa's market share, in data collected in February 2013.

102.    If the Restraints were eliminated, as Plaintiffs demand in this suit, competition would return to the market for ATM access fees, and for network services.

103.    First, the ATM could charge differentially based on the network that best offsets its costs, bringing its access fee closer to its cost for each transaction.  Because ATM operators' costs are largely fixed – they incur little cost per additional transaction – their profitability is highly dependent on volume of customers.  ATM Operators would advertise their lower access fees to attract customers.  The ATMs would attract more customers, and their cost per transaction would decrease, allowing them to charge even less.  Thus, they would have every incentive to price as low as they could to compete for business with nearby ATMs and banks.

104.    Second, ATM networks would compete for transactions by offering ATMs higher net interchange.  ATM networks could advertise to customers to demand that banks add their "bug" to their debit cards in order to pay lower transaction fees.  Single-bug cards would become multiple-bug cards.

105.    It is clear that customers are highly attuned to bank fees, even more since the federal government bailed out the banks in 2008.  A 2012 J.D. Power and Associates report found that fees were the number one reason customers shopped for a new primary bank, and one-third of customers of big and large regional banks cited fees as the main reason.  "It is apparent

that new or increased fees are the proverbial straws that break the camel's back," stated Michael

Beird, director of the banking services practice at J.D. Power and Associates.

106.    Third, Visa and MasterCard would have to compete with the other networks for

ATM volume, and would lower their prices.  Even the *threat* of price competition would result in

lower ATM access fees.

107.    Fourth, the higher volume of lower-priced services reflects more convenience for

consumers, and more economic activity, both central goals of the antitrust laws.

## XI.    THE ELEMENT OF AGREEMENT

108.    The Network Defendants are descendants of bankcard associations formerly

jointly owned and operated by a majority of the retail banks in the United States.  Visa, Inc.

became a publicly held corporation after an initial public offering ("IPO") of its stock began

trading on the New York Stock Exchange on March 18, 2008.  MasterCard, Inc. became a

publicly held corporation after its IPO on May 24, 2006.

109.    From the beginning of their existence until their IPOs, the Network Defendants

and their predecessor entities' member banks elected a Board of Directors, composed exclusively

or almost exclusively of competing member banks.  That Board of Directors in turn established,

approved, and agreed to adhere to rules and operating regulations that required all member banks

to fix ATM Access Fees at a certain level ("ATM Access Fee Restraints").

110.    Prior to the Network Defendants' IPOs, each bank member of the Visa and

MasterCard networks was a member of a horizontal agreement in the form of the Restraints, and

they knew that the Restraints would continue after the Network Defendants' respective IPOs.

111.    In 1998, the Antitrust Division of the Department of Justice sued Visa and

MasterCard alleging that the joint governance of the two networks and certain rules that

prevented banks from issuing cards on competitive networks (the "exclusionary rules") violated

Section 1 of the Sherman Act.  After a 34-day trial, the court found that the Visa and MasterCard networks, together with their member banks, implemented and enforced illegal exclusionary agreements requiring any U.S. bank that issued Visa or MasterCard general purpose cards to refuse to issue American Express and Discover cards.  *United States v. Visa USA*, 163 F. Supp. 2d 322, 405-06 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003).

112.    The court concluded that the "exclusionary rules undeniably reduce output and harm consumer welfare," that Visa and MasterCard had "offered no persuasive procompetitive justification for them," and that "the Member Banks agreed not to compete by means of offering American Express and Discover branded cards," that "[s]uch an agreement constitutes an unreasonable horizontal restraint [that] cannot be permitted," and that "these rules constitute agreements that unreasonably restrain interstate commerce in violation of Section 1 of the Sherman Act." *Id.*

113.    In affirming the court's "comprehensive and careful opinion," 344 F.3d at 234, the Second Circuit Court of Appeals explained the crucial role played by the member banks in agreeing to, and abiding by, the Visa and MasterCard versions of the exclusionary rules:

> Visa U.S.A. and MasterCard, however, are not single entities; they are consortiums of competitors.  They are owned and effectively operated by some 20,000 banks, which cooperate with one another in the issuance of Payment Cards and the acquiring of Merchant's transactions. These 20,000 banks set the policies of Visa U.S.A. and MasterCard.  These competitors have agreed to abide by a restrictive exclusivity provision to the effect that in order to share the benefits of their association by having the right to issue Visa or MasterCard cards, they must agree not to compete by issuing cards of American Express or Discover.  The restrictive provision is a horizontal restraint adopted by 20,000 competitors.

114.    Similar to the exclusionary rules at issue in *United States v. Visa, U.S.A.*, the ATM Access Fee Restraints at issue in this case are horizontal agreements among the Bank

Defendants, and later the Network Defendants, to adhere to rules and operating regulations that require ATM Access Fees to be fixed at a certain level.

115.     After being adjudicated "structural conspiracies" in the United States, the European Union, the United Kingdom, and several other jurisdictions, the Network Defendants took steps to restructure themselves in an attempt to remove their conspiratorial conduct from Section 1 of the Sherman Act and equivalent laws in foreign jurisdictions that prohibit agreements among competitors.

116.     On May 22, 2006, MasterCard completed its IPO.  The resulting entity acquired certain of its member banks' ownership and control rights in MasterCard through the redemption and reclassification of stock that was previously held by the member banks.  To date, the member banks retain a significant financial and equity interest in MasterCard.

117.     Similarly, on March 19, 2008, Visa completed its own IPO.  Under a series of transactions, Visa redeemed and reclassified approximately 270 million shares of Visa stock previously held by the member banks.  To date, the member banks retain a significant financial and equity interest in Visa.

118.     Following the IPOs, the Network Defendants continue to refer to their bank customers as "members" of Visa and MasterCard.  By perpetuating the ATM Access Fee Restraints, the banks collectively have accorded the Network Defendants, in whom they have a significant financial interest, the authority to design, implement, and enforce a horizontal price-fixing restraint in which they are knowing participants.

119.     Both prior to, and after the Network Defendants' IPOs, each bank which was a member of the Visa or MasterCard Networks, knew and understood that it and each and every other member of the applicable network would agree or continue to agree to be bound by the

ATM Access Fee Restraints.  Indeed, as discussed *infra*, it was and is in the member banks' best interest to agree or continue to agree to be bound by the ATM Access Fee Restraints.

120.    In short, the violation in this case is a horizontal agreement among every bank that is a member of the Visa and/or MasterCard networks that charges ATM Access Fees on Foreign ATM Transactions.  These co-conspirators are collectively referred to herein as the "Bank Co-Conspirators."

## XII.    THE RELEVANT MARKET

121.    Plaintiffs allege a *per se* violation of the antitrust laws.  For this reason, there is no need to plead a relevant product or geographic market.

122.    To the extent it is required, Plaintiffs allege that the relevant product market is the market for ATM cash withdrawal services.  No cost-effective alternative to ATM cash withdrawal services exists, and there are few substitutes.  The market for ATM services is a separate and distinct relevant product market for the purposes of 15 U.S.C. § 1.

123.    The relevant geographic market is comprised of the United States and its territories and possessions.

## XIII.    DEFENDANTS' MARKET POWER

124.    Plaintiffs allege a *per se* violation of the antitrust laws.  For this reason, there is no need to plead market power.  To the extent it is required, Plaintiffs allege as follows.

125.    The Bank Defendants represent the largest of the nation's consumer banking entities and are the leading providers of ATM services.

126.    The Network Defendants represent the largest providers of ATM network processing services in the United States, and the leading brands of PIN debit payment cards.

127.    Through their contracts and agreements, Defendants and their co-conspirators, including the Bank Co-Conspirators, wield considerable market power and control pricing in the

relevant market.  Visa and MasterCard implement and enforce the ATM restraints challenged herein and require compliance with them in their contracts, agreements, rules and undertakings with the Bank Defendants and the Bank Co-Conspirators, who, in turn, secure compliance by their customers and suppliers.  Together, Defendants and their co-conspirators, including the Bank Co-Conspirators, directly exercise their market power through these arrangements to suppress competition in the relevant market.

128.     Defendants' direct exercise of market power constrains all consumers of ATM services and results in supra-competitive ATM Access Fees.  Defendants actively monitor and vigorously enforce the ATM restraints.  Consumers of ATM services must accept and agree to pay inflated and supra-competitive ATM Access Fees as a condition of withdrawing money in Foreign ATM Transactions.

129.     Defendants and the Bank Co-Conspirators maintain their market power in light of the insurmountable barriers to entry faced by potential competitors.

## XIV.   NATIONWIDE DIRECT PURCHASER CLASS ALLEGATIONS

130.     Plaintiffs bring this action under Fed. R. Civ. P. 23(a), (b)(2) and (3), on behalf of themselves and the following class (hereinafter, "Nationwide Direct Purchaser Class"):

> All individuals and entities that paid an ATM Access Fee for a Foreign ATM Transaction directly to any Bank Defendant or Bank Co-Conspirator at any time on or after October 1, 2007 until such time as Defendants' unlawful conduct ceases.

131.     Excluded from the Indirect Purchaser Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state, or local governmental entities, any judicial presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

132.     The members of the Nationwide Direct Purchaser Class are so numerous that joinder of all members is impracticable.  Plaintiffs estimate that the number of ATM cardholders forced to pay inflated ATM Access Fees in connection with a Foreign ATM Transaction are at least in the many thousands.  Although the precise number of members of the Nationwide Direct Purchaser Class is currently unknown to Plaintiffs, this information is certainly within the control of the Defendants.  Accordingly, the identity of these Class members can readily be determined from records maintained by Defendants.

133.     Defendants' anticompetitive conduct is substantially uniform and the antitrust violations alleged herein affect Plaintiffs and the proposed Nationwide Direct Purchaser Class in substantially the same manner.  Consequently, common questions of law and fact will predominate over any individual questions of law and fact.  Among the questions of law and fact common to the Nationwide Direct Purchaser Class are:

a.       Whether Defendants have entered into an agreement to artificially fix the prices of all ATM Access Fees charged to Plaintiffs and the Nationwide Direct Purchaser Class;

b.       Whether Defendants possess and exercise market power in the relevant market alleged in this complaint;

c.       Whether the ATM restraints alleged herein cause Plaintiffs and the Nationwide Direct Purchaser Class to pay artificially high ATM Access Fees for Foreign ATM Transactions;

d.       Whether Defendants' ATM restraints are unlawful under Section 1 of the Sherman Act;

e.       The proper measure of damages and the amount thereof sustained by Plaintiffs and the Nationwide Direct Purchaser Class as a result of the violations alleged herein;

f.       Whether Plaintiffs and the Nationwide Direct Purchaser Class are entitled to injunctive relief.

134.     Plaintiffs have claims that are typical of the claims of the Nationwide Direct Purchaser Class and have no interests adverse to or in conflict with the Nationwide Direct Purchaser Class.  Plaintiffs are represented by counsel competent and experienced in the prosecution of class action and antitrust litigation, and will fairly and adequately protect the interests of the Nationwide Direct Purchaser Class.

135.     There is no foreseeable difficulty managing this action as a class action.  Common questions of law and fact exist with respect to all members of the Nationwide Direct Purchaser Class and predominate over any questions solely affecting individual members.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many class members who could not afford to individually litigate an antitrust claim against large corporate Defendants.  There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

136.     The anticompetitive conduct of Defendants alleged herein has imposed a common antitrust injury on the members of the Nationwide Direct Purchaser Class.

137.     Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## XV.   INDIRECT PURCHASER CLASS ALLEGATIONS

138.   In the event that Plaintiffs are held not to be direct purchasers under federal antitrust law, Plaintiffs, in the alternative, allege as follows:

139.   Plaintiffs bring this action against Network Defendants only under Fed. R. Civ. P. 23(a), b(2) and (b)(3) on behalf of themselves and the following class (hereinafter, "Indirect Purchaser Class"):

> All individuals and entities that paid an ATM Access Fee for a Foreign ATM Transaction to any Visa and MasterCard Member Bank at any time on or after October 1, 2007 until such time as the Network Defendants' unlawful conduct ceases.

140.   Excluded from the Indirect Purchaser Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are any federal, state, or local governmental entities, any judicial presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

141.   Plaintiffs will seek certification of the following subclasses (collectively, the "Indirect Purchaser State Classes") for damages for claims under the antitrust statutes and/or consumer protection statutes of each of the following jurisdictions:

a.   **Arizona Indirect Purchaser Class**:  All persons and entities who, as residents of Arizona, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

b.   **California Indirect Purchaser Class**:  All persons and entities who, as residents of California, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

c.     **District of Columbia Indirect Purchaser Class**:  All persons and entities who, as residents of the District of Columbia, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

d.     **Florida Indirect Purchaser Class**:  All persons and entities who, as residents of Florida, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

e.     **Hawaii Indirect Purchaser Class**:  All persons and entities who, as residents of Hawaii, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

f.     **Illinois Indirect Purchaser Class**:  All persons and entities who, as residents of Illinois, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

g.     **Iowa Indirect Purchaser Class**:  All persons and entities who, as residents of Iowa, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

h.     **Kansas Indirect Purchaser Class**:  All persons and entities who, as residents of Kansas, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

i.     **Maine Indirect Purchaser Class**:  All persons and entities who, as residents of Maine, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

j.      **Massachusetts Indirect Purchaser Class**:  All persons and entities who, as residents of Massachusetts, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

k.      **Michigan Indirect Purchaser Class**:  All persons and entities who, as residents of Michigan, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

l.      **Minnesota Indirect Purchaser Class**:  All persons and entities who, as residents of Minnesota, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

m.      **Missouri Indirect Purchaser Class**:  All persons and entities who, as residents of Missouri, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

n.      **Mississippi Indirect Purchaser Class**:  All persons and entities who, as residents of Mississippi, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

o.      **Montana Indirect Purchaser Class**:  All persons and entities who, as residents of Montana, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

p.      **Nebraska Indirect Purchaser Class**:  All persons and entities who, as residents of Nebraska, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

q.   **Nevada Indirect Purchaser Class**:  All persons and entities who, as residents of Nevada, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

r.   **New Hampshire Indirect Purchaser Class**:  All persons and entities who, as residents of New Hampshire, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

s.   **New Mexico Indirect Purchaser Class**:  All persons and entities who, as residents of New Mexico, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

t.   **New York Indirect Purchaser Class**:  All persons and entities who, as residents of New York, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

u.   **North Carolina Indirect Purchaser Class**:  All persons and entities who, as residents of North Carolina, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

v.   **North Dakota Indirect Purchaser Class**:  All persons and entities who, as residents of North Dakota, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

w.   **Oregon Indirect Purchaser Class**:  All persons and entities who, as residents of Oregon, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

x.     **South Carolina Indirect Purchaser Class**:  All persons and entities who, as residents of South Carolina, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

y.     **South Dakota Indirect Purchaser Class**:  All persons and entities who, as residents of South Dakota, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

z.     **Tennessee Indirect Purchaser Class**:  All persons and entities who, as residents of Tennessee, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

aa.     **Utah Indirect Purchaser Class**:  All persons and entities who, as residents of Utah, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

bb.     **Vermont Indirect Purchaser Class**:  All persons and entities who, as residents of Vermont, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

cc.     **West Virginia Indirect Purchaser Class**:  All persons and entities who, as residents of West Virginia, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

dd.     **Wisconsin Indirect Purchaser Class**:  All persons and entities who, as residents of Wisconsin, paid an ATM Access Fee to any Member Bank on or after October 1, 2007.

142.     The members of the Indirect Purchaser State Classes are so numerous that individual joinder of all members is impracticable under the circumstances of this case.

Although the precise number of such persons is unknown, the exact size of each of the Indirect Purchaser State Classes is easily ascertainable, as each class member can by identified by using Defendants' records.  Plaintiffs are informed and believe that there are many thousands of Indirect Purchaser State Class members.

143.    Indirect Purchaser Plaintiffs' claims are typical of the claims of the members of the Indirect Purchaser State Classes in that Indirect Purchaser Plaintiffs are indirect purchasers of ATM services from Member Banks and paid ATM Access Fees, all Indirect Purchaser State Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Indirect Purchaser State Classes.

144.    Defendants' relationships with the members of the Indirect Purchaser State Classes and Defendants' anticompetitive conduct are substantially uniform and the antitrust violation alleged herein affects Plaintiffs in substantially the same manner.  Consequently, common questions of law and fact will predominate over any individual questions of law and fact.  Among the questions of law and fact common to the Indirect Purchaser State Classes are:

a.    Whether Defendants have entered into an agreement to artificially fix the prices of all ATM Access Fees charged to Plaintiffs and the Indirect Purchaser State Classes;

b.    Whether Defendants possess and exercise market power in the relevant market alleged in this complaint;

c.    Whether the ATM restraints alleged herein cause Plaintiffs and the Indirect Purchaser State Classes to pay artificially high ATM Access Fees for Foreign ATM Transactions;

d.    Whether Defendants' ATM restraints are unlawful under the state antitrust and consumer protection statutes alleged herein;

e.  The proper measure of damages and the amount thereof sustained by Plaintiffs and the Indirect Purchaser State Classes as a result of the violations alleged herein;

f.  Whether Plaintiffs and the Indirect Purchaser State Classes are entitled to injunctive relief.

145.  Plaintiffs have claims that are typical of the claims of the class and have no interests adverse to or in conflict with the class.  Plaintiffs are represented by counsel competent and experienced in the payment industry and in prosecution of class action and antitrust litigation and will fairly and adequately protect the interests of the Indirect Purchaser State Classes.

146.  There is no foreseeable difficulty managing this action as a class action.  Common questions of law and fact exist with respect to all members of the Indirect Purchaser State Classes and predominate over any questions solely affecting individual members.  A class action is superior to any other method for the fair and efficient adjudication of this legal dispute because joinder of all members is impracticable, if not impossible.  The damages suffered by most of the members of the Indirect Purchaser State Classes are small in relation to the expense and burden of individual litigation and therefore impractical for such members of the class to individually attempt to redress the antitrust violation alleged herein.

147.  The anticompetitive conduct of Defendants alleged herein has imposed a common antitrust injury on the members of the class.

148.  Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to the Indirect Purchaser State Classes, thereby making appropriate final injunctive relief with respect to the Class as a whole.

**FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:**
**SHERMAN ACT, SECTION 1, 15 U.S.C. § 1**
**(*PER SE* AGREEMENT TO FIX PRICES OR**
**UNREASONABLE RESTRAINT OF TRADE)**

149.     Through the ATM restraints challenged herein, Defendants and the Bank Co-Conspirators have implemented and managed a horizontal agreement to fix prices for ATM Access Fees and to protect and shield themselves from competition from lower-priced ATM services.  Defendants' ATM restraints independently restrain competition and constitute a *per se* violation of Section 1 of the Sherman Act.

150.     Defendants' ATM restraints constitute an agreement that unreasonably restrains competition in the market for ATM services in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The agreements have and will continue to restrain trade in interstate commerce by fixing the price of ATM Access Fees in a manner that prevents ATM customers from using lower-cost ATM network services and protecting Defendants from competition in providing ATM services.  By unlawfully insulating the Visa and MasterCard networks from competition in providing ATM services, the agreements unlawfully increase ATM Access Fees above reasonably competitive levels, reduce output and the number of ATM terminals deployed, harm the competitive process, raise barriers to entry and expansion, and impede innovation and investment.

151.     The ATM restraints are not reasonably necessary to accomplish any pro-competitive goal.  Any efficiency benefit is outweighed by anticompetitive harm and less restrictive alternatives exist by which Defendants could reasonably achieve the same or greater efficiency.

152.     As a result of these violations of Section 1 of the Sherman Act, Plaintiffs and the putative Class have been monetarily injured.  Among other effects, the ATM restraints prevent

Plaintiffs and the proposed Class from paying the lower ATM Access Fees that would result from a competitive market.

153. These violations of the Sherman Act and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted.

154. Plaintiffs and members of the Nationwide Direct Purchaser Class have been and are injured in their business or property by being forced to pay inflated and supra-competitive ATM Access Fees, resulting from Defendants' unlawful imposition of the ATM restraints alleged herein.

**SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:**
**SHERMAN ACT, SECTION 1, 15 U.S.C. § 1**
**(VERTICAL AGREEMENT AMONG VISA, BANK DEFENDANTS, AND BANK CO-**
**CONSPIRATORS TO FIX PRICES OR UNREASONABLE RESTRAINT OF TRADE)**

155. In the event Defendants' ATM restraints are held not to constitute a horizontal conspiracy in restraint of trade, Plaintiffs, in the alternative, allege as follows.

156. The Bank Defendants, along with the Bank Co-Conspirators, entered into separate, but identical express written agreements ("ATM Restraint Agreements") with Visa (pursuant to Section 4.10A of the Visa Operating Agreement) whereby Visa, Bank Defendants and Bank Co-Conspirators explicitly agreed to fix the ATM Access Fee charged for any transaction at a given ATM to be no less than the amount charged at the same ATM for a Visa or MasterCard transaction.

157. As set forth in Paragraphs 1 through 148, Defendants' ATM Restraint Agreements restrain competition in the ATM services market and constitute a violation of Section 1 of the Sherman Act.

158. Defendants' ATM Restraint Agreements unreasonably restrain interbrand competition in the ATM services market in violation of Section 1 of the Sherman Act, 15 U.S.C.

§ 1.  The ATM Restraint Agreements have restrained and will continue to restrain trade in interstate commerce by fixing and inflating the price of ATM Access Fees in a manner that:  (1) prevents ATM operators from varying the ATM Access Fees they charge to reflect differences in the ATM Operators' costs imposed by competing ATM networks; (2) eliminates any incentive for consumers to conduct transactions at ATMs with Pin debit cards that contain service marks of competing lower-cost ATM networks; and (3) protects Visa from competition with other ATM networks in providing ATM network services.  By unlawfully insulating Visa from competition in the ATM network market, the ATM Restraint Agreements unlawfully result in increased ATM Access Fees above reasonably competitive levels, reduce output and the number of ATM terminals deployed, harm the competitive process, raise barriers to entry in the ATM network market, and impede innovation and investment in both the ATM network and ATM services market.

159.    The ATM Restraint Agreements are not reasonably necessary to accomplish any pro-competitive goal and no pro-competitive benefits result from them.  Any efficiency benefit is outweighed by anticompetitive harm and less restrictive alternatives exist by which Visa, Bank Defendants and Bank Co-Conspirators could reasonably achieve the same or greater efficiency.

160.    As a result of these violations of Section 1 of the Sherman Act, Plaintiffs and the Nationwide Direct Purchaser Class have been monetarily injured.  Among other effects, the ATM Restraint Agreements prevent Plaintiffs and the Nationwide Direct Purchaser Class from paying the lower ATM Access Fees that would result from a competitive ATM services market.

161.    These violations of the Sherman Act and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted.

162.    Plaintiffs and members of the Nationwide Direct Purchaser Class have been and are injured in their business or property by being forced to pay inflated and supra-competitive ATM Access Fees, resulting from the anticompetitive effects of the ATM Restraint Agreements alleged herein.

**THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:
SHERMAN ACT, SECTION 1, 15 U.S.C. § 1
(VERTICAL AGREEMENT AMONG MASTERCARD, BANK DEFENDANTS, AND
BANK CO-CONSPIRATORS TO FIX PRICES OR
UNREASONABLE RESTRAINT OF TRADE)**

163.    In the event Defendants' ATM restraints are held not to constitute a horizontal conspiracy in restraint of trade, Plaintiffs, in the alternative, allege as follows:

164.    The Bank Defendants, along with the Bank Co-Conspirators, entered into separate, but identical express written agreements ("ATM Restraint Agreements") with MasterCard (pursuant to Section 7.13.1.2 of MasterCard's Cirrus Worldwide Operating Rules ) whereby MasterCard, Bank Defendants and Bank Co-Conspirators explicitly agreed to fix the ATM Access Fee charged for any transaction at a given ATM to be no less than the amount charged at the same ATM for a Visa or MasterCard transaction.

165.    As set forth in Paragraphs 1 through 148, Defendants' ATM Restraint Agreements restrain competition in the ATM services market and constitute a violation of Section 1 of the Sherman Act.

166.    Defendants' ATM Restraint Agreements unreasonably restrain interbrand competition in the ATM services market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The ATM Restraint Agreements have restrained and will continue to restrain trade in interstate commerce by fixing and inflating the price of ATM Access Fees in a manner that:  (1) prevents ATM operators from varying the ATM Access Fees they charge to reflect differences in the ATM Operators' costs imposed by competing ATM networks; (2) eliminates any incentive

for consumers to conduct transactions at ATMs with Pin debit cards that contain service marks of competing lower-cost ATM networks; and (3) protects MasterCard from competition with other ATM networks in providing ATM network services.  By unlawfully insulating MasterCard from competition in the ATM network market, the ATM Restraint Agreements unlawfully result in increased ATM Access Fees above reasonably competitive levels, reduce output and the number of ATM terminals deployed, harm the competitive process, raise barriers to entry in the ATM network market, and impede innovation and investment in both the ATM network and ATM services market.

167.    The ATM Restraint Agreements are not reasonably necessary to accomplish any pro-competitive goal and no pro-competitive benefits result from them.  Any efficiency benefit is outweighed by anticompetitive harm and less restrictive alternatives exist by which MasterCard, Bank Defendants, and Bank Co-Conspirators could reasonably achieve the same or greater efficiency.

168.    As a result of these violations of Section 1 of the Sherman Act, Plaintiffs and the Nationwide Direct Purchaser Class have been monetarily injured.  Among other effects, the ATM Restraint Agreements prevent Plaintiffs and the Nationwide Direct Purchaser Class from paying the lower ATM Access Fees that would result from a competitive ATM services market.

169.    These violations of the Sherman Act and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted.

170.    Plaintiffs and members of the Nationwide Direct Purchaser Class have been and are injured in their business or property by being forced to pay inflated and supra-competitive ATM Access Fees, resulting from the anticompetitive effects of the ATM Restraint Agreements alleged herein.

**FOURTH CLAIM FOR RELIEF AGAINST NETWORK DEFENDANTS:**
**VIOLATIONS OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS**

171.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

172.    Plaintiffs allege the following violations of state antitrust and restraint of trade laws.

173.    <u>Arizona</u>:  By reason of the foregoing, Network Defendants have violated Arizona Revised Statutes, § 44-1401 *et seq.*  The Arizona Indirect Purchaser Class alleges as follows:

a.    Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Arizona; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) members of the Arizona Indirect Purchaser Class were deprived of free and open competition; and (4)  members of the Arizona Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions;

b.    During the Class Period, Network Defendants' illegal conduct substantially affected Arizona commerce.

c.    As a direct and proximate result of Network Defendants' unlawful conduct, members of the Arizona Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Network Defendants entered into agreements in restraint of trade in violation of Arizona Revised Statutes § 44-1401 *et seq.*  Accordingly, the members of the Arizona Indirect Purchaser Class seek all forms of relief available under Arizona Revised Statutes § 44-1401 *et seq.*

174.   <u>California</u>:  By reason of the foregoing, Network Defendants have violated California Business and Professions Code, § 16700 *et seq.*  The California Indirect Purchaser Class alleges as follows:

a.      Network Defendants' contract, combination, trust or conspiracy was entered in, carried out, effectuated and perfected within the State of California, and Network Defendants' conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of the California Indirect Purchaser Class.

b.      Beginning at a time currently unknown to the California Indirect Purchaser Class, but at least as early as October 1, 2007, and continuing thereafter at least up to the filing of this complaint, Network Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of section 16720, California Business and Professions Code.  Network Defendants, and each of them, have acted in violation of section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for ATM Transactions at supra-competitive levels.

c.      The aforesaid violations of section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Network Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for ATM Transactions.

d.      For the purpose of forming and effectuating the unlawful trust, the Network Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not in any way limited to, the acts, practices and course of conduct set forth above, fixing, raising, stabilizing, and pegging the price of ATM Transactions.

e.      The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) price competition in the sale of ATM Transactions has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for ATM Transactions have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California; and (3) those who purchased ATM Transactions directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

f.      As a direct and proximate result of Network Defendants' unlawful conduct, the members of the California Indirect Purchaser Class have been injured in their business and property in that they paid more for ATM Transactions than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Network Defendants' violation of Section 16720 of the California Business and Professions Code, the California Indirect Purchaser Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions Code.

175.   District of Columbia:  By reason of the foregoing, Network Defendants have violated District of Columbia Code Annotated § 28-4501 *et seq.*  District of Columbia Plaintiffs on behalf of the District of Columbia Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) members of the District of Columbia Indirect Purchaser Class were deprived of free and open competition; and (4) members of the District of Columbia Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected District of Columbia commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the District of Columbia Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Annotated § 28-4502 *et seq.* Accordingly, the District of Columbia Indirect Purchaser Class seek all forms of relief available under District of Columbia Code Annotated § 28-4503 *et seq.*

176.    <u>Hawaii</u>:  By reason of the foregoing, Network Defendants have violated Hawaii Revised Statutes, § 480-1 *et seq.*  The Hawaii Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Hawaii; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) members of the Hawaii Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Hawaii Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected Hawaii commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Hawaii Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants entered into agreements in restraint of trade in violation of Hawaii Revised Statutes § 480-1 *et seq.*  Accordingly, the members of the Hawaii Indirect Purchaser Class seek all forms of relief available under Hawaii Revised Statutes § 480-1 *et seq.*

177.    <u>Illinois</u>:  By reason of the foregoing, Network Defendants have violated the Illinois Antitrust Act, Illinois Compiled Statutes, § 740 Ill. Comp. Stat. 10/1 *et seq.*  The Illinois Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Illinois; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) members of the Illinois Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Illinois Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected Illinois commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, the Illinois Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants entered into agreement in restraint of trade in violation of Illinois Compiled Statutes, § 740 Ill. Comp. Stat. 10/1 *et seq.* Accordingly, members of the Illinois Indirect Purchaser Class seek all forms of relief available under Illinois Compiled Statutes, § 740 Ill. Comp. Stat. 10/1 *et seq.*

178.   <u>Iowa</u>:  By reason of the foregoing, Network Defendants have violated Iowa Code § 553.1 *et seq.*  The Iowa Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Iowa; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) the Iowa Indirect Purchaser Class were deprived of free and open competition; and (4) the Iowa Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected Iowa commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Iowa Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of Iowa Code § 553.1 *et seq.*  Accordingly, members of the Iowa Indirect Purchaser Class seek all forms of relief available under Iowa Code § 553.1 *et seq.*

179.   <u>Kansas</u>:  By reason of the foregoing, Network Defendants have violated Kansas Statutes, § 50-101 *et seq.*  The Kansas Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Kansas; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) the Kansas Indirect Purchaser Class were deprived

of free and open competition; and (4) the Kansas Indirect Purchaser Class paid supra-

competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially

affected Kansas commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct,

members of the Kansas Indirect Purchaser Class have been injured in their business and property

and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in

restraint of trade in violation of Kansas Statutes § 50-101 *et seq.*  Accordingly, members of the

Kansas Indirect Purchaser Class seek all forms of relief available under Kansas Statutes § 50-101

*et seq.*

180.    <u>Maine</u>:  By reason of the foregoing, Network Defendants have violated the Maine

Revised Statutes, 10 M.R.S. § 1101 *et seq.*  The Maine Indirect Purchaser Class alleges as

follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1)

price competition for ATM Transactions was restrained, suppressed, and eliminated throughout

Maine; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at

artificially high levels throughout Maine; (3) members of the Maine Indirect Purchaser Class

were deprived of free and open competition; and (4) members of the Maine Indirect Purchaser

Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially

affected Maine commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Maine Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of Maine Revised Statutes 10, § 1101 *et seq.* Accordingly, members of the Maine Indirect Purchaser Class seek all relief available under Maine Revised Statutes 10, § 1101 *et seq.*

181.    <u>Michigan</u>:  By reason of the foregoing, Network Defendants have violated Michigan Compiled Laws § 445.773 *et seq.*  The Michigan Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Michigan; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) members of the Michigan Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Michigan Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected Michigan commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Michigan Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of Michigan Compiled Laws § 445.773 *et seq.*  Accordingly,

members of the Michigan Indirect Purchaser Class seek all relief available under Michigan

Compiled Laws § 445.73 *et seq.*

182.   <u>Minnesota</u>:  By reason of the foregoing, Network Defendants have violated

Minnesota Statutes § 325D.49 *et seq.*  The Minnesota Indirect Purchaser Class alleges as

follows:

a.        Network Defendants' combinations or conspiracies had the following effects:  (1)

price competition for ATM Transactions was restrained, suppressed, and eliminated throughout

Minnesota; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at

artificially high levels throughout Minnesota; (3) members of the Minnesota Indirect Purchaser

Class were deprived of free and open competition; and (4) members of the Minnesota Indirect

Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.        During the Class Period, Network Defendants' illegal conduct substantially

affected Minnesota commerce.

c.        As a direct and proximate result of Network Defendants' unlawful conduct,

members of the Minnesota Indirect Purchaser Class have been injured in their business and

property and are threatened with further injury.

d.        By reason of the foregoing, Network Defendants have entered into agreements in

restraint of trade in violation of Minnesota Statutes § 325D.49 *et seq.*  Accordingly, members of

the Minnesota Indirect Purchaser Class seek all relief available under Minnesota Statutes §

325D.49 *et seq.*

183.   <u>Mississippi</u>:  By reason of the foregoing, Network Defendants have violated

Mississippi Code § 75-21-1 *et seq.*  The Mississippi Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1)
price competition for ATM Transactions was restrained, suppressed, and eliminated throughout
Mississippi; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at
artificially high levels throughout Mississippi; (3) members of the Mississippi Indirect Purchaser
Class were deprived of free and open competition; and (4) members of the Mississippi Indirect
Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially
affected Mississippi commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct,
members of the Mississippi Indirect Purchaser Class have been injured in their business and
property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in
restraint of trade in violation of Mississippi Code § 75-21-1 *et seq.*

e.      Accordingly, members of the Mississippi Indirect Purchaser Class seek all relief
available under Mississippi Code § 75-21-1 *et seq.*

184.   <u>Nebraska</u>:  By reason of the foregoing, Network Defendants have violated
Nebraska Revised Statutes § 59-801 *et seq.*  The Nebraska Indirect Purchaser Class alleges as
follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1)
price competition for ATM Transactions was restrained, suppressed, and eliminated throughout
Nebraska; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at
artificially high levels throughout Nebraska; (3) members of the Nebraska Indirect Purchaser

Class were deprived of free and open competition; and (4) members of the Nebraska Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected Nebraska commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Nebraska Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation Nebraska Revised Statutes § 59-801 *et seq.*  Accordingly, members of the Nebraska Indirect Purchaser Class seek all relief available under Nebraska Revised Statutes § 59-801 *et seq.*

185.    <u>Nevada</u>:  By reason of the foregoing, Network Defendants have violated Nevada Revised Statutes § 598A.010 *et seq.*  The Nevada Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Nevada; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) members of the Nevada Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Nevada Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected Nevada commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Nevada Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of Nevada Revised Statutes § 598A.010 *et seq.*  Accordingly, members of the Nevada Indirect Purchaser Class seek all relief available under Nevada Revised Statutes § 598A.010 *et seq.*

186.    <u>New Hampshire</u>:  By reason of the foregoing, Network Defendants have violated New Hampshire Revised Statutes § 356:1 *et seq.*  The New Hampshire Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout New Hampshire; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) members of the New Hampshire Indirect Purchaser Class were deprived of free and open competition; and (4) members of the New Hampshire Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected New Hampshire commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the New Hampshire Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes § 356:1 *et seq.*  Accordingly, members of the New Hampshire Indirect Purchaser Class seek all relief available under New Hampshire Revised Statutes § 356:1 *et seq.*

187.    <u>New Mexico</u>:  By reason of the foregoing, Network Defendants have violated New Mexico Statutes § 57-1-1 *et seq.*  The New Mexico Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout New Mexico; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) members of the New Mexico Indirect Purchaser Class were deprived of free and open competition; and (4) members of the New Mexico Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected New Mexico commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the New Mexico Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of New Mexico Statutes § 57-1-1 *et seq.*  Accordingly, members of the New Mexico Indirect Purchaser Class seek all relief available under New Mexico Statutes § 57-1-1 *et seq.*

188.   <u>New York</u>:  By reason of the foregoing, Network Defendants have violated New York General Business Laws § 340 *et seq.*  The New York Indirect Purchaser Class alleges as follows:

a.   Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout New York; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) members of the New York Indirect Purchaser Class were deprived of free and open competition; and (4) members of the New York Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.   During the Class Period, Network Defendants' illegal conduct substantially affected New York commerce.

c.   As a direct and proximate result of Network Defendants' unlawful conduct, members of the New York Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of New York General Business Laws § 340 *et seq.*  Accordingly, members of the New York Indirect Purchaser Class seek all relief available under New York General Business Laws § 340 *et seq.*

189.   <u>North Carolina</u>:  By reason of the foregoing, Network Defendants have violated North Carolina General Statutes § 75-1 *et seq.*  The North Carolina Indirect Purchaser Class alleges as follows:

a.   Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout

North Carolina; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) members of the North Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) members of the North Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected North Carolina commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the North Carolina Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of North Carolina General Statutes § 75-1 *et seq.* Accordingly, members of the North Carolina Indirect Purchaser Class seek all relief available under North Carolina General Statutes § 75-1 *et seq.*

190.      <u>North Dakota</u>:  By reason of the foregoing, Network Defendants have violated North Dakota Century Code § 51-08.1-01 *et seq.*  The North Dakota Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout North Dakota; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) members of the North Dakota Indirect Purchaser Class were deprived of free and open competition; and (4) members of the North

Dakota Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the North Dakota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of North Dakota Century Code § 51-08.1-01 *et seq.*  Accordingly, members of the North Dakota Indirect Purchaser Class seek all relief available under North Dakota Century Code § 51-08.1-01 *et seq.*

191.    <u>Oregon</u>:  By reason of the foregoing, Network Defendants have violated Oregon Revised Statutes § 646.705 *et seq.*  The Oregon Indirect Purchaser Class allege as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Oregon; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) members of the Oregon Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Oregon Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct had a substantial effect on Oregon commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Oregon Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes § 646.705 *et seq.*  Accordingly, members of the Oregon Indirect Purchaser Class seek all relief available under Oregon Revised Statutes § 646.705 *et seq.*

192.    <u>South Dakota</u>:  By reason of the foregoing, Network Defendants have violated South Dakota Codified Laws § 37-1-3.1 *et seq.*  The South Dakota Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout South Dakota; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) members of the South Dakota Indirect Purchaser Class were deprived of free and open competition; and (4) members of the South Dakota Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct had a substantial effect on South Dakota commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the South Dakota Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1 *et seq.*  Accordingly, members of the South Dakota Indirect Purchaser Class seek all relief available under South Dakota Codified Laws § 37-1-3.1 *et seq.*

193.    <u>Tennessee</u>:  By reason of the foregoing, Network Defendants have violated Tennessee Code § 47-25-101 *et seq.*  The Tennessee Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) members of the Tennessee Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Tennessee Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct had a substantial effect on Tennessee commerce as products containing ATM Transactions were sold in Tennessee.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Tennessee Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of Tennessee Code § 47-25-101 *et seq.*  Accordingly, members of the Tennessee Indirect Purchaser Class seek all relief available under Tennessee Code § 47-25-101 *et seq.*

194.  <u>Utah</u>:  By reason of the foregoing, Network Defendants have violated Utah Code § 76-10-911 *et seq.*  The Utah Indirect Purchaser Class alleges as follows:

a.  Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Utah; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) members of the Utah Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Utah Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.  During the Class Period, Network Defendants' illegal conduct had a substantial effect on Utah commerce.

c.  As a direct and proximate result of Network Defendants' unlawful conduct, members of the Utah Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of violated Utah Code § 76-10-911 *et seq.*  Accordingly, members of the Utah Indirect Purchaser Class seek all relief available under violated Utah Code § 76-10-911 *et seq.*

195.  <u>Vermont</u>:  By reason of the foregoing, Network Defendants have violated Vermont Stat. Ann. 9 § 2453 *et seq.*  The Vermont Indirect Purchaser Class alleges as follows:

a.  Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Vermont; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) members of the Vermont Indirect Purchaser

Class were deprived of free and open competition; and (4) members of the Vermont Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct had a substantial effect on Vermont commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Vermont Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453 *et seq.*  Accordingly, members of the Vermont Indirect Purchaser Class seek all relief available under Vermont Stat. Ann. 9 § 2453 *et seq.*

196.    <u>West Virginia</u>:  By reason of the foregoing, Network Defendants have violated West Virginia Code § 47-18-1 *et seq.*  The West Virginia Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout West Virginia; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) members of the West Virginia Indirect Purchaser Class were deprived of free and open competition; and (4) members of the West Virginia Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the West Virginia Indirect Purchaser Class has been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of West Virginia Code § 47-18-1 *et seq.*  Accordingly, members of the West Virginia Indirect Purchaser Class seek all relief available under West Virginia Code § 47-18-1 *et seq.*

197.    <u>Wisconsin</u>:  By reason of the foregoing, Network Defendants have violated Wisconsin Statutes § 133.01 *et seq.*  The Wisconsin Indirect Purchaser Class alleges as follows:

a.      Network Defendants' combinations or conspiracies had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices for ATM Transactions were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) members of the Wisconsin Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Wisconsin Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, Wisconsin Plaintiffs and members of the Wisconsin Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Network Defendants have entered into agreements in restraint of trade in violation of Wisconsin Statutes § 133.01 *et seq.*  Accordingly, members of

the Wisconsin Indirect Purchaser Class seek all relief available under Wisconsin Statutes §

133.01 *et seq.*

### FIFTH CLAIM FOR RELIEF AGAINST NETWORK DEFENDANTS:
### VIOLATIONS OF STATE CONSUMER PROTECTION
### AND UNFAIR COMPETITION LAWS

198.    Indirect Purchaser Plaintiffs incorporate by reference the allegations in the above

paragraphs as if fully set forth herein.

199.    Indirect Purchaser Plaintiffs allege the following violations of state consumer

protection and unfair competition laws in the alternative.

200.    Network Defendants engaged in unfair competition or unfair, unconscionable,

deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair

competition statutes listed below.

201.    <u>California</u>:  By reason of the foregoing, Network Defendants have violated

California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*  California

Plaintiffs on behalf of the California Indirect Purchaser Class allege as follows:

a.      Network Defendants committed acts of unfair competition, as defined by section

17200 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of ATM Transactions as

described above.

b.      The acts, omissions, misrepresentations, practices and non-disclosures of Network

Defendants, as described above, constitute a common and continuing course of conduct of unfair

competition by means of unfair, unlawful and/or fraudulent business acts or practices with the

meaning of section 17200 *et seq.*, including, but not limited to (1) violation of Section 1 of the

Sherman Act; (2) violation of the Cartwright Act.

c.     Network Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

d.     Network Defendants' acts or practices are fraudulent or deceptive within the meaning of section 17200 *et seq.*

e.     Network Defendants' conduct was carried out, effectuated, and perfected within the state of California.  Network Defendants maintained offices in California where their employees engaged in communications, meetings and other activities in furtherance of Defendants' conspiracy.

f.     By reason of the foregoing, California Plaintiffs and the California Indirect Purchaser Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Network Defendants as a result of such business acts and practices described above.

202.   <u>Florida</u>:  By reason of the foregoing, Network Defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*  The Florida Indirect Purchaser Class alleges as follows:

a.     Network Defendants' unlawful conduct had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Florida; (2) prices for ATM Transactions were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) members of the Florida Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Florida Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected Florida commerce and consumers.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Florida Indirect Purchaser Class have been injured and are threatened with further injury.

d.      Network Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201 *et seq.*, and, accordingly, members of the Florida Indirect Purchaser Class seek all relief available under that statute.

203.    <u>Hawaii</u>:  By reason of the foregoing, Network Defendants have violated Hawaii Revised Statutes Annotated § 480-1 *et seq.*  The Hawaii Indirect Purchaser Class alleges as follows:

a.      Network Defendants' unlawful conduct had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Hawaii; (2) prices for ATM Transactions were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) members of the Hawaii Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Hawaii Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Hawaii Indirect Purchaser Class have been injured and are threatened with further injury.

d.        Network Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Revised Statutes Annotated § 480-1 *et seq.*, and, accordingly, members of the Hawaii Indirect Purchaser Class seek all relief available under that statute.

204.    <u>Massachusetts</u>:  By reason of the foregoing, Network Defendants have violated the Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1 *et seq.*  The Massachusetts Indirect Purchaser Class alleges as follows:

a.        Network Defendants were engaged in trade or commerce as defined by M.G.L. c. 93A, § 1.

b.        Network Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels, the prices at which ATM Transactions were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from the Massachusetts Indirect Purchaser Class.

c.        Network Defendants' unlawful conduct had the following effects:  (1) price competition for ATM Transactions was restrained, suppressed, and eliminated throughout Massachusetts; (2) the prices of ATM Transactions were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) members of the Massachusetts Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Massachusetts Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions and ATM Transactions.

d.        As a direct and proximate result of Defendants' unlawful conduct, members of the Massachusetts Indirect Purchaser Class were injured and are threatened with further injury.

e.      Each of the Network Defendants or their representatives have been served with a demand letter in accordance with M.G.L. c. 93A, § 1, or such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.  More than thirty days has passed since such demand letters were served, and each Network Defendant served has failed to make a reasonable settlement offer.

f.      By reason of the foregoing, Network Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of M.G.L. c. 93A, § 2.  Network Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling the Massachusetts Indirect Purchaser Class to multiple damages.

205.    <u>Missouri</u>:  By reason of the foregoing, Network Defendants have violated Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020.  The Missouri Indirect Purchaser Class alleges as follows:

a.      Members of the Missouri Indirect Purchaser Class purchased ATM Transactions for personal, family, or household purposes.

b.      Network Defendants engaged in the conduct described herein in connection with the prices at which ATM Transactions were sold, distributed, or obtained in Missouri,

c.      Network Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which ATM Transactions were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to the members of the Missouri Indirect Purchaser Class.

d.     Network Defendants concealed, suppressed, and omitted to disclose material facts to the Missouri Indirect Purchaser Class concerning Network Defendants' unlawful activities and artificially inflated prices for ATM Transactions.  The concealed, suppressed, and omitted facts would have been important to the Missouri Indirect Purchaser Class as they related to the cost of ATM Transactions they purchased.

e.     Network Defendants misrepresented the real cause of price increases and/or the absence of price reductions in ATM Transactions by making public statements that were not in accord with the facts.

f.     Network Defendants' statements and conduct concerning the price of ATM Transactions were deceptive as they had the tendency or capacity to mislead the Missouri Indirect Purchaser Class to believe that they were purchasing ATM Transactions and ATM Transactions at prices established by a free and fair market.  Network Defendants' unlawful conduct had the following effects:  (1) ATM Transaction price competition was restrained, suppressed, and eliminated throughout Missouri; (2) ATM Transaction prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) members of the Missouri Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Missouri Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

g.     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

h.     As a direct and proximate result of the above-described unlawful practices, members of the Missouri Indirect Purchaser Class suffered ascertainable loss of money or property.

i.      Accordingly, members of the Missouri Indirect Purchaser Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010 *et seq.*, 15 CSR 60-8.010 *et seq.*, and 15 CSR 60-9.010 *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

206.    <u>Montana</u>:  By reason of the foregoing, Network Defendants have violated Montana's Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103 *et seq.*  The Montana Indirect Purchaser Class alleges as follows:

a.      Defendants' unlawful conduct had the following effects:  (1) ATM Transaction price competition was restrained, suppressed, and eliminated throughout Montana; (2) ATM Transaction prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) members of the Montana Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Montana Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.      As a direct and proximate result of Network Defendants' unlawful conduct, members of the Montana Indirect Purchaser Class have been injured and are threatened with further injury.

d.      Network Defendants have engaged in unfair competition or unfair or deceptive

acts or practices in violation of Montana's Unfair Trade Practices and Consumer Protection Act,

Mont. Code § 30-14-103 *et seq*. and, accordingly, members of the Montana Indirect Purchaser

Class seek all relief available under that statute.

207.    <u>Nebraska</u>:  By reason of the foregoing, Network Defendants have violated

Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601 *et seq*.  The Nebraska Indirect

Purchaser Class alleges as follows:

a.      Network Defendants' unlawful conduct had the following effects:  (1) ATM

Transaction price competition was restrained, suppressed, and eliminated throughout Nebraska;

(2) ATM Transactions prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout Nebraska; (3) members of the Nebraska Indirect Purchaser Class were

deprived of free and open competition; and (4) members of the Nebraska Indirect Purchaser

Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially

affected Nebraska commerce and consumers.

c.      As a direct and proximate result of Network Defendants' unlawful conduct,

members of the Nebraska Indirect Purchaser Class have been injured and are threatened with

further injury.

d.      Network Defendants' actions and conspiracy have had a substantial impact on the

public interests of Nebraska and its residents.

e.      Network Defendants have engaged in unfair competition or unfair or deceptive

acts or practices in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601

*et seq.* and, accordingly, members of the Nebraska Indirect Purchaser Class seek all relief available under that statute.

208.  <u>New Hampshire</u>:  By reason of the foregoing, Network Defendants have violated New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2 *et seq.*  The New Hampshire Indirect Purchaser Class alleges as follows:

a.  Network Defendants' unlawful conduct had the following effects:  (1) ATM Transaction price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) ATM Transaction prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) members of the New Hampshire Indirect Purchaser Class were deprived of free and open competition; and (4) members of the New Hampshire Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.  During the Class Period, Network Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

c.  As a direct and proximate result of Network Defendants' unlawful conduct, members of the New Hampshire Indirect Purchaser Class have been injured and are threatened with further injury.

d.  Network Defendants' actions and conspiracy have had a substantial impact on the public interests of New Hampshire and its residents.

e.  Network Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2 *et seq.* and, accordingly, members of the New Hampshire Indirect Purchaser Class seek all relief available under that statute.

209.   <u>New York</u>:  By reason of the foregoing, Network Defendants have violated New

York's General Business Law, N.Y. Gen. Bus. Law § 349 *et seq.*  The New York Indirect

Purchaser Class alleges as follows:

a.   Network Defendants agreed to, and did in fact, act in restraint of trade or

commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive

levels, the prices at which ATM Transactions were sold, distributed or obtained in New York

and took efforts to conceal their agreements from the New York Indirect Purchaser Class.

b.   The conduct of the Network Defendants described herein constitutes consumer-

oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which

resulted in consumer injury and broad adverse impact on the public at large, and harmed the

public interest of New York State in an honest marketplace in which economic activity is

conducted in a competitive manner.

c.   Network Defendants made certain statements about ATM Transactions that they

knew would be seen by New York residents and these statements either omitted material

information that rendered the statements they made materially misleading or affirmatively

misrepresented the real cause of price increases for ATM Transactions.

d.   Network Defendants' unlawful conduct had the following effects:  (1) ATM

Transaction price competition was restrained, suppressed, and eliminated throughout New York;

(2) ATM Transactions prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout New York; (3) members of the New York Indirect Purchaser Class were

deprived of free and open competition; and (4) members of the New York Indirect Purchaser

Class paid supra-competitive, artificially inflated prices for ATM Transactions.

e.      During the Class Period, Network Defendants' illegal conduct substantially affected New York commerce and consumers.

f.      During the Class Period, each of the Network Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed ATM Transactions in New York.

g.      Members of the New York Indirect Purchaser Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Without prejudice to their contention that Network Defendants' unlawful conduct was willful and knowing, members of the New York Indirect Purchaser Class do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

210.    South Carolina:  By reason of the foregoing, Network Defendants have violated South Carolina's Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.*  The South Carolina Indirect Purchaser Class alleges as follows:

a.      The South Carolina Indirect Purchaser Class Network Defendants' unlawful conduct had the following effects:  (1) ATM Transaction price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) ATM Transaction prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) members of the South Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) members of the South Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

b.      During the Class Period, Network Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

c.     As a direct and proximate result of Network Defendants' unlawful conduct, members of the South Carolina Indirect Purchaser Class have been injured and are threatened with further injury.

d.     Network Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Revised Statutes Annotated § 480-1 *et seq.*, and, accordingly, members of the South Carolina Indirect Purchaser Class seek all relief available under that statute.

211.   <u>Vermont</u>:  By reason of the foregoing, Network Defendants have violated Vermont's Consumer Fraud Act, 9 Vt. Stat. Ann. § 2451 *et seq.*  The Vermont Indirect Purchaser Class alleges as follows:

a.     Network Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and noncompetitive levels, the prices at which ATM Transactions were sold, distributed, or obtained in Vermont.

b.     Network Defendants deliberately failed to disclose material facts to the Vermont Indirect Purchaser Class concerning Network Defendants' unlawful activities and artificially inflated prices for ATM Transactions.  Network Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Network Defendants breached that duty by their silence.  Network Defendants misrepresented to all consumers during the Class Period that Network Defendants' ODD prices were competitive and fair.

c.     Network Defendants' unlawful conduct had the following effects:  (1) ATM Transaction price competition was restrained, suppressed, and eliminated throughout Vermont;

(2) ATM Transaction prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) members of the Vermont Indirect Purchaser Class were deprived of free and open competition; and (4) members of the Vermont Indirect Purchaser Class paid supra-competitive, artificially inflated prices for ATM Transactions.

       d.      As a direct and proximate result of the Network Defendants' violations of law, members of the Vermont Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Network Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Network Defendants' willful and deceptive conduct, as described herein.

       e.      Network Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of ATM Transactions, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing ATM Transactions at prices born by a free and fair market.  Network Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. Ann. § 2451 *et seq.*, and, accordingly, members of the Vermont Indirect Purchaser Class seek all relief available under that statute.

## XVI.   REQUEST FOR RELIEF

      212.      Accordingly, Plaintiffs pray that final judgment be entered against each Defendant granting the following relief:

       a.      A declaration that this action may be maintained as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure and that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure be given to all members of the Class;

b.      A finding that the combinations and agreements alleged in the Amended Complaint be adjudged and decreed to be per se violations and/or unreasonable restraints of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.      An injunctive order and decree requiring each Defendant to eliminate the ATM restraints and be prohibited from otherwise enforcing them;

d.      An injunctive order and decree that each Defendant be permanently enjoined from fixing or specifying the ATM Access Fee for ATM services or implementing other rules or policies having a similar purpose or effect in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

e.      The Plaintiffs and each member of the Classes recover three-fold their damages as provided by the applicable law as determined to have been sustained by each of them (using such damage methodologies as may be appropriate at trial), and for judgment in favor of Plaintiffs and the Classes be entered against Defendants and each of them in that amount plus interest;

f.      The Plaintiffs and the Classes recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

g.      The Plaintiffs and the Classes be granted such other relief as may be appropriate and as the court deems just and proper.

## XVII.  JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, for all issues triable of right by a jury.

Dated:  April 18, 2013

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By:   */s/ George W. Sampson*
　　　　　George W. Sampson
Steve W. Berman (*pro hac vice*)
Anthony D. Shapiro (*pro hac vice*)
George W. Sampson (*pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
george@hbsslaw.com

**MEHRI & SKALET, PLLC**
Craig L. Briskin (D.C. Bar No. 980841)
1250 Connecticut Avenue NW, Suite 300
Washington, DC  20036
Tel: 202-822-5100
Fax: 202-822-4997
cbriskin@findjustice.com

**HUDSON, MALLANEY, SHINDLER &
　ANDERSON, P.C.**
J. Barton Gopelrud
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265

**THE PAYNTER LAW FIRM PLLC**
Stuart M. Paynter (D.C. Bar # 226147)
1200 G Street N.W., Suite 800
Washington, DC  20005
Telephone:  (202) 626-4486
Facsimile:  (866) 734-0622
stuart@smplegal.com

*Attorneys for Plaintiffs and the Proposed Class*