*Public Redacted Version*                    ~~*Highly Confidential — Subject to Protective Order*~~

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ATM COUNCIL, INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | **Civil Action No. 1:11-cv-01803-RJL** |
| VISA INC., *et al.*, | |
| *Defendants*. | |
| LYNNE BARTRON, *et al.,* | |
| *Plaintiffs*, | |
| v. | **Civil Action No. 1:11-cv-01831-RJL** |
| VISA INC., *et al.*, | |
| *Defendants*. | |
| PETER BURKE, *et al.*, | |
| *Plaintiffs*, | |
| v. | **Civil Action No. 1:11-cv-01882-RJL** |
| VISA INC., *et al.*, | |
| *Defendants*. | |

## VISA AND MASTERCARD DEFENDANTS'
## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION AND
## APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

# ~~FILED UNDER SEAL~~

\

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND .............................................................................................................6

A.   The ATM Industry Is Decentralized, Heterogeneous, and Multi-Faceted .......................6

B.   All Leading ATM Networks Have Non-Discrimination Rules and Most Adopted
     Them Before Visa or Mastercard Did.............................................................................14

C.   ATM Networks Compete Vigorously for Transaction Volume from Both Issuers
     and Acquirers ..................................................................................................................17

D.   Surcharges Have Risen Steadily When Net Interchange Increased or Remained
     Level ...............................................................................................................................22

LEGAL STANDARD......................................................................................................23

ARGUMENT .................................................................................................................26

I.   No Plaintiff Group Can Establish Injury with Common Proof .........................................26

     A.   Plaintiffs Must Show that Class-Wide Injury Can Be Established with
          Common Proof...........................................................................................................26

     B.   Consumer Plaintiffs Cannot Establish Class-Wide Injury with Common
          Proof...........................................................................................................................29

     C.   Operator Plaintiffs Cannot Establish Class-Wide Injury with Common
          Proof...........................................................................................................................43

II.  Plaintiffs' Models Are Invalid Because They Do Not Show Class-Wide
     Antitrust Injury in a Two-Sided Market .........................................................................56

     A.   *Amex* Requires that Competitive Effects Be Assessed on Both Sides of a
          Two-Sided Transaction Platform..............................................................................57

     B.   ATM Networks Are Two-Sided Transaction Platforms.............................................59

     C.   Plaintiffs' Experts Failed to Conduct the Requisite Two-Sided Market
          Analysis......................................................................................................................60

III. Consumer Plaintiffs' Models Do Not Reliably Measure Injury or Damages
     to Individual Cardholders ...............................................................................................65

IV.  The Proposed Classes Are Not Ascertainable or Administratively Feasible.................70

     A.   The Operator Class Is Not Defined by Objective Criteria .................................71

     B.   The Proposed Classes Are Not Administratively Feasible ................................75

\

*Highly Confidential – Subject to Protective Order*

## TABLE OF CONTENTS
### (Continued)

**Page**

V.      The Proposed Classes Do Not Merit Rule 23(b)(2) Certification..................................80

VI.     *Burke* Plaintiffs Are Inadequate Class Representatives..................................82

VII.    *Burke* Plaintiffs Have Failed to Show Their State-Law Claims Can Be
        Resolved on a Class-Wide Basis........................................................................84

CONCLUSION......................................................................................................................84

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Amchem Products, Inc.* v. *Windsor*,
 521 U.S. 591 (1997)......................................................................................26

*Amgen* v. *Connecticut Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013)......................................................................................27

*Artis* v. *Yellen*,
 307 F.R.D. 13 (D.D.C. 2014).........................................................................72

*Blackman* v. *D.C.*,
 633 F.3d 1088 (D.C. Cir. 2011)................................................................24, 80

*Blades* v. *Monsanto Co.*,
 400 F.3d 562 (8th Cir. 2005) .........................................................................24

*Borum* v. *Brentwood Assocs., L.P.*,
 329 F.R.D. 90 (D.D.C. 2019).........................................................................82

*Brewer* v. *Lynch*,
 2015 WL 13604257 (D.D.C. Sept. 30, 2015) ............................................. *passim*

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977)......................................................................................57

*Bynum* v. *District of Columbia*,
 214 F.R.D. 27 (D.D.C. 2013).....................................................................72, 75

*Califano* v. *Yamasaki*,
 442 U.S. 682 (1970)......................................................................................23

*Campbell* v. *Nat'l R.R. Passenger Corp.*,
 311 F. Supp. 3d 281 (D.D.C. 2018)............................................................71, 72

*Carrera* v. *Bayer Corp.*,
 727 F.3d 300 (3d Cir. 2013)..........................................................................71

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013)..................................................................................... *passim*

*Daubert* v. *Merrell Dow Pharm.*,
 509 U.S. 579 (1993)..................................................................................25, 65

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*DL* v. *Dist. of Columbia*,
 302 F.R.D. 1 (D.D.C. 2013)................................................................71

*Ellis* v. *Costco Wholesale Corp.*,
 657 F.3d 970 (9th Cir. 2011) .......................................................25, 65

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014)...........................................................................24

*Hardy* v. *Dist. of Columbia*,
 283 F.R.D. 20 (D.D.C. 2012).............................................................76

*Harris* v. *Koenig*,
 271 F.R.D. 383 (D.D.C. 2010) ...........................................................82

*In re Asacol Antitrust Litigation*,
 907 F.3d 42 (1st Cir. 2018) ...................................................... _passim_

*In re Graphics Processing Units Antitrust Litig.*,
 253 F.R.D. 478 (N.D. Cal. 2008)...................................................38, 69

*In re Hydrogen Peroxide Antitrust Litig.*,
 552 F.3d 305 (3d Cir. 2008)........................................................25, 65

*In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*,
 2019 WL 3021245 (D.D.C. July 10, 2019).....................................71, 72

*In re Processed Egg Prods. Antitrust Litig.*,
 312 F.R.D. 124 (E.D. Pa. 2015)..........................................................67

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
 292 F. Supp. 3d 14 (D.D.C. 2017) ..........................................25, 67, 71

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
 725 F.3d 244 (D.C. Cir. 2013) ..................................................._passim_

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
 934 F.3d 619 (D.C. Cir. 2019) ..........................................25, 27, 28, 29

*In re Text Messaging Antitrust Litig.*,
 46 F. Supp. 3d 788 (N.D. Ill. 2014) .....................................................68

*Karhu* v. *Vital Pharm., Inc.*,
 621 F. App'x 945 (11th Cir. 2015) .......................................................78

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Little* v. *Washington Metro. Area Transit Auth.*,
   249 F. Supp. 3d 394 (D.D.C. 2017) ..................................................................71

*Nat'l Ass'n for Mental Health, Inc.* v. *Califano*,
   717 F.2d 1451 (D.C. Cir. 1983) ......................................................................82

*Ohio* v. *American Express*,
   138 S. Ct. 2274 (2018) ......................................................................... *passim*

*Osborn* v. *Visa*,
   797 F.3d 1057 (D.C. Cir. 2015) ................................................................4, 63

*Perez* v. *Metabolife Int'l, Inc.*,
   218 F.R.D. 262 (S.D. Fla. 2003) .................................................................72, 77

*Richardson* v. *L'Oreal U.S., Inc.*,
   991 F. Supp. 2d 181 (D.D.C. 2013) ...............................................................81

*US Airways, Inc.* v. *Sabre Holdings Corp.*,
   938 F.3d 43 (2d Cir. 2019) ................................................................... *passim*

*Wal-Mart Stores, Inc.* v. *Dukes*,
   564 U.S. 338 (2001) ...............................................................23, 24, 25, 80

*Weisman* v. *Darneille*,
   78 F.R.D. 669 (S.D.N.Y. 1978) ......................................................................82

*Williams* v. *Glickman*,
   1997 WL 33772612 (D.D.C. Feb. 14, 1997) ..................................................75

*Young* v. *Nationwide Mutual Ins. Co.*,
   693 F.3d 532 (6th Cir. 2012) ........................................................................75

**Rules**

Fed. R. Civ. P. 23(a)(4) ......................................................................................82

Fed. R. Civ. P. 23(b)(2) ............................................................................5, 24, 80

Fed. R. Civ. P. 23(b)(3) ................................................................................24, 26

Fed. R. Evid. 702 ..............................................................................................25

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

**Other Authorities**

Congressional Budget Office, *Competition in ATM Markets: Are ATMs Money Machines?* (July 1998)...................................................................................... *passim*

Fumiko Hayashi, Richard Sullivan, and Stuart E. Weiner, *A Guide to the ATM and Debit Card Industry: 2006 Update*, Federal Reserve Bank of Kansas City (2006)...............................................................................................................8

Fumiko Hayashi, Richard Sullivan, and Stuart E. Weiner, *A Guide to the ATM and Debit Card Industry*, Federal Reserve Bank of Kansas City (2003) ................................6

Kostis Hatzitaskos, et al., *Antitrust Impact in Indirect Purchaser Class Actions: The Need for Rigorous Analysis of Pass-Through* (April 2015) .............................................68

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2013-2018)............................................................67

U.S. Gov't Accountability Office, GAO-13-266, *Automated Teller Machines: Some Consumer Fees Have Increased* (April 2013)...................................................... *passim*

William B. Rubenstein, 1 Newberg on Class Actions § 3:7 (5th ed. 2011) ................................71

*Highly Confidential – Subject to Protective Order*

## PRELIMINARY STATEMENT

No class should be certified, much less three, in this litigation challenging non-discrimination rules that Visa and Mastercard adopted over two decades ago.  The non-discrimination rules protect cardholders, like the consumer plaintiffs here, by providing them the lowest available surcharge for cash withdrawals over Visa's and Mastercard's ATM networks (known as Visa/Plus and Cirrus, respectively).  These rules encourage more banks to issue ATM cards enabled on Visa/Plus and Cirrus, more consumers to use Visa/Plus and Cirrus, and more ATM operators to accept Visa/Plus and Cirrus.  That is why all leading ATM networks have similar rules.  It is also why rival ATM networks—with larger market share—adopted non-discrimination rules before Visa and Mastercard did.  Far from being the cause of consumer injury, these rules actually prevent it.

Notwithstanding these clear benefits, three separate groups of plaintiffs—two sets of consumers and one set of independent ATM operators—claim to have been injured by Visa's and Mastercard's non-discrimination rules.[1]  (The non-discrimination rules of the other ATM networks are not challenged here.)  To have their classes certified, each set of plaintiffs must show that common evidence can establish injury for all members of their respective classes.  Each plaintiff group has failed to do so.  Plaintiffs' inability to satisfy that threshold burden is fatal to their motions for class certification.

---

[1]   "*Mackmin* Plaintiffs" refers to the putative class in *Mackmin* v. *Visa*, Case No. 11-1831, which includes cardholders who transacted at bank ATMs; "*Burke* Plaintiffs" refers to the putative class in *Burke* v. *Visa*, Case No. 11-1882, which includes cardholders who transacted at independent ATMs; "Consumer Plaintiffs" refers to the *Mackmin* Plaintiffs and *Burke* Plaintiffs collectively; and "Operator Plaintiffs" refers to the putative class in *National ATM Council* v. *Visa*, Case No. 11-1803.  "Defendants" refers to Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc. ("Visa Defendants") and Mastercard Incorporated and Mastercard International Incorporated ("Mastercard Defendants").

*Public Redacted Version*                    ~~Highly Confidential – Subject to Protective Order~~

The Consumer Plaintiffs claim injury from ATM surcharges that they allege were set above a competitive level.  But Visa and Mastercard do not impose, set, or collect surcharges. ATM operators do.  Recognizing as much, Consumer Plaintiffs allege that Visa's and Mastercard's fee changes, including increases in "acquirer fees" (which ATM operators may pay, either directly or indirectly), have caused ATM operators to raise their surcharges. Consumer Plaintiffs cannot prove with common evidence, however, that all ATM operators have raised surcharges because of Visa/Plus and Cirrus fees.

The *Mackmin* Plaintiffs and their expert Professor Carlton claim ███████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████. The *Burke* Plaintiffs and their expert Dr. Lehr ████████████████████████████████████

████████████████████████████████████████████████████████████████

███. The Consumer Plaintiffs thus have assumed away the very question they must be prepared to answer with common evidence—whether ATM operators did or did not raise their surcharges in response to Visa/Plus and Cirrus fees.  Consumer Plaintiffs' failure to satisfy their burden is unsurprising: ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███ ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████

Any consumer who used only an ATM that did not adjust surcharges in response to Visa/Plus or Cirrus fees was not injured. ████████████████████████████████████████

████████████████████████████████ Defendants' economic expert, Professor

~~Highly Confidential – Subject to Protective Order~~

Hubbard, applied Professor Carlton's methodology to ██████████████████████████████

████████████████████.  Professor Hubbard demonstrates ██████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████   ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████  The presence of these uninjured consumers

within the putative *Mackmin* and *Burke* classes defeats certification.

The Operator Plaintiffs likewise claim to have been injured by Visa/Plus and Cirrus fees,

but they cannot prove with common evidence that all members of their proposed class actually

paid those fees.  To the contrary, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████

In addition to plaintiffs' failure to identify common proof, their methodologies for

proving class-wide injury suffer from additional fatal defects.  Each set of plaintiffs relies on

methodologies to identify antitrust injury that the Supreme Court rejected only two years ago.  In

*Ohio* v. *American Express*, 138 S. Ct. 2274 (2018) ("*Amex*"), the Supreme Court held that

antitrust claims arising from two-sided transaction platforms, like the ATM networks at issue

here, must account for competition on both sides of the platform.  ███████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████.  Following *Amex*, the one-sided analysis

conducted by all plaintiffs' experts is not permissible.  138 S. Ct. at 2286–87.[2]

 Another methodological flaw in their models provides further grounds to deny Consumer

Plaintiffs' motions.  Under *Comcast*, plaintiffs must come forward with injury and damages

models that correspond with their theory of injury.  Consumer Plaintiffs have failed to do so

here.  Both sets of Consumer Plaintiffs identify ███████████████████, but then

████████████████████████████████.  Consumer

Plaintiffs ████████████████████████████████

██████████████.  In the absence of a methodologically sound damages model,

neither consumer class can be certified.

 The Operator Plaintiffs have also failed to meet their burden of showing that their

proposed class is ascertainable.  Their class definition lacks objective criteria for "ATM

operator," potentially sweeping in diverse entities that play various roles in the industry, and is

therefore hopelessly vague.  It is impossible to know which entities are within the class and

which are outside of it.  The testimony of the proposed class representatives and their experts

regarding class composition has only compounded the muddle.

---

[2] As discussed below, Plaintiffs cannot rest on the theory of injury described in the D.C. Circuit's motion to dismiss decision in these cases, *Osborn* v. *Visa*, 797 F.3d 1057, 1060 (D.C. Cir. 2015), in light of the two-sided market analysis subsequently required by the Supreme Court in *Amex*.  138 S. Ct. at 2286–87.

~~*Highly Confidential — Subject to Protective Order*~~

Furthermore, all three proposed classes are administratively infeasible.  Plaintiffs are unable to identify the uninjured class members referenced above and winnow them from the class, but even if they could identify a methodology for doing so, it would require an individualized inquiry for hundreds of thousands of class members.  For consumers, that inquiry would cover (1) whether they paid an unreimbursed surcharge (2) at an ATM that raised its surcharges (3) because of Visa/Plus and Cirrus fees, and (4) whether the ATM was bank or independently operated.  For ATM operators, it would cover whether the entity (1) qualifies as a class member in light of its business model and contractual obligations, (2) actually paid Visa/Plus and Cirrus fees, and (3) actually had the ability to set surcharges.  None of the plaintiff groups has come forward with a methodology for identifying class members, much less a feasible one.

The Consumer Plaintiffs have also failed to carry their burden of showing that prospective equitable relief would benefit the class as a whole, as required by Rule 23(b)(2).  Eliminating the Visa and Mastercard non-discrimination rules on a prospective basis would injure cardholders using Visa/Plus and Cirrus, who would face higher surcharges in the aftermath of the rules' repeal.  Finally, the *Burke* Plaintiffs have failed to identify adequate class representatives or show that their state claims can be resolved on a class-wide basis.

For all of these reasons, any one of which would be sufficient, each plaintiff group has failed to carry its burden of demonstrating that class certification is warranted.  Plaintiffs' motions should be denied.

## BACKGROUND

**A.   The ATM Industry Is Decentralized, Heterogeneous, and Multi-Faceted**

     1.     *ATM Transaction Participants*

Consumers are able to use ATMs to access cash in their depository accounts in two ways. First, consumers can use an ATM operated by the bank that issued their ATM cards. These transactions are completed internally over the bank's own ATM fleet, and are referred to as "on-us" transactions.[3] Second, consumers can use a "foreign" ATM—that is, an ATM that is not owned or operated by their own bank. These transactions are referred to as "off-us" transactions. Whenever a consumer initiates an off-us ATM transaction, the ATM terminal he or she uses communicates with the consumer's bank through an ATM network, which facilitates the transaction.[4]

     Foreign ATM transactions can occur either at an ATM operated by another bank (a "bank ATM") or at an ATM not operated by a bank at all (an "independent ATM," such as those operated by Cardtronics or Payment Alliance International).[5] For an independent ATM to accept

---

[3]  *See* Ex. 1 to *Declaration of Rosemary Szanyi in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification*, Fumiko Hayashi, Richard Sullivan, and Stuart E. Weiner, *A Guide to the ATM and Debit Card Industry*, Federal Reserve Bank of Kansas City 34 (2003) (MC-ATM-00251941) (All other exhibits to the Szanyi declaration are cited in the form "Ex. __."); Ex. 2, U.S. Gov't Accountability Office, GAO-13-266, *Automated Teller Machines: Some Consumer Fees Have Increased* 5 (April 2013) ("GAO Report") (VISA-ATM1-00010762).

[4]  *See* Ex. 2, GAO Report at 5–6; Mem. Op., *Nat'l ATM Council, Inc. et al.* v. *Visa Inc. et al.*, 1:11-cv-01803-RJL (*NAC*), at 2–3, ECF No. 111.

[5]  *See* Ex. 2, GAO Report at 4–5; *see also* Ex. 3, Jeffrey M. Sachs Dep. 27:1–22; ██████ ████████████████; Ex. 5, Clinton Cheng (Visa 30(b)(6)) (Feb. 6, 2019) Dep. 62:21–63:1. Cardtronics and PAI are the two largest independent ATM operators in the United States. ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ *See* Ex. 6, ██████████████████████████████████████████████████████████████

6

a particular ATM network at its terminal, the ATM operator must enter into a contract with a financial institution that maintains a relationship with that network:  the ATM operator's "sponsoring bank," also called the "acquiring bank."[6]  The ATM operator may also contract with an ATM processor to become technologically capable of facilitating ATM transactions.[7]

Foreign ATM transactions thus involve numerous participants, including:  (i) the ATM cardholder; (ii) the foreign ATM operator (*i.e.*, the operator of the physical ATM terminal), which may or may not be a bank; (iii) the acquiring bank (which for bank-operated ATMs is also the operator); (iv) the issuing bank; and (v) the electronic ATM network that links the ATM and the issuing bank together.[8]  And some foreign transactions at independent ATMs may involve even more entities that have a role in operating the ATMs, such as owners of the premises where the ATMs are located; money loaders (who replace the money in ATMs); and "Independent Sales Organizations" (or "ISOs") (who provide transaction processing and other services to affiliated ATM operators).  *See infra* Section I.C.1.

In the United States, more than ten different ATM networks link over 400,000 ATMs and thousands of banks that issue ATM/Debit cards to their customers (so-called "issuing banks").[9]

---

[6]   *See* Ex. 2, GAO Report at 4–5; Ex. 7, Congressional Budget Office, *Competition in ATM Markets: Are ATMs Money Machines?* 22 (July 1998) ("CBO Report") ("Many networks admit only depository institutions as members; however, most networks allow nonbank ATM owners to become members if they are sponsored by a member depository institution."); Ex. 3, Sachs Dep. 24:13–25:15, 252:13–254:2; ATM Operator Pls.' Experts James McAndrews and J. Douglas Zona Joint Report ("McAndrews/Zona Report") ¶ 18.  *See also, e.g.*, Ex. 8, Kamlesh Jethani (Just ATMs USA, Inc. 30(b)(6)) Dep. Ex.,

[7]   *See, e.g.*, Ex. 9,                                                                                      .

[8]   *See NAC* Mem. Op., at 2–3 (describing the relevant actors in a foreign ATM transaction); Ex. 3, Sachs Dep. at 23:16–25:2.

[9]   *See* Ex. 6,                                          ; Ex. 2, GAO Report at 9.

Visa owns and operates the Visa/Plus network, and Mastercard owns and operates the Cirrus network.[10]  Other ATM networks include STAR, NYCE, PULSE, SHAZAM, Accel, and Credit Union 24.[11]  For historical reasons, Visa/Plus and Cirrus are commonly referred to as "national" networks,[12] and most other ATM networks are commonly referred to as "regional" networks[13]— even though several large "regional" networks (such as STAR and NYCE) have had national coverage since around 1990.[14]

   2. *ATM Transaction Routing Varies Widely*

   The ATM network over which a specific transaction is routed depends, in the first instance, on both the networks the ATM operator has chosen to accept and the networks the issuing bank has chosen to enable on the ATM/Debit card.  ATM operators—through their acquiring banks or processors—determine which ATM networks will be accepted at their terminals.[15]  Typically, a single ATM terminal can connect to multiple competing ATM networks.[16]

---

[10] Mastercard's ATM network is referred to as "Cirrus" regardless of which Mastercard brand (Mastercard, Maestro, or Cirrus) is presented at the ATM.

[11] Ex. 10, Fumiko Hayashi, Richard Sullivan, and Stuart E. Weiner, *A Guide to the ATM and Debit Card Industry: 2006 Update*, Federal Reserve Bank of Kansas City 42 (Table 3) (2006) (MC-ATM-01027597).

[12] *See* Expert Report of Tony Hayes ("Hayes Rep.") ¶ 45.  Tony Hayes is defendants' industry expert, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[13] *Id.*

[14] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[15] *See, e.g.*, Ex. 8, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[16] *See* Ex. 11, Stacey Pinkerd Dep. 190:19–191:23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Some issuing banks choose to enable multiple ATM networks on their cards, and some choose to enable only one ATM network.[17]  An issuing bank makes decisions about which ATM networks to enable in the broader context of the bank's relationship with a network.  The choice of which (and how many) networks to enable may be only one term in a complex, varied contractual relationship.[18]

If more than one network is both accepted at the ATM and enabled on the card, network routing rules determine which network facilitates the transaction.  In some cases, the issuing bank directs the network over which the transaction must be routed, a practice referred to as "issuer-directed" routing.[19]  Many ATM networks have had rules providing for "issuer-directed" routing,[20] ████████████████████.[21]

In other cases, a regional ATM network enabled on the card requires that the transaction be routed over its network or another regional network, instead of Cirrus or Visa/Plus, a practice referred to as "priority routing."[22]  For instance, in 2007, ███████████████████████████

---

[17]  *See* Ex. 12, Sachs Decl. ¶ 7; Ex. 13, Englebardt Decl. ¶¶ 7, 10; Ex. 14, ████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████.

[18]  *See, e.g.*, Ex. 15, ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████; Ex. 16, ████████████████
████████████████████████████████████████████████████
█████████████████████.

[19]  *See* Ex. 17, James McAndrews Dep. 207:10–208:8.

[20]  *See, e.g.*, Ex. 18, ████████████████████████████████████
████████████; Ex. 19, ████████████████████████████
█████.

[21]  *See* Ex. 17, McAndrews Dep. 206:5–20.

[22]  *See* Ex. 17, McAndrews Dep. 211:21–212:6.  *See, e.g.*, Ex. 20, █████████
████████████████████████████████████████ Ex. 19, ██████



When more than one ATM network is enabled on the card and no issuer-directed or priority routing rules are in force, the ATM operator decides the network over which to route the ATM transaction.[25]  Some ATM operators have delegated responsibility for routing transactions to their acquirer or processor.[26]

3.      *ATM Transaction Fees Vary Widely*

Foreign ATM transactions generally involve a number of fees paid by (and to) the various participants in those transactions.  These fees vary considerably by issuing bank, ATM operator, and cardholder.[27]

***Switch and Acquirer Fees.***  Some issuing banks and acquiring banks may pay a per-transaction fee to the ATM network to access the network.[28]  This fee is commonly referred to as a "switch fee" (when paid by an issuing bank) or as an "acquirer fee" or a "network fee" (when

---



[23]    *See, e.g.*, Ex. 23,

[24]    *See* Ex. 17, McAndrews Dep. 211:21–212:17.
[25]    Ex. 13, Englebardt Decl. ¶ 10; *see also, e.g.*,                        ; Ex. 24,
[26]    *See, e.g.*,
        (testifying that                                                  :
                                                      (testifying that
                                                      .
[27]    For a graphical depiction, see Hayes Rep. Fig. 3.
[28]    *See* Ex. 2, GAO Report at 8, 24 n.40.

*Public Redacted Version*                    ~~Highly Confidential – Subject to Protective Order~~

paid by an acquiring bank).[29]   Some acquiring banks ███████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████.[30]   ATM networks independently set switch and acquirer

fees, and rates may vary depending on the network over which a transaction is routed.   Some

ATM networks provide discounted rates for entities that route higher transaction volumes over

their network.[31]   And some ATM networks negotiate terms with issuing banks or acquiring

banks to eliminate or reduce these fees.[32]

      *Interchange and "Net Interchange."*   An issuing bank also generally pays a per-

transaction fee to the acquiring bank for providing ATM access to the issuing bank's

cardholder.[33]   This payment is referred to as "interchange."[34]   The issuing bank pays a default

interchange rate, which is set independently by each ATM network for transactions routed over

that network, absent an agreement between the issuer and the acquirer.[35]   Although ATM

---

29   *See id.*; Ex. 3, Sachs Dep. at 55:16–55:25; Ex. 11, Pinkerd Dep. 259:21–260:7; Ex. 12, Sachs
    Decl. ¶ 10; Ex. 13, Englebardt Decl. ¶ 11; Hayes Rep. ¶ 41(i).

30   Ex. 27, Leland Englebardt (March 14, 2019) Dep. 249:21–250:18; Ex. 13, Englebardt Decl.
    ¶ 13; *see also* Ex. 28, ████████████████████████████████████████████████
    ████████████████████████████████████████████████████████████████
    ████████████████████████████████████████████████████████████████
    ████.

31   *See, e.g.*, Ex. 29, ████████████████████████████████████████████████████.

32   *See, e.g.*, Ex. 30, ████████████████████████████████████████████████████
    (testifying that ████████████████████████████████████████████████████
    ████████████████████████████████████████████████████████████████.

33   Ex. 7, CBO Report at xi, 23–24; Ex. 12, Sachs Decl. ¶ 10; Ex. 13, Englebardt Decl. ¶ 11.

34   *See* Ex. 7, CBO Report at 23–24; Ex. 3, Sachs Dep. 56:1–57:2.   This term should not be
    confused with the term "interchange fee" used in the context of debit and credit transactions,
    as "interchange" in those transactions flows in the opposite direction:  from acquiring bank to
    issuing bank.

35   Ex. 7, CBO Report at 23–24; Ex. 3, Sachs Dep. 56:1–59:10; Ex. 12, Sachs Decl. ¶¶ 10–11;
    Ex. 13, Englebardt Decl. ¶¶ 12–13; Hayes Rep. ¶ 41(ii).

networks set default rates and administer the collection of interchange, they do not retain interchange.[36]

Default interchange rates vary by network.  Some ATM networks have "tiered" interchange rates, which in some instances allow issuers with more transactions to pay lower interchange rates.[37]  The interchange that acquiring banks receive from issuing banks — minus the network fee acquiring banks pay to the ATM network — is sometimes called "net interchange."

***Surcharge and Foreign Fees.***  A cardholder may be assessed one or more fees for initiating a foreign ATM transaction.  First, a foreign ATM may charge the cardholder an "access fee," or surcharge, for the use of the terminal.[38]  Sometimes a single entity sets and retains the surcharge at the ATM.[39]  Sometimes, one entity sets the surcharge and a different entity retains all or a portion of the surcharge revenue.[40]  The entity, or entities, involved in setting the surcharge for any given ATM varies based on the contractual arrangements supporting that terminal.[41]  Surcharge amounts vary widely.[42]  For instance, surcharges are

---

[36]  Ex. 7, CBO Report at 23–24; Ex. 3, Sachs Dep. 57:3–10.
[37]  *See, e.g.*, Ex. 29, ███████████████████████████████████.
[38]  Ex. 2, GAO Report at 6–7; Ex. 7, CBO Report at xi, 25; Hayes Rep. ¶¶ 17-18.
[39]  *See, e.g.*, ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████.
[40]  *See, e.g.*, ███████████████████████ (testifying that ██████████
███████████████████████████████████████████; Hayes Rep. ¶¶ 125–129.
[41]  *See* Hayes Rep. ¶¶ 123, 125–129.
[42]  *See* Ex. 2, GAO Report at 14.

sometimes relatively higher in rural areas, or at venues where consumers have limited cash

withdrawal options, such as casinos, concert venues, or movie theaters.[43]

    In addition to a surcharge, a cardholder's issuing bank sometimes charges a "foreign

ATM fee" for using an ATM outside of that bank's fleet.[44]  These fees are set by a cardholder's

issuing bank and vary by bank.[45]

    Some issuing banks offer programs to reduce or reimburse surcharges or foreign fees.

For instance, some issuing banks offer customers credits that reimburse some or all of the

surcharges assessed by ATM operators.[46]  Some issuing banks do not charge a foreign ATM fee

at all, or do not charge a foreign ATM fee to certain customers.[47]  The policies of issuing banks

with respect to these fees vary from bank to bank, and vary from cardholder to cardholder within

an issuing bank.[48]

    4.    *Cardholder Reactions to ATM-Related Fees Vary Widely*

    Cardholders' reactions to fees they may be charged to access ATMs vary widely, as

shown by discovery from class representatives.  Some cardholders, for instance, will not travel a

block out of their way (to their own bank's ATM) to avoid surcharges and foreign fees.[49]  Others

prioritize the safety of the ATM's physical location, and do not consider fees, when deciding

---

[43]  *See, e.g.*, ███████████████████████ (explaining that █████████
█████████████████████████████████████████████ ; Ex. 33,
Sam Osborn Dep. 189:7–190:20 (testifying that ████████████████████████████
████████████ .

[44]  Ex. 2, GAO Report at 7; Ex. 7, CBO Report at xi, 24–25.

[45]  Ex. 2, GAO Report at 7; Ex. 7, CBO Report at xi, 24–25.

[46]  *See* Hayes Rep. ¶¶ 79, 85, 86–91; Ex. 17, McAndrews Dep. 288:6–11.

[47]  *See* Hayes Rep. ¶¶ 87–88; Ex. 17, McAndrews Dep. 288:19–21.

[48]  *See* Hayes Rep. ¶¶ 86–94; Ex. 17, McAndrews Dep. 288:6–289:5; McAndrews/Zona Rep. ¶ 26.

[49]  *See* ██████████████████████████████████████████████ .

which ATMs to use.[50]  Others have ATM surcharges reimbursed by their issuing bank, and

therefore effectively do not incur ATM surcharges.[51]  ATM fees might not matter to some

cardholders at all.  A cardholder's reason for selecting his or her depository bank may have

nothing (or little) to do with access to cash at ATMs or that bank's surcharge reimbursement or

foreign fee policies.[52]

**B.    All Leading ATM Networks Have Non-Discrimination Rules and Most Adopted
         Them Before Visa or Mastercard Did**

Most ATM networks have non-discrimination rules ("NDRs") governing surcharges.

NDRs provide that an ATM operator cannot impose a greater surcharge on cardholders whose

transactions are routed over one network than are imposed on transactions over other networks.

Visa/Plus and Cirrus were among the last networks to adopt NDRs.[53]

---



[50]  *See*

[51]  For example,                              *Compare, e.g.,*

*with*

[52]  *See* Ex. 17, McAndrews Dep. 297:17–298:4

[53]  *See* Ex. 38, Memorandum from Ron Reed to PLUS Board from March 1994 (VISA-ATM1-
00002859, at 865) ("In today's environment, some regional networks permit ATM
surcharging (e.g. PULSE, Honor and Star).  However, each of these networks allow
surcharging only if it is permitted on an nondiscriminating basis."); Ex. 39, Visa Business
Review, "ATM Surcharging Variance Granted for U.S. Acquirers" (Feb. 1996) (VISA-ATM-
00066901, 903–04) (Visa announcing new surcharging rules effective April 1, 1996); Ex. 40,

In the early 1980s, ATM networks generally prohibited ATM operators from levying surcharges on any transaction, including cash disbursements, routed over the networks.[54]  In the late 1980s, both ATM operators and state governments began to pressure ATM networks to lift their surcharge bans.[55]  A number of states passed laws prohibiting network rules banning ATM surcharging.[56]  By 1996, 15 states had either enacted legislation nullifying ATM no-surcharge rules or taken regulatory action.[57]  As a result, networks considered modifications to their surcharging rules.[58]

In the late-1980s and mid-1990s, ███████████████████████████████████████████████
███████████████████████████████████████[59] ███████████████████████████████████
██████████████████████████████████[60]  In April 1995, ███████████████████████████

---

[54]  *See* Ex. 7, CBO Report at 27; Ex. 12, Sachs Decl. ¶ 13; Ex. 13, Englebardt Decl. ¶ 15.

[55]  *See* Ex. 7, CBO Report at 27–28; Ex. 41, October 16–17, 1995 Visa International Board of Directors Meeting Materials, Executive Summary, "Surcharging: Variance for the U.S. Region" (VISA-ATM1-00453434).

[56]  *See* Ex. 7, CBO Report at ix, 28; Ex. 12, Sachs Decl. ¶ 14; Ex. 13, Englebardt Decl. ¶ 15; Ex. 5, Cheng 30(b)(6) Dep. (Feb. 6, 2019) 155:20–156:9, 161:2–162:9.

[57]  *See* Ex. 7, CBO Report at 28.

[58]  *See id.*; Ex. 42, Anthony McEwen, Director and Executive Vice President, Plus System, Inc., Testimony Before Senate Banking, Housing and Urban Affairs Committee (July 29, 1997) (VISA-ATM-00099233).  *See also* Hayes Rep. Fig. 7.

[59]  ████████████████████████████████████████████ *See* Ex. 43, ████████████████████████ Although transaction share data is not available for 1988, █████████████████████████████████ *See* Ex. 44 ████████████████████████  The EFT Data Books were industry publications that reported total monthly ATM transactions for the ATM industry and individual ATM networks.

[60]  *See* Ex. 45,



. *See* Ex. 46,

[redacted][61]  Visa/Plus and Cirrus followed these (and other) larger networks, by amending their rules likewise to permit surcharging on a non-discriminatory basis.[62]  According to one of the Operator Plaintiffs, when these NDRs went into effect in 1996, and continuing for approximately the next ten years, Visa/Plus's and Cirrus's share of foreign ATM transactions "averaged approximately 3–5%, each."[63]  Plaintiffs cannot reasonably claim that Visa or Mastercard used market power to impose the rules at that time.

        To this day, most ATM networks include non-discrimination provisions in their rules on surcharging.[64]  In addition, [redacted] and at least one other competitor ATM network



[61]  [redacted] ).
[redacted]
                                        *See* Ex. 47, [redacted].
[redacted]
        *See* Ex. 48, [redacted]; Ex. 49, [redacted].

[62]  *See* Ex. 17, McAndrews Dep. 315:3–11 (testifying he [redacted].

[63]  *See* Restated Decl. of Roger Myers ¶ 8 (*NAC* ECF No. 91); *see also* Ex. 50, 1997 EFT Network Data Book (MC-ATM-00412138, at 140, 142) (providing figures for monthly ATM EFT transactions and approximate monthly volume on Visa/PLUS and Cirrus, which approximates Plus share in 1996 to be about 7% and Cirrus share in 1996 around 4%).

[64]  *See, e.g.*, Ex. 51, [redacted]; Ex. 52, [redacted]

██████████████ strengthened their rules governing surcharging since the mid-1990s.

Rather than prohibiting discrimination only against themselves, these networks have required

ATM operators to apply a *uniform* surcharge to all transactions—regardless of network.[65]

## C.   ATM Networks Compete Vigorously for Transaction Volume from Both Issuers and Acquirers

ATM networks operate in what NYCE's general manager recently described as a "robust

competitive environment."[66]  Since their inception and through the present, competition among

---



[65] ████████████████████████████████████████ *See* Ex. 53, █████████████████████

Ex. 54, ███████████████████████████████████

██████████████████████████████████

██████████████████████████ *See* Ex. 55, ███

██████████████ .

██ *See* Ex. 56, ███████████████
██████ ; Ex. 57, █████████████████
██████ ; Ex. 58, ██████████████████

██████████████████████████████████

████████████████ Ex. 58, ██████████████

█████████████████████ , *see* Ex. 59, ████
██████████████ ; Ex. 60, ███████████████

[66]   Ex. 61, Decl. of Robert Woodbury, NYCE General Manager ¶ 20, *Mackmin et al.* v. *NYCE Payments Network, LLC* (July 23, 2018), 18-cv-11517 (D.N.J.), ECF No. 9-9.  Two decades earlier, ██████████████████████████████

██████████████████ " Ex. 62, ████████████

█████████████████████ *See also* Ex. 3, Sachs Dep. 133:14–134:18.

the regional and national ATM networks has been intense.  According to a recent Visa strategy

presentation, the U.S. ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████,"[67]

     At all relevant times, ATM networks have competed to gain transaction volume by:

(a) ████████████████████████████████████████████,

(b) ████████████████████████████████ and (c) ████████████████

███████████████████████.[68]  This competition has taken a number of forms.  For

example, ATM networks have competed on the reliability and security of their services.

Visa/Plus and Cirrus, for example, have long marketed themselves as more consistent and

reliable than the regional networks.[69]

---

[67]  *See* Ex. 63, Visa, ████████████████████████████████████

[68]  *See* Ex. 3, Sachs Dep. 61:19–22 ████████████████████████████████ ; Ex.
11, Pinkerd Dep. 333:20–334:8 ████████████████████████████████████████
████████████).

[69]  *See* Ex. 27, Englebardt (March 14, 2019) Dep. 192:4–13 ████████████████
████████████████████████████████████████████████████████ ;
Ex. 11, Pinkerd Dep. 330:23–331:2 ████████████████████████████████████ ;
Ex. 3, Sachs Dep. 92:6–11 ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████); Ex. 15,
███(testifying that ███████████████████████████████████████
████ ; Ex. 16,
███(explaining that ████████████████████████████████████████).

All ATM networks compete on the pricing they offer to issuing and acquiring banks.[70] For example, in the late 1990s, some regional networks began to charge ATM acquirers an acquirer fee on transactions for which acquirers were collecting surcharges.[71]  By 2004, both

███████████████████████████████████████████████████████████████

█████████.[72]  Regional networks used those revenues to provide issuing banks financial incentives to enable their respective networks.[73]  Notably, and as with NDRs, fixed acquirer fees were introduced by regional networks, not Visa or Mastercard.

---



[70]  *See* Ex. 5, Cheng 30(b)(6) (Feb. 6, 2019) Dep. 66:8–68:7 (testifying that ████████████████████████████████████████████████████████████████████████████████; *id.* at 95:20–98:10 (testifying that ████████████████████████████████████████████████████; Ex. 11, Pinkerd Dep. 333:20–334:8 ████████████████████████"); Ex. 3, Sachs Dep. 63:7–18 (██████████████████████████████████████████); *id.* at 127:2–23.

[71]  *See* Ex. 65, ████████████████████████████████████████████

[72]  *See* Ex. 66, ████████████████████████████████████████████; Ex. 67, ████████████████████████████████████████████████████████████████████████████████. *See* Ex. 68, Visa/PLUS System, Inc. Bulletin, "ATM Fee Changes Effective November 2007," Aug. 31, 2007 (VISA-ATM1-00115979); Ex. 69, Brian Swain Dep. Ex., ███████████████████████████████████████████████).

[73]  *See* Ex. 70, ████████████████████████████████████████████████████████████████████

As a further example, in 2009, Mastercard adopted a tiered interchange structure for Cirrus that took effect in April 2010.[74]  Prior to 2010, Cirrus had long struggled to compete with the regional networks.  About ████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████.[75]  In light of those rules, Cirrus could not gain share simply by providing higher interchange to acquirers.  No matter how high Cirrus's interchange rate went, acquirers could not choose to route to Cirrus as long as a regional network was also enabled on the ATM/Debit card, unless the issuing bank prioritized Cirrus.  Faced with these market conditions, Mastercard competed for share by creating incentives for issuing banks to direct ATM transactions to Cirrus.[76]  Starting in 2010, issuing banks would pay a lower fee per transaction (interchange and switch fees) when they routed a greater volume of transactions over Cirrus.  That fee schedule created a clear financial incentive — ██████████████████████ — for issuing banks to use issuer-directed routing to send ATM transactions to Cirrus, thereby overcoming the barriers erected by the regional ATM networks.[77]

---

[74]  *See* Ex. 71, Daniel Goodman 30(b)(6) Dep. Ex. ██████████████████ ████████

[75]  *See* Ex. 72, ██████████████████████████████████████████ ██████; Ex. 73. ████████████████████████████████████████ ██████████.

[76]  *See* Ex. 72, ████████████████████████████████████████████ ████

[77]  *See* Ex. 74, ██████████████████████████████████████████ ██████████████; Ex. 75, ███████████████████████████████████ ████████████████████████████████████████████████████

Mastercard also introduced a new ATM acquirer fee.[78]  Mastercard intended to use the money it collected from charging a fee to ATM acquirers to provide incentives to issuing banks — i.e., to generate " ███████████████████████████████████████████ ███████████████████████████████.[79]  Here, Mastercard was borrowing a page from ████████████████; ████████████████████████████████████████ ████.[80]

Mastercard's revamped interchange and fees had the intended effect:  Cirrus ATM transactions were more attractive to issuing banks, and so more issuing banks prioritized Cirrus on their ATM/Debit card.  Since that time, Mastercard has continued to use its acquirer fee revenue to provide financial incentives to issuers.[81]

Given the success of Mastercard's pricing changes and the imperative to compete, Visa in 2011 adopted its own tiered interchange fee structure and increased the acquirer fees it charged ATM acquirers.  According to the head of Visa's ATM business at the time: ███████████████ ████████████████████████████████████████████████████████████████

---

[78]  *See* Ex. 76, Goodman 30(b)(6) Dep. 146:11–147:12.
[79]  *See* Ex. 77, ██████████████████████████████████████████ ████████).
[80]  *See* Ex. 70, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████
[81]  *See* Ex. 78, █████████████████████████████████████████████████ ██████████████████████████████████████████; *see also* Ex. 3, Sachs Dep. 156:12–157:9 (████████████████████████████████████████████████ ██████████).

 ▢"[82]  Visa also has made pricing changes to compete for additional ATM transactions from acquirers.  In 2016, Visa ▢

▢.[83]  Through these changes, Visa sought to ▢

▢[84]

▢"[85]

## D.     Surcharges Have Risen Steadily When Net Interchange Increased or Remained Level

Back when surcharging was prohibited, ATM operators made their money strictly from net interchange.  After the mid-1990s, however, ATM operators increasingly imposed surcharges on cardholders at foreign ATM terminals and have steadily increased surcharge amounts.  This new surcharge revenue did not replace net interchange:  it added a new source of revenue for ATM operators.

Surcharge rates rose steadily over time, regardless of whether net interchange decreased.  Surcharge rates increased even during periods when average net interchange was level or rising.[86]  For example, between 1998 and 2005, ▢

▢

---

[82]  Ex. 3, Sachs Dep. 176:19–24, 180:5–8; Ex. 79, Sachs Dep. Ex., U.S.: Joint Proposal to Modify ATM Acquirer Fee and ATM Cash Disbursement Fee (Interchange) (VISA-ATM1-00090164, at 165).

[83]  *See* Ex. 80, Joint U.S. Interchange and Pricing Proposal: Modify Visa/Plus ATM Cash Disbursement Fee and Issuer Switch Fee to Encourage ATM Preference, Sept. 21, 2015 (VISA-ATM1-00477504).

[84]  *Id.* at 504.

[85]  *Id.* at 506.

[86]  *See* Hayes Rep. ¶¶ 160, 164; *see also* Ex. 27, Englebardt Dep. 156:17–157:25 (explaining that ▢ ▢.

███.[87]  In other words, acquirers continued to receive essentially the same net interchange payment they had when surcharging was banned — even though they were adding to their revenue through ever-increasing surcharging after it became available.  A large pool of revenue was therefore gathering on the ATM operator side of the transaction.  Anticipating this result,

████████████████████████████████████████████████

████████████████████████████████████████████████

████████.[88]

      The same trend has occurred in recent years.  After Visa added a higher interchange rate tier in 2016, average industry-wide net interchange increased between 2017 and 2018 by ████, ████,[89] but overall ATM surcharges also rose by █████████████████ over the same time period.[90]   In short, over the course of time, there has been no real correlation — let alone the inverse correlation that plaintiffs assume — between net interchange and ATM surcharge levels.

**LEGAL STANDARD**

      Class actions are "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350-51 (2001) (quoting *Califano* v. *Yamasaki*, 442 U.S. 682, 700–01 (1970)).  Plaintiffs bear the

---

[87]   *See* Hayes Rep. ¶¶ 159–160.  *See also* Ex. 5, Cheng 30(b)(6) (Feb. 6, 2019) Dep. 112:4–17 (████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████).

[88]   *See* Ex. 81, ████████████████████████████████████ ████████████████████████████████████ ████████████████████████.

[89]   *See* Hayes Rep. ¶ 164.

[90]   *See* Hayes Rep. ¶ 164 & Fig. 31.

23

burden to "actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23":  numerosity, commonality, typicality, and adequacy of representation. *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis in original).

To certify their proposed damages classes under Rule 23(b)(3), plaintiffs must further prove that common questions of law or fact predominate over individual questions, and that a class action is the superior method of adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  Plaintiffs must "affirmatively demonstrate" predominance for both injury and causation.  *Wal-Mart*, 564 U.S. at 350.  A damages class cannot be certified where it would deprive defendants of the right to challenge whether specific class members suffered any injury.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.* - MDL No. 1869, 725 F.3d 244, 252 (D.C. Cir. 2013) ("*In re Rail Freight I*"); *see also In re Asacol Antitrust Litigation*, 907 F.3d 42, 51–52 (1st Cir. 2018).  In antitrust cases in particular, the inability to show class-wide injury with common proof will defeat class certification, even if there is "common" evidence of an antitrust conspiracy. *See*, *e.g.*, *In re Rail Freight I*, 725 F.3d at 252; *Blades* v. *Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005) ("proof of conspiracy is not proof of common injury").

As to the proposed injunctive relief classes under Rule 23(b)(2), to warrant class certification, the *Mackmin* and *Burke* Plaintiffs must prove that defendants' conduct "appl[ies] generally to the class," such that injunctive relief is appropriate for the class as a whole.  Fed. R. Civ. P. 23(b)(2).  "[C]ohesiveness is a significant touchstone of a (b)(2) class."  *Blackman* v. *D.C.*, 633 F.3d 1088, 1094 (D.C. Cir. 2011) (Brown, J., concurring).

When evaluating whether to certify any class, courts must conduct a "rigorous analysis" to determine whether plaintiffs have met their evidentiary burden.  *Wal-Mart*, 564 U.S. at 351; *see also Comcast*, 569 U.S. at 35.  Courts' scrutiny of class certification claims "will frequently

entail overlap with the merits of the plaintiff's underlying claim." *Comcast*, 569 U.S. at 33 (internal citation omitted); *see also Wal-Mart*, 564 U.S. 351 (internal citation omitted); *In re Rail Freight I*, 725 F.3d at 253 ("It is now indisputably the role of the district court to scrutinize the evidence before granting class certification, even when doing so 'requires inquiry into the merits of the claim.'") (quoting *Comcast*, 569 U.S. at 28)).

Moreover, the need for a "hard look" at the evidence extends to expert testimony proffered by both sides. *See In re Rail Freight I*, 725 F.3d at 253; *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869, 934 F.3d 619, 621 (D.C. Cir. 2019) ("*In re Rail Freight II*"). Defendants here contest the reliability of all of plaintiffs' experts' models and methodologies. As a matter of efficiency, defendants are not filing separate motions to exclude plaintiffs' experts under *Daubert* v. *Merrell Dow Pharm.*, 509 U.S. 579 (1993). But both *Daubert* and the predominance requirement for class certification under Federal Rule 23 require the Court to determine whether plaintiffs' expert opinions are reliable. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 91 (D.D.C. 2017).[91] Rule 23 presents a still higher standard for the reliability of an expert's models and methodologies than reliability under *Daubert*. *See id.* And the rigorous analysis under Rule 23 additionally requires the court to resolve competing conclusions of expert testimony. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir. 2008) ("Weighing conflicting expert testimony . . . may be integral to the rigorous analysis Rule 23 demands."); *Ellis* v. *Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (holding court must "judg[e] the persuasiveness of the evidence presented" not "merely admissib[ility]" under *Daubert*).

---

[91] For purposes of the pending motions, defendants do not contest that plaintiffs' experts are qualified by "knowledge, skill, experience, training, or education" to offer opinions. Fed. R. Evid. 702.

## ARGUMENT

All three motions for class certification should be denied.  None of the plaintiff groups has shown an ability to establish class-wide injury with common proof.  Each proposed class includes an abundance of uninjured class members.  Winnowing the uninjured out of the classes would require individualized inquiries that would devolve into a series of mini-trials to determine injury.  That alone is sufficient to deny certification, but there is more.

Plaintiffs' methodology for measuring injury by evaluating only one side of a two-sided transaction platform has been rejected by the Supreme Court in *American Express* and cannot support class certification here.  Consumer Plaintiffs have also failed to align their damages model with their theory of injury, in violation of *Comcast*.  And all three putative classes are not ascertainable, administratively feasible, or both, which provides further grounds to deny certification.  Plaintiffs have also failed to come forward with a valid basis to certify a class for equitable relief, to find the *Burke* class representatives adequate, or to allow state law claims to be pursued in a class action.

## I.     No Plaintiff Group Can Establish Injury with Common Proof

### A.     Plaintiffs Must Show that Class-Wide Injury Can Be Established with Common Proof

Plaintiffs bear the burden of proving that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Predominance is a "demanding" requirement that "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Products, Inc.* v. *Windsor*, 521 U.S. 591, 623–24 (1997).  Under D.C. Circuit precedent, courts must deny class certification where the case would require thousands of individual adjudications about causation and injury.  These questions cannot be deferred until jury trial, or, worse, to a post-trial claims

*Highly Confidential – Subject to Protective Order*

administration process.  *See In re Rail Freight II*, 934 F.3d at 625–26; *accord In re Asacol*, 907 F.3d at 53.  "To the contrary, confronting such questions is part-and-parcel of the 'hard look' required by" Supreme Court precedent, and these questions must be confronted on class certification.  *In Rail Freight II*, 934 F.3d at 626.

The predominance inquiry tests whether any dissimilarity among class members can be resolved in a manner that is not "inefficient or unfair."  *Amgen* v. *Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013).  One can picture inefficiency as "a line of thousands of class members waiting their turn to offer testimony and evidence on individual issues."  *In re Asacol*, 907 F.3d at 51–52.  Unfairness can be seen "as an attempt to eliminate inefficiency by presuming to do away with the [Seventh Amendment] rights a party would customarily have to raise plausible individual challenges on those issues" of injury-in-fact and causation, and to do so to a jury.  *Id.*

To establish liability at trial, each plaintiff will have to prove "not only an antitrust violation, but also an injury to [their] business or property and a causal relation between the two."  *In re Rail Freight II*, 934 F.3d at 623.  Courts commonly refer to this element of proof as "injury in fact" or "proof of injury," as distinguished from "damages."  *In re Rail Freight I*, 725 F.3d at 252–53.  At the class certification stage, "[w]ithout common proof of injury and causation . . . plaintiffs cannot establish predominance."  *Id.*; *see also In re Rail Freight I*, 725 F.3d at 252 ("The plaintiffs must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy.").  Two recent decisions in antitrust class actions—including a D.C. Circuit decision issued several weeks before plaintiffs filed their motion for class certification—illustrate when the need for individual proof of injury will destroy predominance.

In *In re Asacol*, the First Circuit reversed certification of a class of branded drug purchasers who claimed they would have purchased a generic version of the drug but for the defendants' alleged misconduct.  907 F.3d 42.  The court determined that thousands of unidentified class members were likely uninjured because they in fact may not have purchased a generic version for "various reasons."  *Id.* at 51.  The court stated:  "The need to identify those individuals will predominate and render an adjudication unmanageable absent unrebutted affidavits . . . or some other mechanism that can manageably remove uninjured persons from the class in a manner that protects the parties' rights."  *Id.* at 53–54.  Because plaintiffs could not assure the court that "the number of affidavits to which the defendants will be able to mount a genuine challenge is so small that it will be administratively feasible to require those challenged affiants to testify at trial," *id.* at 53, the court refused to allow the submission of affidavits to winnow out uninjured class members, *id.* at 53–54.  The court reasoned that the process would not protect defendants' Seventh Amendment and due process rights requiring a "meaningful opportunity to contest whether an individual" was injured before a jury.  *Id.* at 53.

Similarly, in *In re Rail Freight II*, the D.C. Circuit affirmed the denial of class certification when, under plaintiffs' expert damages model, 2,037 class members were uninjured (according to common proof) and thus would "need individualized adjudications of causation and injury."  934 F.3d at 625.  The court affirmed the district court's conclusion that those individualized inquiries "precluded a finding of predominance."  *Id.* at 624.  Assuming without deciding that there was a "*de minimis*" exception to the requirement of common evidence of injury for all class members, the court decided that the exception would not apply.  *Id.* at 624.[92]

---

[92]  The D.C. Circuit expressed skepticism about the existence of such an exception, noting that it "appears inconsistent with our statement in *Rail Freight I* that the plaintiffs, to establish

~~*Highly Confidential – Subject to Protective Order*~~

The D.C. Circuit cited *In re Asacol* with approval as "explain[ing] that any winnowing mechanism [to identify uninjured class members] must be truncated enough to ensure that the common issues predominate, yet robust enough to preserve the defendants' Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense." *Id.*  As in *In re Asacol*, the court concluded that no acceptable winnowing mechanism existed since "the defendants intend[ed] to contest whether any of the 2,037 [class members] suffered injury as a result of any conspiracy." *Id.* at 625.

B.   Consumer Plaintiffs Cannot Establish Class-Wide Injury with Common Proof

Consumer Plaintiffs run into the exact problem described by *Rail Freight* and *Asacol*.

Consumer Plaintiffs claim that class-wide injury can be proven with common evidence that ATM operators impose higher surcharges on cardholders when the net interchange they receive falls.  Consumer Plaintiffs' experts, Professor Carlton and Dr. Lehr, each opine that ███████

███████████████████████████████████████████████████████

████████████████████████████████.[93]  But neither expert supports his opinion with empirical evidence: ████████████████████████████████████████████████

███████████████.  Professor Carlton and Dr. Lehr have assumed away the very issue that common evidence must prove if the classes are to be certified.

---

predominance, must 'show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy.'"  *In re Rail Freight II*, 934 F.3d at 624 (quoting *In re Rail Freight I*, 725 F.3d at 252).  That issue need not be resolved in this case because, as in *In re Rail Freight II*, the number of class members for whom individualized inquiries into injury are required—i.e., "how many individual adjudications are too many"—would exceed any "*de minimis*" standard.  *See infra* Sections I.B. & I.C.

[93]  *Mackmin* Br. at 46–51; Carlton Report ¶ 108 ███████████████████████████

████████████████████████████; *see Burke* Pls.' Expert

William Lehr Report ("Lehr Rep.") ¶ 85 ████████████████████████████████████████

███████████).

*Highly Confidential — Subject to Protective Order*

The record shows that an individualized inquiry—not common proof—is required to determine whether any particular ATM operator imposed higher surcharges in response to decreases in net interchange.  An individualized inquiry is also required to determine whether any cardholder broke the chain of causation by his or her own conduct.  The existence of any injury for many cardholders will depend on the circumstances of only one or two transactions at a single ATM.  The average ███████████ cardholder, for example, ████████████████

███████████████████.[94] ████████████████████████████████████████

████████████████████████████████████████████.[95]  Plaintiffs cannot rely on assumptions and averages to obscure the need for individualized inquiries.

       1.     Mackmin *Plaintiffs Cannot Establish Class-Wide Injury with Common Proof*

The *Mackmin* Plaintiffs cannot show with common evidence that all bank-operated ATMs increased surcharges because of decreases in net interchange.  At most, Professor Carlton

████████████████████████████████████████████████████████████████

██████████████████████████████████████.[96]  But analyzing █████████████

██████████ cannot establish common proof:  it sidesteps the issue of commonality entirely.

Professor Carlton ████████████████████████████████████████████████████

███████.

---

[94]   Expert Report of Glenn Hubbard ("Hubbard Rep.") n.47 (████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████).

[95]   Hubbard Rep. ¶ 252.

[96]   Carlton Rep. ¶ 83.

Professor Carlton's assumption ███████████████████████████████████

██████████████████.  Professor Hubbard tested that assumption ████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████.[97]  Using Professor Carlton's

own methodology, Professor Hubbard found ██████████████████████████████

██████████████████████████████████████████████████████████.  For

example, ████████████████████████████████████████████████████

███████.[98]  Indeed, ██████████████████████████████████████████████

████████████████████████████████████.[99]  Even though ███

██████████████████████████████████████████████████████████████

██████████████████████████████████████████.[100] █████████████

████████████████████████████████████████████████████████

███████████████████████.

Professor Hubbard also ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.[101]

---

[97] Hubbard Rep. ¶¶ 222–223. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████.  *See* Hubbard n.445.
[98] Hubbard Rep. ¶ n.452.
[99] Hubbard Rep. ¶ 224.
[100] Hubbard Rep. ¶ 224.
[101] Hubbard Rep. ¶ 131.

The record shows why some bank ATM operators did not raise surcharges in response to declines in net interchange. █████████████████████████████████████████████████

███████████████████████████████████████,"[102] ███████████████████████████████████

████████████████████████████████████.[103]  After Mastercard announced its 2010 reduction in net interchange—an event plaintiffs cite as the primary example showing the impact of the challenged NDRs on surcharging—█████████████████████████████████████

███████████████████████████ left its national surcharge rate unchanged in the decade since Mastercard's revamped fee schedule was released in 2010.[104]

This variation in bank surcharge practices results from a variation in business strategies. Some banks have viewed ATMs primarily as a service to their own account holders,[105] rather

---



[102] Ex. 82, ██████████████████████████████████████████████████████████████;
Ex. 83, ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████; *see also* █████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

[103] ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at 52:1–15. ████████████████████████

[104] ██████████████████████ *See* Ex. 86, ████████████████████████████████████.
█████████████████████████████████████████████████████████. *See id.* at 49:2–10;
Ex. 87, ████████████████████████████████████████████████████

[105] *See* ██████████████████████████████████████████████████████████████;
████████████████████████████████████████████████████████████████████████████
█████████: ████████████████████████████████████████████████████; *id.* at
213:9–217:10 ███████████████████████████████████████████████████████████████
████████████████████████████: ██████████████████████████████████████████████

than a source of revenue, and so set their surcharges based on considerations other than net

interchange alone.[106]  As a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.”[107]  Similarly, ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[108] and that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓”[109]  These banks' business strategies as ATM operators,

and thus their surcharge fees, have been based on a variety of factors, not pure profit-

maximization at each ATM.[110]

        Professor Carlton did not ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓,[111] but they have far-reaching consequences for Consumer Plaintiffs.  By

---

[106] *See, e.g.,* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

[107] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; *see also* ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓(explaining that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

[108] Ex. 90, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

[109] Ex. 91, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

[110] *See* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; Ex. 92, ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓. In fact, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓; *see also id.* at 169:12–18 (▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); Hayes Rep. ¶¶
112–113.

[111] *See, e.g.,* Ex. 93, Dennis Carlton Dep. 112:19–113:19, 124:12–21 (testifying that ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; *see also id.* 92:2–93:3 (▓▓▓▓

way of illustration, Professor Hubbard estimates ███████████████████████████

██████████████████████████████████████████████████████████████████████

███.  That analysis of data from ████████████████████████████████████

████████████████████████████.[112]  There is good reason to believe that a similar

analysis ██████████████████████████████████████████████████████████

██████████████.  Even measured conservatively, these uninjured class members far

exceed any conceivable "*de minimis*" threshold.

2.      Burke *Plaintiffs Cannot Establish Class-Wide Injury with Common Proof*

The record evidence similarly shows—contrary to Dr. Lehr's central assumption—████

████████████████████████████████████████████████████████████████████

███████.  Dr. Lehr simply asserted ████████████████████████████████████

███████████████████████████████████████████████████"[113]

The *Burke* Plaintiffs cannot rely on an assumption alone to carry their burden of proof, but that is



).
[112]  Hubbard Rep. ¶ 256.  As Professor Hubbard notes, ████████████████████████

*Id.* at ¶ 258.

. *Id.* at
n.507.
[113]  Lehr Rep. ¶ 86.

all they have.  Dr. Lehr 

.

Because Dr. Lehr                                    Professor Hubbard        Professor

Hubbard

.[114]  Professor Hubbard found

[115]

.[116]

, Professor Hubbard performed

. Professor Hubbard again

found

.[117]

Like bank ATM operators, independent ATM operators do not uniformly raise surcharges

in response to decreases in net interchange for a variety of different business reasons.  For

example, some independent ATMs operate under a bank's brand and logo, so the independent

operator cannot unilaterally raise surcharges because doing so would carry brand implications

---

[114]  Hubbard Rep. ¶ 225.
[115]  Hubbard Rep. ¶ 225.
[116]  Hubbard Rep. ¶ 225.
[117]  Hubbard Rep. ¶¶ 133–134.

and reputational risk for the branding bank.[118]  Some ATM operators that receive net interchange

have ceded to the premises owner the right to set the surcharge amount, or stipulated to a fixed

surcharge amount by contract.[119]  These premises owners have no reason to vary surcharges in

response to net interchange, because they do not receive net interchange.  They instead set

surcharges at levels to satisfy their own business objectives—for example, merchants may keep

---

[118]  *See* Hayes Rep. ¶¶ 122–123.

[119]  *See* Hayes Rep. ¶¶ 125–130; Ex. 2, GAO Report at 12–13.  Some named Operator Plaintiffs
       have entered into these types of arrangements with merchants.  *See, e.g.*,

                                                                                          ; Ex.
       94,

                                                                              ; *id.* at 122:3–123:7

surcharges at a low level to increase foot traffic in their stores,[120] or casinos and purveyors of adult entertainment may keep their surcharges high to capitalize on a captive audience.[121]

Those and other valid business reasons explain why some independent ATM operators did not increase surcharges in response to decreases in net interchange.  Cardholders who only used any of those operators' ATMs (for one or more transactions) could not have been injured by the challenged NDRs because they did not pay an inflated surcharge.  But those cardholders are still swept into the purported *Burke* class.

Although plaintiffs ███████████████████████ Professor Hubbard ██████████



it is reasonable to expect that a substantial number of cardholders in the proposed *Burke* class are uninjured.[122]  And, as Dr. Lehr's testimony confirms, ███████████████████████



---

[120] *See, e.g.,* ██████████████████████████████ ; Ex. 100, ██████████
██████████████████████████ ; Ex. 101, ██████████
██████████████████████ ; *see also* Lehr Rep. ¶¶ 75, 82
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████ ); Ex. 102, Lehr Dep. 170:10–
176:13 ██████████████████████
██████████████████ ).

[121] *See, e.g.,* ██████████████████████
██████████████████████ ; Ex. 33, Osborn Dep.
189:7–190:22 (██████████████████
████ ).

[122] *See* Hubbard Rep. ¶ 126.

███████████. These problems are baked in to plaintiffs' theory and their experts' models, and cannot be dismissed under any "*de minimis*" threshold.

        3.     *Consumer Plaintiffs Use Averaging to Mask Uninjured Class Members in their But-For World*

To show common proof of injury, Professor Carlton and Dr. Lehr deploy methodologies that rely on averages. But averages necessarily obscure variations within data sets. For example, if four investors lost $5 and one investor made $100, the average outcome for the five investors is a $16 gain. But it would be wrong to say that all five investors made money. So too here. Any consumer who withdrew cash from an ATM that never raised surcharges was not injured regardless of whether his withdrawal is combined with four other consumers who withdrew cash from ATMs that did raise surcharges. Averaging to create the *appearance* of uniform injury does not rectify the *reality* of individual winners and losers in the class. *See, e.g.*, *In re Asacol*, 907 F.3d at 54 (denying class certification where model that relied on representative evidence and averages led to the "demonstrably wrong conclusion that one hundred percent of individuals were injured"); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493 (N.D. Cal. 2008) (denying class certification where model that relied on averages "masked important differences between products and purchasers").

Professor Carlton presents ████████████████████████. With NDRs in place, he expects ████████████████████████████████████████ ████████████████████████████████████████. Without NDRs in place, he expects ████████████████████████████████████████ ████████████████████████████████.[123] Put another way,

---

[123] Carlton Report ¶¶ 51–52. Similarly, Operator Plaintiffs' expert testified that, ██████ ████████████████████████████████████

some surcharges would be higher in the absence of the NDRs.  Both Professor Carlton and Dr.

Lehr suggest that ███████████████████████████████████████████████████

███████████████████████████████████████████[124]  And for their part, the Operator

Plaintiffs likewise testified that, ████████████████████████████████████████████

██████████████████████████████[125]  This means that some cardholders—who are

able to transact only over Visa/Plus and Cirrus—would be worse off without the NDRs in place.

Plaintiffs' claims about the "average" effect simply assumes common impact, but cannot prove it

in light of this evidence.

There are good reasons to believe that many issuers would choose to maintain exclusive

(or near-exclusive) relationships with Visa/Plus or Cirrus, even if their cardholders faced higher

ATM surcharges in the absence of the NDRs, and that those issuers would pay lower interchange



————————————————

███████████████████████████████████████████ Ex. 103, J.
Douglas Zona Dep. 135:22–138:8.

[124] *See* Carlton Report ¶ 52 (explaining that, ████████████████████████████

██████████████████████████████); Lehr Report ¶ 26 (arguing that ████████████

██████████████████████████████████████████████████████.

[125] *See, e.g.,* ██████████████████████████████████████████ (testifying he

████: ███ ██████████ (agreeing that ████████████████████████████████

████: █████████████████████████████████ (testifying that ██████████

████: █████████████████████████████ (testifying that ███████

███████████████████████████████████████.  In its earlier preliminary injunction
motion, one of the putative class representatives candidly stated that the rules ensure that
ATM operators are "[u]nable to raise the surcharge on only Visa or MasterCard
transactions."  Powell Decl. ¶ 8. (*NAC* ECF No. 60-4).

rates for ATM transactions routed to Visa/Plus and Cirrus.[126]  Visa has ███████████

███████████████████████████████████████████████████

██████████████████████.[127]  Mastercard similarly has offered ████

███████████████████████████████████████████████████

█████████████████████████████[128]  As Operator Plaintiffs'

expert observed, ████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████[129]

---



[126]  *See* Ex. 106, ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████. Ex. 5, Cheng 30(b)(6) (Feb. 6, 2019) Dep. 285:1–286:2.
[127]  *See* Ex. 5, Cheng 30(b)(6) (Feb. 6, 2019) Dep. 107:16–110:4 (████████
███████████████████████████████████); Ex. 85
████████████████████████ (testifying that ████████████
███████████████████).
[128]  *See, e.g.*, Ex. 107, ██████████████████████████████████
████████████████████).
[129]  Ex. 17, McAndrews Dep. 310:21–312:8.  Moreover, as plaintiffs' industry experts explained,
████████████████████████████████████████████████
███████████████ McAndrews/Zona Rep. ¶ 40.  For example,
████████████████████████████████████████ *See* Ex.
108, ████████████████████████████████████████████████
████████████████████████; Ex. 109, ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████ *See* Ex. 110, ██████████████████████████████
█████████████████████████████████).

Given these circumstances, the issuers that enable only Visa/Plus or Cirrus for ATM transactions would pay lower interchange rates even if the challenged NDRs did not exist (*i.e.*, in the "but-for world").  But their cardholders would be worse off in the but-for world because, under Consumer Plaintiffs' theory, ATM operators would impose higher surcharges on them. Professor Hubbard estimates that, as of 2015, ███████████████████████████ ████████████████████████████████.[130]  Individualized inquiries into each issuing bank, and each cardholder, would be necessary for the jury to determine which of those cards would have remained enabled only for Visa/Plus or Cirrus if the NDRs did not exist.

Moreover, a cardholder could be worse off in the but-for world based on its issuing bank for an additional reason.  In the rare instances where ATM operators have contemplated differential surcharging, banks that both operate ATMs and issue cards have discussed *raising* surcharges on cards associated with other *specific issuers*.[131]  As plaintiffs note, in Puerto Rico, ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████.[132]  Thus, a factfinder would need to consider how an ATM operator would treat each

---

[130]  *See* Hubbard Rep. ¶ 267.
[131]  ███████████████████████████████████████████ ███████████████████████████████ *. See* Ex. 111, ████████████████████████████████████████ ███████████ Ex. 112, ████████████████ ███████████████████ *. See also* Hayes Rep. ¶¶ 182–186 ████ ████████████).
[132]  *See NAC* Br. at 13; Ex. 113, ██████████████ ████████████████████████

41

cardholder's issuing bank to determine whether that cardholder would or would not have been better off in the but-for world.

4.   *Consumer Plaintiffs Cannot Establish with Common Proof Other Links in Their Causal Chain*

Consumer Plaintiffs argue that cardholders would, over time, avoid higher surcharges by switching to banks offering ATM networks that provided higher net interchange to ATM operators. But there is extensive evidence to the contrary. The evidence shows that cardholders have chosen to incur a surcharge—even when that surcharge was readily avoidable—because the cardholder had different priorities. Those cardholders would not have been injured by defendants' actions. Individualized inquiry therefore is necessary to understand how any given cardholder or group of cardholders would have behaved in a but-for world.

For instance, class representative Ms. Heiskell testified ███████████████████ ████████████████████████████████████████████████,[133] and ███████████████ ███████████████████████████████████████████████████████████████████ ████████ She also testified that ████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████.[136] Class representative Mr. Burke similarly testified that ████████████████████



████████████████████████████████████████████████████████
██████████████████████████████████; *id.* at 368:3–20 ███████████████████
████████████████████████████████████████████████████████.

133   *See* Ex. 34, Heiskell Dep. 93:7–17.
134   *See* Ex. 34, Heiskell Dep. 100:20–101:12.
135   *See* Ex. 34, Heiskell Dep. 141:16–25. ████████████████████████ Most ATM cardholders have a single checking account. █████████████████ Many checking accounts require minimum balances to avoid monthly fees that would far exceed $0.25 savings even on multiple ATM withdrawals per month.
136   *See* Ex. 34, Heiskell Dep. at 142:2–10.



.[137]  He also testified that

[138]

Class representative Mr. Osborn acknowledged that

[139]  And class representative Mr. Byrnes testified that

,[140]

,[141] and

.[142]  These cardholders may prioritize other concerns, such as physical security of

location, over avoiding surcharges.[143]  Individual inquiries would be required of individual

putative class members to determine whether their own choices caused their alleged injuries.

    C.    <u>Operator Plaintiffs Cannot Establish Class-Wide Injury with Common Proof</u>

    Operator Plaintiffs likewise fail to establish common proof of injury.  Operator Plaintiffs

assume but offer no source of evidence that would actually prove that each individual class

member (1) paid fees to Visa and Mastercard[144] and (2) was able to differentially surcharge.

---

[137] *See* Ex. 35, Burke Dep. 91:7–92:6.
[138] Ex. 35, Burke Dep. 182:20–183:7.
[139] *See* Ex. 33, Osborn Dep. 66:4–67:25.
[140] *See* Ex. 114, Brian Byrnes Dep. 99:3–6.
[141] *See id.* at 115:22–116:1.
[142] *See id.* at 117:12–118:6.
[143] *See*                                                                                      .
[144] Because acquiring banks, not independent ATM operators, directly pay acquirer fees to Visa
and Mastercard, the Operator Plaintiffs assert that acquiring banks deduct acquirer fees from
the interchange income that acquiring banks pay to independent ATM operators, such that

Operator Plaintiffs cannot point to common proof to establish these two elements on a class-wide basis.  Rather, individualized, fact-intensive inquiries into thousands of putative class members would be required to ensure that uninjured operators are not swept into the class.

          1.       *Operator Plaintiffs Cannot Establish with Common Proof That Any Given Operator Actually Paid Acquirer Fees*

Operator Plaintiffs' putative class consists of "independent ATM Operators."   Operator Plaintiffs and their witnesses have provided hopelessly vague criteria to identify "ATM Operators" under their definition—a separate failing discussed in Section IV.A.  But at the very least, their definition includes a number of entities that do not pay acquirer fees that Operator Plaintiffs claim as damages.[145]  Any operator that does not pay acquirer fees cannot be injured.

Operator Plaintiffs' brief notes that they rely on the term "ATM operators" as "defined by Visa."[146]  Visa's definition is clear:  an "ATM operator" includes a range of entities that present fraud or other risks in the operation of an ATM connected to the Visa/Plus network.[147]  Visa's rules require ATM acquirers (or their agents) to have contracts with all of these entities because,

---

the operators "pay" acquirer fees on a "pass through" basis.  *See, e.g.*, Ex. 103, Zona Dep. 121:6–12 ███████████████████████████████████████████████████████████.  Even accepting this "pass-through" theory for purposes of argument, Operator Plaintiffs cannot establish fact of injury on a class-wide basis.

[145]  Operator Plaintiffs' damages expert ███████████████████████████████████████████.  Zona Rep. ¶¶ 65–72; *see* Ex. 103, Zona Dep. 115:5–116:2 (███████████████████████████████████████████████████████████████████).

[146]  *NAC* Br. at 1 & n.2; *see also* Ex. 17, McAndrews Dep. 82:4–17, 90:3–18 (explaining that ███████████████████████████); Ex. 103, Zona Dep. 142:16–18 ██████████████).

[147]  Declaration of Clinton Cheng dated February 11, 2020, submitted concurrently with this memorandum ("Cheng Decl.") ¶¶ 3–9.

in the event of fraud, Visa relies on ATM acquirers (the financial institutions) to help locate the

responsible entities.[148]  Specifically, an "ATM Operator" includes:

> An entity authorized by a Member or its Agent to originate a
> Transaction through the connection of an ATM to the Visa ATM
> Network and that displays an Acceptance Mark.  An ATM Operator
> owns, operates, or leases ATMs that are connected to the Visa ATM
> Network and may either or both:
>
> - Receive revenue from the Interchange process or from
>   fees assessed with Transactions
>
> - Manage cryptographic functions or stock ATMs with
>   cash[149]

Multiple types of entities — including "Independent Sales Organizations" (ISOs),

affiliates of ISOs, processors, and merchants — are involved in operating and servicing a single

independent ATM and satisfy this definition of "ATM Operator."[150]  These entities have roles

such as ownership, transaction processing, and cash loading.[151] ████████████████████

████████████████████████████████████████████████████████[152]

But Operator Plaintiffs assume, incorrectly, that there can only be one ATM operator for a given

---

[148]  *Id.*

[149]  Ex. 115, Visa Core Rules and Visa Product and Service Rules, April 15, 2015 (*NAC* ECF No.
60-26, at 764).  The Plus operating regulations include a similar and co-extensive definition.
*See* Ex. 116, Visa Plus System, Inc. Operating Regulations, Oct. 15, 2016 (VISA-ATM1-
00130150, at 311); Cheng Decl. ¶¶ 10–12.

[150]  *See* Cheng Decl. ¶ 14; Hayes Rep. ¶¶ 102-104 & Fig. 23; Ex. 2, GAO Rep. at 4 n.6, 11
(identifying "several types of independent ATM operators" and discussing divisions of
responsibilities).

[151]  *See* Cheng Decl. ¶ 14; Hayes Rep. ¶¶ 102-104 & Fig. 23; Ex. 2, GAO Rep. at 4 n.6, 11.

[152]  *NAC* Br. 43.

terminal.[153]  For any single ATM terminal, more than one entity may be an "ATM operator."[154]

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ [155]

Because so many types of entities fall within this definition, not all ATM operators pay acquirer fees, directly or indirectly.  Visa's definition contemplates that an ATM operator might not "[r]eceive revenue from the Interchange process [n]or from fees assessed with Transaction."[156]  Thus, determining whether a particular ATM operator *actually* paid acquirer fees for a given ATM transaction would be a highly individualized inquiry.  It depends on the individual financial relationships among ATM operators, as well as among ATM operators and other service providers.

The nature of these relationships is complex and varied—███████████████████

█████████████████████████████████████████ [157]  He explained that ██████████████████████████████████

████████████████████████████████████. [158]  Further complicating

---

153  *See, e.g.*, Ex. 17, McAndrews Dep. 73:11–16 (██████████████████████████

██████); *id* at 91:16–17 ███████████████████████████.");

█████████████  This confusion suggests that Operator Plaintiffs are significantly understating the size of the proposed class.

154  *See* Cheng Decl. ¶ 14.

155  *See* Ex. 117, ████████████████████████████████

████.

156  Ex. 115, 2015 Visa Core Rules (*NAC* ECF No. 60-26, at 764).

157  Ex. 64, ████████████████████.

158  *Id.* at 43:2–45:21, 125:7–129:12; *see also* Hayes Rep. ¶¶ 118, 120, 125–130.  For example,

██████████████████████████████████████████

matters, according to the Operator Plaintiffs, ████████████████████████████

███████████████.[159]

    To illustrate, many merchants load cash at ATMs they lease or own on their premises.[160]

These merchants are ATM operators under Visa's definition and, in accordance with Visa's

rules, must have written agreements with acquiring banks (or agents) authorizing them to

connect to the Visa/Plus ATM network.[161]  But many of these merchants do not receive any

interchange revenue or pay any acquirer fees:



████████████████████████. *See, e.g.*, Ex. 26, SJI ATMs 30(b)(6) Dep. 181:21–
182:14 (describing how ████████████████████████████████████
████████████████████████. *See, e.g.*, Ex. 32, TurnKey 30(b)(6) Dep.
219:21–220:14 (testifying that ████████████████████████████████
███████████████).
[159] *See, e.g.*, Ex. 26, SJI ATMs 30(b)(6) Dep. 206:7–21 (estimating ██████████████
████████████████████████); Ex. 32, TurnKey 30(b)(6) Dep. 155:5–11 (describing
██████████████████████████████████████████████████);
*see also* Ex. 105, Selman 30(b)(6) Dep. 362:17–364:21 (████████████████████

████████████████████████████████).
[160] *See, e.g.*, ██████████████ (describing
█████████████████████████████████);
████████████████ (testifying that █████████████
█████████████████████████████████████);
███████████████████ (describing
█████████████████████);
██████████ (testifying that ████████████████████████).
[161] *See, e.g.*, Ex. 118, SJI ATMs Dep. Ex., ████████████████████
████████████████████████████████; Ex. 26, SJI ATMs
30(b)(6) Dep. 206:22–209:22 (agreeing █████████████████████████████
████████); Ex. 119, Just ATMs Dep. Ex. 120, ██████████████
████████████████; Ex. 120, █████████████████████
█████████████████████████████; Ex. 121,

47

- Proposed class representative ⬛⬛⬛⬛⬛⬛ corporate representative testified that, ⬛⬛⬛⬛⬛⬛[162] In this scenario, ⬛⬛⬛⬛⬛⬛."[163] As a result, ⬛⬛⬛⬛⬛⬛[164]

- Proposed class representative ⬛⬛⬛⬛⬛⬛ corporate representative confirmed that, ⬛⬛⬛⬛⬛⬛[165]

- Proposed class representative ⬛⬛⬛ also has ⬛⬛⬛[166] ⬛⬛⬛[167]



As another illustration, a single ATM can be operated by two different "ISO affiliates," which are entities that operate multiple ATMs but do not have a direct relationship with a sponsoring bank.[168]  While both ISO affiliates would be ATM operators under Visa's definition, it may be that only one of them receives interchange revenue and pays the acquirer fees on transactions at the ATM.[169]  For example, ⬛⬛⬛⬛⬛⬛

---

[162] ⬛⬛⬛⬛⬛⬛.
[163] *Id.*
[164] *Id.* at 189:9–14.
[165] ⬛⬛⬛ *see also id.* at 143:4–10.
[166] *See, e.g.,* ⬛⬛⬛⬛⬛⬛ (same).
[167] ⬛⬛⬛.
[168] *See* Ex. 17, McAndrews Dep. 88:1–89:8 (explaining that ⬛⬛⬛⬛⬛⬛.
[169] *See, e.g.,* ⬛⬛⬛⬛⬛⬛





.[170]  For

unknown reasons,

.[171]  However, only

[172]

Only individualized evidence can clarify which ATM operators paid acquirer fees on a

specific ATM's transactions, and is therefore potentially an injured party according to Operator

Plaintiffs.  Indeed,

.[173]  Since damages flow from paying the acquirer fee,

that inquiry would be critical to determine fact of injury.



[170]  *See*                                            (testifying

); *id.* at 216:15–218:21;                .

[171]  *See*                    ,                        .

[172]  *See*                    .

[173]  Ex. 17, McAndrews Dep. 113:3–117:6 (describing

); *see also* Ex. 127, Bruce Renard (National ATM Council
(30(b)(6)) Dep. 164:3–15 (

Operator Plaintiffs cannot overcome these issues by narrowing their class definition to include only non-bank entities that paid acquirer fees.  The entities that directly or indirectly pay acquirer fees for transactions at independent ATMs are not always the same entities that set the surcharges at those ATMs,[174] and Operator Plaintiffs' injury methodology hinges on the assumption that individual class members had the ability to differentially surcharge absent the challenged rules.[175]  Defining the class to include only non-bank entities that paid acquirer fees — and thus exclude some entities that set surcharges at independent ATMs — would replace one insurmountable defect with another.

In the face of so many uninjured class members, Operator Plaintiffs may resort to the suggestion that *someone* must have paid each acquirer fee for an independent ATM transaction, and thus it should not matter to defendants whether the actually injured class members are identified, as long as total aggregate damages are limited to the total amount of acquirer fees paid.  But as the *Asacol* court explained when rejecting this "no harm, no foul" position, it would "fly in the face of the core principle that class actions are the aggregation of individual claims, and do not create a class entity or re-apportion substantive claims."  907 F.3d at 55–56.  For the same reason, Operators Plaintiffs should not be allowed to gloss over complex business

---

[174] *See supra* note 119 and accompanying text, describing ████████████████████████████████ .

[175] Zona Rep. ¶ 40.

relationships among ATM operators—and, as a result, sweep in scores of uninjured class members.

<ol start="2" type="1">
<li><em>Operator Plaintiffs Cannot Establish with Common Proof that Any Given Operator Could Have Differentially Surcharged</em></li>
</ol>

Operator Plaintiffs' injury methodology assumes without any basis that ██████



██████████, and that eliminating the challenged rules would allow those operators to set surcharges differentially.[176]  The facts disprove plaintiffs' assumption and show that individual proof would be required.  At least four categories of independent ATM operators would have been *foreclosed* from adopting differential surcharging without the challenged rules:  (1) some ATM operators accepted one or more of the regional networks (██████████) that required operators to surcharge *uniformly* irrespective of network during the relevant period; (2) some ATM operators gave premises owners the authority to set ATM surcharges, in order to secure desirable ATM locations; (3) some ATM operators would be unwilling to undertake the technological upgrades to make differential surcharging a realistic possibility; and (4) some ATM operators receive financial incentives from ATM networks for delivering transaction volume.  These operators were not injured by the NDRs, but are still swept into plaintiffs' class.

***Uniform Surcharge Rules.***  Regional networks like ██████████ have required ATM operators to apply a *uniform* surcharge to all transactions—regardless of network.[177]  Thus, whether an ATM operator could have differentially surcharged in the but-for world depends, in part, on whether that operator accepted one of those networks.  If the operator did, then it would not be able to differentially surcharge—and the game ends there.

---

[176]  Ex. 103, Zona Dep. 146:1–4.
[177]  *See supra* note 65.

Based on Professor Hubbard's analysis, █████████████████████████████████

███████████████████████████████████████████████████.[178]  But Operator

Plaintiffs and their experts did not even *mention* the uniform surcharge rules, much less attempt

to explain how operators subject to them could have differentially surcharged.  At his deposition,

Dr. Zona testified that ████████████████████████████████████████████████

███████████████████████████"[179]  Dr. McAndrews was ██████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████.[180]  Unlike plaintiffs'

experts, a jury would have to consider whether any given operator was able to differentially

surcharge based on other networks' uniform surcharging rules.  That would require

individualized inquiry.

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████[181]  But the facts support the opposite view:

████████████████████████████████████████████████████████████████████

---

[178]  Professor Hubbard found ████████████████████████████████████████

███████████████████████████████████████.  Hubbard Rep. ¶ 145.

[179]  Ex. 103, Zona Dep. 170:6–20.

[180]  Ex. 17, McAndrews Dep. 195:11–21 (███████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████).

[181]  *See* Ex. 103, Zona Dep. 175:11–22; Ex. 17, McAndrews Dep. 199:3–8; Carlton Rep. ¶ 39

████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████. *See supra* Background Section B.  And regardless, plaintiffs'

experts ██████████████████████████████████████████.[182]  They have

no reason to believe those networks would have dropped their rules if Visa and Mastercard never

had adopted their NDRs.  There is also no reason to believe that ATM operators would have

uniformly chosen not to accept ATM networks with NDRs or uniform surcharging requirements.

To the contrary, ATM Operator Plaintiffs have testified ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████[183]

   ***Ceding Surcharging Authority.***  Similarly, operators that contractually ceded to premises

owners the authority to impose surcharges could not differentially surcharge, even if the NDRs

did not exist.  Those operators would thus be uninjured.

---

[182] *See* Ex. 103, Zona Dep. 171:20–172:4; Ex. 17, McAndrews Dep. 199:10–22, 202:1–7,
318:12–17.

[183] *See, e.g.*, Ex. 128, Objs. and Resps. of ATMs of the South, Inc. to Mastercard Def.'s First Set
of Interrogs. at Resp. to Interrog. No. 11, at 6; Ex. 104, ATMs of the South 30(b)(6) Dep.
125:10–126:24 (testifying █████████████████████████████████████████████
████████████████████████████████████; Ex. 129, Objs. and Resps. of SJI ATMs to Mastercard Def.'s First Set
of Interrogs. at Resps. to Interrog. No. 11, at 6; Ex. 26, SJI ATMs Dep. 30(b)(6) 164:3–164:4
(██████████████████████████████████████████████); Ex. 130, Objs.
and Resps. of Just ATMs, Inc. to Mastercard Def.'s First Set of Interrogs. at Resps. to
Interrog. No. 11, at 6; Ex. 99, Just ATMs 30(b)(6) Dep. 216:24–217:12 (████████
████████████████████████████████████████████████████
████████████████); Ex. 32, TurnKey 30(b)(6) Dep. 163:5–12 (██████████████
████████████████████████████████████████████████████
████████████████████████).

The record evidence suggests that ████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████. ATM operators

routinely compete against each other for contracts with premises owners and give premises

owners discretion to set surcharge levels in that context.[184]  One independent ATM operator

testified that ████████████████████████████████████████████████████████

█████████████████████████████████████.[185] ████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████.[186]  Another independent

ATM operator ███████████████████████████████████████████████████████████

███████████████████████████████████████.''[187]

Dr. McAndrews testified that ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████.[188]  This is unsupported speculation.  The undisputed factual record shows

---

[184]  *See supra* note 119.
[185]  ███████████████████████████████████████████████
[186]  *Id.* at 47:23–48:8.
[187]   . This Operator Plaintiff's

   *See, e.g.,*

   . *But see*                                      (stating
                                                      ).
[188]  Ex. 17, McAndrews Dep. 177:3–181:1, 189:19–190:13.

that █████████████████████████████████████████████████████████

██████████████████████████████████████[189] ███████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████

> ***Technological Capability.*** Operators' ATMs require certain technological capabilities to enable differential surcharging. All ATMs likely would require a software upgrade, and many would require a hardware upgrade as well. Depending on the scope of an ATM operator's existing fleet of terminals, these upgrades can vary in both expense to the operator and the extent to which they would disrupt the operator's business.[190] A factfinder would have to determine whether any given operator would have been likely to incur the expense and inconvenience of upgrading its fleet's technological capabilities, in the absence of the rules. Operators' willingness to undertake upgrades is likely to vary widely: ████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████[191] Operator Plaintiffs fail to account for these individual issues relating to injury.

---

[189] As Consumer Plaintiffs' expert Dr. Lehr correctly notes, ████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████ Lehr Report ¶¶ 75, 82.

[190] *See, e.g.*, Ex. 32, TurnKey 30(b)(6) Dep., 336:20–338:14 (testifying ██████████████
████████████████████████████████████████████); Ex. 131, █████████
█████████████████████████████████████████; *id.* at 906–07 (showing
██████████████████████████████).

[191] *See* Ex. 96, ATM Bankcard Services 30(b)(6) Dep. 56:19–57:9 ████████████████
████████████████████████████████████████████████████████████

***Contracts with Networks.*** Operator Plaintiffs also ███████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████[192]  Operator Plaintiffs ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████.[193]  Again, Operator Plaintiffs fail to account for these

individual issues relating to injury.

## II.   Plaintiffs' Models Are Invalid Because They Do Not Show Class-Wide Antitrust Injury in a Two-Sided Market

The ATM networks at issue here are two-sided transaction platforms.  Under the

Supreme Court's decision in *Amex*, the relevant market in Sherman Act cases involving two-

sided transaction platforms must include both sides of the platform.  138 S. Ct. at 2286–87.  Any



████████████████████████████████████████████████████
██████████████████████████; Ex. 104, ATMs of the South 30(b)(6) Dep. 81:20–82:5;
Ex. 26, SJI ATMs 30(b)(6) Dep., 138:16–139:14 (testifying ████████████
████████████████████████████████████); Ex. 105, Selman 30(b)(6) Dep.
122:18–124:20 (testifying ████████████████
██████████████████████████████); Ex. 122, Wash Water 30(b)(6) Dep. 159:7–
161:6; 165:21–167:6 (testifying ████████████████████████
█████████████████████); Ex. 25, Trinity 30(b)(6) Dep. 72:23–73:3; *see also id.* at 79:6–23
(testifying ██████████████████████████████████████████
██████████████████████).

[192]  *See, e.g.*, Ex. 132, ██████████████████████████████████████
████████████████; Ex. 133, ██████████████████████████████████
███████████████████████████████████████████████.

[193]  For example, Dr. Zona admitted that he had ████████████████████
████████████████████████████████████████████████████
██████████████.  *See* Ex. 103, Zona Dep. 249:6–252:6.

assessment of alleged anticompetitive effects likewise must be conducted in that two-sided market.  Accordingly, plaintiffs must account for costs and benefits on both sides of the platform and not focus solely on costs (whether to the cardholder or the ATM operator) on the acquiring side.  *See id.*

All of plaintiffs' economic models fail this requirement.  It is not enough to show that each class member paid more on the ATM acquiring side as a result of the challenged rules (which plaintiffs cannot do in any event).  The models must show that the amount class members paid was the result of an anti-competitive effect of the rules across both sides of the platform, as required to show antitrust injury.[194]

A.      *Amex* Requires that Competitive Effects Be Assessed on Both Sides of a Two-Sided Transaction Platform

*Amex* involved a Sherman Act challenge to American Express's "anti-steering provisions," which prohibited merchants from using surcharges or other mechanisms to dissuade customers from using their American Express cards.  138 S. Ct. at 2283.  Before assessing whether these rules had anti-competitive effects, the Court explained that a credit card network is a "two-sided platform," meaning it "offers different products or services to two different groups who both depend on the platform to intermediate between them."  *Id.* at 2280.  Moreover, "the value of the two-sided platform to one group of participants depends on how many members of a different group participate," a phenomenon referred to as "indirect network effects."  *Id.* at 2280–81.

---

[194] Antitrust plaintiffs "must prove more than injury causally linked to an illegal presence in the market."  *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Rather, they "must prove *antitrust* injury," which requires that the alleged injury must be *both* "injury of the type antitrust laws were intended to prevent *and* [injury] that flows from that which makes defendants' acts unlawful."  *Id*. (second emphasis added).

The Court determined that "two-sided platforms . . . must take these indirect network effects into account before making a change in price on either side," which can require the platforms to "charge one side much more than the other." *Id.* at 2281. "In a competitive market, indirect network effects also encourage companies to take increased profits from a price increase on side A and spend them on side B to ensure more robust participation on that side and to stem the impact of indirect network effects. . . . Indirect network effects thus limit the platform's ability to raise overall prices and impose a check on its market power." *Id.* at 2281 n.1. Given these features, the Court explained, "[p]rice increases on one side of the platform . . . do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services," after accounting for decreases in costs on the other side of the platform. *Id.* at 2286.

The Court held that credit card networks fell into a subset of two-sided platforms—namely, "two-sided transaction platforms"—that inherently "exhibit more pronounced indirect network effects" because they "cannot make a sale unless both sides of the platform simultaneously agree to use their services." *Id.* at 2286. For two-sided transaction platforms, "courts must include both sides of the platform" when defining the market and "assess[ing] competition." *Id.* at 2286–87. Thus, "as a matter of law," transaction platforms "must *always* receive two-sided treatment." *US Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) ("*Sabre*") (emphasis in original) (applying *Amex*).

With this framework established, the Supreme Court proceeded to "analyze the two-sided market for credit-card transactions as a whole," and determined that plaintiffs had failed to show that the anti-steering provisions had anticompetitive effects in that two-sided market. *Amex*, 138 S. Ct. at 2287–90. The Court noted that, while the fees charged on the merchant side of the

platform had increased, that fact alone did not demonstrate "an ability to charge above a competitive price." *Id.* at 2288. Indeed, the available evidence suggested these price increases were caused by "increased competition for cardholders and a corresponding marketwide adjustment in the relative price charged to merchants." *Id.* And the plaintiffs in *Amex* failed to offer evidence on the effect of costs and prices on the other side of the platform. *Id*. at 2287–88.

B.   ATM Networks Are Two-Sided Transaction Platforms

ATM networks, just like credit card networks, are two-sided transaction platforms requiring a two-sided market analysis under *Amex.* Operator Plaintiffs' experts Drs. Zona and McAndrews acknowledged ██████████████████████████████████."[195]

*Mackmin* Plaintiffs' expert Professor Carlton agreed that ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████.[196] *Burke* Plaintiffs' expert Dr. Lehr likewise asserts that ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████.[197]

The relevant facts demonstrating that ATM networks are two-sided transaction platforms are not in dispute. First, ATM networks offer ████████████████████████████████

---

[195]   Ex. 17, McAndrews Dep. 237:6–8 (████████████████████████████ ████████████████████████████); McAndrews/Zona Joint Rep. ¶ 20 (███████████ ████████████████████████████).
[196]   *See* Ex. 93, Carlton Dep. 297:6–306:14.
[197]   Lehr Rep. ¶ 22; *see also id.* ¶ 56 (stating that ██████████████████ ████████████████████████████████████████).



██████[198]: issuers/cardholders on one side, and acquirers/operators on the other.[199]  Second, ATM networks exhibit ██████████████████████████

█████████████████████████████████████████████

███████████████████████████████"[200]  Finally, ATM networks fall within the subset of two-sided platforms known as "transaction" platforms because the "sale" occurs to issuers/cardholders and acquirers/operators *simultaneously*.  *See Amex*, 138 S. Ct. at 2280; *Sabre*, 938 F.3d at 57.  Plaintiffs' expert McAndrews confirmed: ███████████

█████████████████████████████████████████████

████"[201]

C.      Plaintiffs' Experts Failed to Conduct the Requisite Two-Sided Market Analysis

█████████████████████████████████████████████

███████████████████████████  To conduct a two-sided market analysis of the impact of the rules, one would have to combine costs (and benefits) on the acquirer/operator side with costs (and benefits) on the issuer/cardholder side, and determine whether the "total" or

---

[198]  McAndrews/Zona Joint Rep. ¶ 31 (████████████████████████████████
████████████).

[199]  *See id.* ¶ 30 (██████████████████████████████████████
██████████).

[200]  Ex. 103, Zona Dep. 210:5–211:22; *see also* Ex. 17, McAndrews Dep. 222:5–17 (agreeing that ████████████████████████████████████████
███████████).

[201]  Ex. 17, McAndrews Dep. 226:10–14 (████████████████████████████
████████████████████████████); *see also* McAndrews/Zona Joint Rep. ¶ 31 (██████████████████████████████████████████
██████████████████████████) (emphasis added); Ex. 93, Carlton Dep. 302:14–306:14 (agreeing that ████████████████████████████
████████████).

"net" price was supra-competitive.  *See Amex*, 138 S. Ct. at 2286–87; *Sabre*, 938 F.3d at 58–59

(explaining that "[i]n a two-sided platform, the payment made to [consumers on one side] would

. . . necessarily reduce any damages" to a consumer on the other side).  None of plaintiffs'

experts attempted to do this.



Plaintiffs' experts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[202]  The models ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Nor do plaintiffs'

models ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Plaintiffs' experts ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.[203]  And they ignore the opinion of Operator Plaintiffs'

---



[202] *See, e.g.*, Zona Rep. ¶ 63 (stating that ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮); Carlton Rep. ¶ 41 (summarizing ▮▮▮▮

▮▮▮▮▮▮); Lehr Rep. ¶ 24 (concluding that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮).

[203] During his deposition Dr. Zona suggested that ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  Ex. 103, Zona Dep. 213:11–216:10, 258:1–

262:12.  However, he made clear ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* at

own industry expert that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[204]  Plaintiffs' models thus fail to show that, on

a class-wide basis, the two-sided cost of ATM transactions would be lower for all cardholders

absent the challenged rules.

Plaintiffs' experts suggest ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[205]  But plaintiffs' economic theories on these

subjects are irrelevant.  The Supreme Court has held that—in the context of a transaction

platform—a two-sided market analysis is required as a matter of law.  As the Second Circuit

recently explained:  "[T]he relevant market for [transaction platforms] must, *as a matter of law,*

always include both sides."  *Sabre*, 938 F.3d at 58.  Thus, an opinion from an economic expert

that a transaction platform is not two-sided because it "lack[s] interdependence" so that

"changing prices on one side of [the] platform will not affect demand in the market as a whole,"

---

260:3–15.  He also agreed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  *Id.* at 33:9–20.

[204]  *See* Ex. 17, McAndrews Dep. at 267:5–18.

[205]  *See* Zona Rep. ¶ 58 (stating that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮); McAndrews Rep. ¶ 58 (arguing that ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Carlton

Rep. ¶ 111 n.150 (explaining that, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

is "*wrong as a matter of law* in light of *Amex*."  *Id.* (emphasis added).  That rejected argument is precisely what plaintiffs' experts advance here.

Nor can plaintiffs take refuge in their argument that this issue "has been resolved in [their] favor" based on findings in *Osborn* v. *Visa*, 797 F.3d 1057, 1060 (D.C. Cir. 2015) on antitrust standing.[206]  The *Osborn* decision predates *Amex* by three years.  *Osborn* therefore did not, and could not have, approved of plaintiffs' failure to conduct the two-sided market analysis that *Amex* later required.

In addition to being wrong as a matter of law, plaintiffs' experts are also wrong on the facts.  There is overwhelming evidence that networks recognize and account for both issuer-side and acquirer-side effects when they make decisions regarding interchange rates and acquirer fees.  For instance,



[207]

When Visa added a higher interchange rate tier in 2016, it sought to ███████████████

---

[206]  *Mackmin* Br. at 28; *see also Burke* Br. at 1.

[207]  Ex. 134, Englebardt Dep. Ex., ██████████████████████████

██████████████████████████

██████████████████████████; *see also* Ex. 77, ██████████████████████████ ).



*Public Redacted Version*                    *Highly Confidential – Subject to Protective Order*

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████,"[208]

ATM networks have used increases in acquirer-side fees to fund increases in issuing-side incentives.[209]  Likewise, ██████████████████████████████████████████

██████████████████████████████████████████████████,[210] and sometimes ████████████████████████████████████████████.[211]  Even if plaintiffs' experts' unsupported assertions were considered by the Court (which they should not



[208] *See* Ex. 80, ████████████████████████████████████████████████████████
████████████████████████.

[209] *See, e.g.*, Ex. 70, ████████████████████████████████████████████████████
███████; Ex. 77, ████████████████████████████████████

[210] *See, e.g.*, Ex. 107, ████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
████████████; Ex. 110, ████████████████████████████████████████████████████████
██████████████████████████████ Ex. 135, ████████████████████████████████████████
███████████████████ Ex. 136, ███████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

[211] For example, for transactions acquired at ████████████████████████████████
████████████████████████████████████████████████████████████. *See*
Ex. 15, ████████████████████████████████████; Ex. 137, ████████████████████████
████████████████████; *see also* Ex. 138, ████████████████████████████████████
██████████████████████████████████████████████████████████████████

be), the overwhelming weight of evidence is against their claims.[212]  The Court should resolve

this dispute at class certification.  *See In re Hydrogen Peroxide*, 552 F.3d at 323 ("Weighing

conflicting expert testimony . . . may be integral to the rigorous analysis Rule 23 demands.");

*Ellis*, 657 F.3d at 982 (holding court must "judg[e] the persuasiveness of the evidence presented"

not "merely admissib[ility]" under *Daubert*).

*       *       *

In short, the models presented by the plaintiffs are unreliable as a matter of law because

they fail to follow Supreme Court precedent on two-sided transaction platforms.  This is a class

certification issue, not just a merits issue.  *See In re Rail Freight I*, 725 F.3d at 255 (Rule 23 "not

only authorizes a hard look at the soundness of statistical models that purport to show

predominance—the rule commands it").  Plaintiffs acknowledge the two-sided nature of ATM

transactions but fail to construct a proper model to address it.  Accordingly, they are not entitled

to class certification.  *See id.* at 253.

## III.   Consumer Plaintiffs' Models Do Not Reliably Measure Injury or Damages to Individual Cardholders

Consumer Plaintiffs' models are unreliable for another, independent reason.  Neither

corresponds with Consumer Plaintiffs' theory of injury, neither is based on an empirical analysis

of whether reduction in net interchange was passed on in higher surcharges, and neither can

determine whether the cardholder in question was reimbursed for a surcharge imposed at the

ATM.  Plaintiffs' models cannot withstand the "hard look" that class certification requires.  *See*

---

[212]  Operator Plaintiffs improperly rely on a soundbite from a Visa deposition, to assert that ███████ ██████████████████████.  *See* Zona Rep. ¶ 58 (████████████████████████████ ███████████████████).  Nowhere did the witnesses say that ████████████████ ████████████████████████.  Moreover, there is overwhelming evidence (including at the cited deposition) demonstrating that ████████████████████████████████████ ████████████████████████████████████████████████████████████.

65

*In re Rail Freight I*, 725 F.3d at 254.   As the D.C. Circuit has succinctly stated:  "[n]o damages model, no predominance, no class certification."  *Id.* at 253.

**Failure to Measure Damages to Cardholders.**  To support class certification, a plaintiff must come forward with a model that "measures only those damages attributable" to plaintiffs' theory of injury.  *Comcast*, 569 U.S. at 35–36.  Consumer Plaintiffs have failed to do that here. While Consumer Plaintiffs allege injury based on supra-competitive surcharges, neither of their models actually measures the alleged overcharges paid by putative class members.

Consumer Plaintiffs' models do not measure *their* alleged damages.  Instead, both Dr. Lehr and Professor Carlton calculate



.[213]  Professor Carlton's model

.[214]  Dr. Lehr's model likewise

[215]

Instead of measuring injury as the *difference* between the surcharge each class member paid and the surcharge that would have prevailed absent the NDRs, Consumer Plaintiffs evaluate only the fees that ATM operators paid and the net interchange they received.  Consumer

---

[213]  *See* Lehr Rep. § 7.6; Ex. 102, Lehr Dep. 230:17–233:9 (testifying that

); Carlton Rep. ¶¶ 109–11.
[214]  *See* Carlton Rep. ¶¶ 109–11.
[215]  *See* Lehr Rep. ¶¶ 39–48, § 7.6; *see also* Ex. 102, Lehr Dep. 230:17–233:9.

Plaintiffs cannot support their motion for class certification with models measuring the alleged damages of the Operator Plaintiffs.  They must come forward with models measuring their *own* damages in accordance with their *own* theories, which depend exclusively on inflated surcharges.  But neither expert analyzes the surcharges that Consumer Plaintiffs actually paid themselves.  Their models are therefore invalid under *Comcast*.

**Failure to Calculate Pass-Through.**  Consumer Plaintiffs try to bridge the gap between their theory of injury and the damages model they offer by arguing that the damages the operators incurred are their own.  Even if that were true, Consumer Plaintiffs would have to offer a pass-through analysis to show it.  But neither Professor Carlton nor Dr. Lehr ██████████ ████████████████████████████ .

Typically, in cases where overcharges are alleged to be assessed to one party and passed on to a second, an economic analysis is necessary to determine the extent to which they in fact were passed on—and, as a result, the extent to which the second party was injured.[216]  Neither Professor Carlton nor Dr. Lehr determined (i) ████████████████████████████████ ████████████████████████████████████████ or (ii)███ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████

---

[216]  *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 395b1 (4th ed. 2013-2018) (noting that "cost increases are not usually passed on in their entirety"); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d at 111; *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 134 (E.D. Pa. 2015).

Instead, Professor Carlton and Dr. Lehr simply ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████.[217]  As that white paper explains, "Plaintiffs' experts often rely

on this finding [of 'perfect competition'] to justify an assumption of common pass-through at all

layers of the market and on all products at issue.  Economists, however, have long recognized

that world markets rarely follow the simple paradigm of 'perfect competition' and that firms do

not always increase their prices dollar for dollar with each increase in costs.  Thus the extent of

pass-through, if any, is generally an empirical question."[218]  Although Dr. Lehr admitted that █

████████████████████████████████████████████████████████

██████████████████████████████.[219]  As in a previous class action

antitrust case where the court found that Dr. Lehr's opinion was unsupported by evidence, Dr.

Lehr offers only "bottom-line conclusions" here.  *In re Text Messaging Antitrust Litig.*, 46 F.

Supp. 3d 788, 809–810, 812 (N.D. Ill. 2014).

Professor Carlton does undertake some minimal empirical steps: █████████████████

█████████████████████████████████████████████████████████.

Professor Carlton concludes that a ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

---

[217]  *See* Ex. 139, Lehr Dep. Ex., Kostis Hatzitaskos, et al., *Antitrust Impact in Indirect Purchaser Class Actions: The Need for Rigorous Analysis of Pass-Through* 3–4 (April 2015).

[218]  *Id.* (emphasis in original).

[219]  Ex. 102, Lehr Dep. 183:12–185:17.

███████████████████████.[220]  Professor Carlton further acknowledged that █

████████████████████████████████████████████████████

███████████████████████.[221]  But Professor Carlton simply ██████████████

████████████████████████████████████████████████████

██████.[222]  As discussed above, █████████████████████.  *See supra*

Section I.B.1.

In the end, neither Professor Carlton's nor Dr. Lehr's "model" can withstand the "hard

look" that class certification requires.  *See In re Rail Freight I*, 725 F.3d at 254 ("It is not enough

to submit a questionable model whose unsubstantiated claims cannot be refuted through *a*

*priori* analysis."); *In re Graphics Processing Units*, 253 F.R.D. at 506 (finding plaintiffs' class

certification expert's analysis unreliable in part because plaintiffs had not obtained the data

necessary for their expert's regression analysis, and asserting that "plaintiffs should be able to

provide more than promises at this late stage of the litigation").  Plaintiffs cannot rely on

unfounded assumptions to carry their burden of proof.

**Failure to Exclude Reimbursements.**  Even if Consumer Plaintiffs were able to

overcome these fatal flaws, they would run into another.  Although putative class members who

were reimbursed by their issuing banks are uninjured, plaintiffs have not built models that can

exclude these transactions.  Dr. Lehr ███████████████████████████

█████████████████████████████████████.[223]  ██████████████

---

[220]  *See, e.g.*, Carlton Rep. ¶ 83; Hubbard Rep. ¶ 222 n.446.
[221]  *See* Ex. 93, Carlton Dep. 40:2–12.
[222]  *See id.* at 124:14–126:17.
[223]  *See* Ex. 102, Lehr Dep. 233:10–21.

████████████████████████████████████████.[224]  And Dr. Lehr ████████████████

████████████████████████████████████.[225]  ████████████████████

████████████████████████████████████████████████████

████████████████████.

Professor Carlton similarly acknowledges that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████,"[226]  Professor Carlton ████████████████████████████████

████████████████████████████████.[227]  At most, Professor Carlton

observes that ████████████████████████████████████████████████

████████████████[228]  But, like Dr. Lehr, he ████████████████████████████

████████████████████████████████████████████████████████.

Accordingly, the Consumer Plaintiffs' models cannot be used to detect injury or measure

damages to any particular cardholder.  They fall well short of the applicable standard.

## IV.   The Proposed Classes Are Not Ascertainable or Administratively Feasible

Courts in this Circuit have recognized an implied requirement of ascertainability, as the

Operator Plaintiffs and *Mackmin* Plaintiffs acknowledge.[229]  *See Brewer* v. *Lynch*, No. 08-1747,

2015 WL 13604257, at *5 (D.D.C. Sept. 30, 2015) ("Courts in this Circuit have 'grafted' onto

---

[224]  *See, e.g.*, *id.* at 233:22–239:25.
[225]  *See id.* (admitting ████████████████████
████████████████████████████████).  *See* Hubbard Rep. ¶¶ 49, 319;
*id.* at Ex. 1 & 2.
[226]  Carlton Rep. ¶ 102.
[227]  *See* Ex. 93, Carlton Dep. 264:14–271:3.
[228]  *Id.*
[229]  *See NAC* Br. at 40; *Mackmin* Br. at 23.

Rule 23 an 'implied' requirement that a court should first determine whether a proposed class is adequately defined such that its members are clearly ascertainable.").[230]  This requirement is essential to "protect absent plaintiffs by enabling notice and to protect defendants 'by enabling a final judgment that clearly identifies who is bound by it.'"  *DL* v. *D.C.*, 302 F.R.D. 1, 16 (D.D.C. 2013) (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:7 (5th ed.)).  Courts in this District apply two principles to determine whether a proposed class is "sufficiently definite":  A class "must be ascertainable by reference to or based on objective criteria," and "analysis of the objective criteria must be administratively feasible."  *Brewer*, 2015 WL 13604257, at *6 (citing cases).  All three classes fall short of these standards.

###### A.     The Operator Class Is Not Defined by Objective Criteria

Operator Plaintiffs do not satisfy the basic requirement that the class be defined "by reference to or based on objective criteria."  *Brewer*, 2015 WL 13604257, at *6; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d at 92 (putative class must be "sufficiently defined so as to be identifiable as a class").  Under this principle, "a class may be certified only when 'an individual would be able to determine, simply by reading the [class]

---

[230]  Although the D.C. Circuit has not addressed the question, a number of courts in this District have followed the holdings of other circuit courts in applying an implied ascertainability requirement under Rule 23.  *See e.g.*, *Campbell* v. *Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 313 (D.D.C. 2018); *Brewer* v. *Lynch*, No. CV 08-1747-BJR, 2015 WL 13604257 (D.D.C. Sept. 30, 2015) (citing several further cases).  *But see, e.g.*, *Little* v. *Washington Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 418 (D.D.C. 2017) (certifying class without referencing or analyzing an implied requirement of ascertainability).  Some courts have applied a "heightened" ascertainability standard, such as the one adopted by the Third Circuit, which requires the plaintiff to demonstrate that the purported method for ascertaining class members is not only "administratively feasible," but also "reliable . . . and permits a defendant to challenge the evidence used to prove class membership."  *Carrera* v. *Bayer Corp.*, 727 F.3d 300, 308 (3d Cir. 2013).  Defendants do not rely on that heightened standard here.  *See In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, No. MC 15-1825 (ESH), 2019 WL 3021245, at *29 (D.D.C. July 10, 2019) (confirming the implied ascertainability standard but declining to adopt the Third Circuit's approach).

definition, whether he or she [is] a member of the proposed class.'" *Campbell* v. *Nat'l Railroad Passenger Corp.*, 311 F. Supp. 3d 281 (D.D.C. 2018) (quoting *Artis* v. *Yellen*, 307 F.R.D. 13, 23 (D.D.C. 2014)); *Bynum* v. *District of Columbia*, 214 F.R.D. 27, 32 (D.D.C. 2013); *see also, e.g.*, *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 2019 WL 3021245, at *29. A court "should deny class certification 'where the class definitions are overly broad, amorphous, and vague.'" *Brewer*, 2015 WL 13604257, at *5 (quoting *Perez* v. *Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003)). Here, Operator Plaintiffs' proposed class definition lacks objective criteria, and the definition confounds both the Operator Plaintiffs' proposed class representatives and their experts.

Operator Plaintiffs' motion for class certification asserts a class of "ATM Operators that originated an Authorized Surcharged ATM Cash Disbursement at a Qualified ATM at any time between October 1, 2007 and the present."[231] Operator Plaintiffs define ATM Operator as:

> any person or entity that owned, operated, or leased a Qualified ATM that was authorized by a Mastercard Member or Visa Member, or by the agent of such Member, to originate an ATM Cash Disbursement through the connection of the Qualifying ATM to the Visa or Mastercard ATM Networks.[232]

Plaintiffs have provided no objective criteria to clarify what they mean by "authorized . . . to originate" ATM transactions in the class definition. This language purports to track the Visa definition of ATM Operator,[233] and Visa understands this term to refer to entities that have a written "ATM Operator Agreement" with a sponsoring bank.[234] Visa specifically

---

[231]  *NAC* Pls.' Mot. Leave to File Corrected Br. Supp. Mot. Class Certification, Appendix A, Class Definition (ECF No. 154-1).

[232]  *Id.*

[233]  *See supra* note 146.

[234]  Cheng Decl. ¶¶ 6–9; *see also* Ex. 117, ██████████████████████████████████ ██████████████████████████████.

requires its sponsoring banks to maintain ATM Operator Agreements with all ATM operators so that it can manage the risks posed by entities involved in the operation of an ATM connected to the Visa/Plus network.[235]

But Operator Plaintiffs have rejected any approach that relies on ATM Operator Agreements to define the entities in their proposed class.  When presented with actual ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████.  Operator Plaintiffs testified, at

deposition or by declaration, █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ (*i.e.*, an entity authorized to originate transactions at the ATM).[236]

Operator Plaintiffs' witnesses instead have offered internally inconsistent and non-objective criteria to identify the entities that are authorized to originate an ATM transaction. Operator Plaintiffs' two experts—Drs. Zona and McAndrews—███████████████████

███████████████████████████████████████████████████.[237]  For

---

[235] Cheng Decl. ¶¶ 6–9.

[236] *See* Ex. 140, William Scot Gardner Decl. dated October 9. 2019 ¶ 7 (██████████████████

██████████████████████████████████████████████████████); Ex. 26, SJI ATMs
30(b)(6) Dep., 210:21–215:5; Ex. 99, Just ATMs 30(b)(6) Dep. 194:17–197:11 (testifying
██████████████████████).

[237] *See* Ex. 103, Zona Dep. 86:1–88:10 (identifying ████████████████████████

███████████████████████████████); Ex. 17, McAndrews Dep. 63:13–73:21 (identifying

█████████████████████████████████████████████████████).

example, Dr. Zona claims that ███████████████████████████████████████

███████████████████████████████████" while Dr. McAndrews claims that ███

██████████████████████████.[238]  Ultimately, Dr. Zona conceded ████████████

████████████████████████████████████████████."[239]

    Named Operator Plaintiffs have been unable to say who is authorized to originate

transactions at various ATMs, or why, testifying that ██████████████████████████

████████████████████"[240]  One plaintiff testified that ████████████████████

████████████████████████████████████████████████████████████

---



[238] Ex. 103, Zona Dep. 88:5–89:1; Ex. 17, McAndrews Dep. 72:21–74:6.
[239] Ex. 103, Zona Dep. 86:15–17 (███████████████████████████████████████
████████); *see also id.* at 144:1–150:1 (clarifying that ██████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████).
[240] *See* Ex. 96, ATM Bankcard Services Dep. 110:25–112:2 (testifying that ██████
████████████████████████████████████████████████); *id.* at 178:11–179:9
(ATM Bankcard Services was ███████████████████████████████████████████
█████████████████████); Ex. 32, TurnKey 30(b)(6) Dep. 95:13–96:6, 96:17–97:2 (testifying
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████); Ex. 99, Just ATMs 30(b)(6) Dep. 44:25–47:4 (testifying at
████████████████████████████████████████████████████████████
█████████████).  *See also* SJI 30(b)(6) Dep. 247:8–20, 392:11–394:7 (testifying
████████████████████████████████████████████████████████████
████████████████████████████████████████).

████████████, while another testified that █████████████████████

████████████████████████████████████████████.[241]

If a named representative cannot determine whether it meets the class definition, no

average entity would "be able to determine, simply by reading the definition, whether he or she

was a member of the proposed class." *Bynum*, 214 F.R.D. at 32.  With such an "amorphous" and

"imprecise" definition, there "can be no class action."[242]  *Young* v. *Nationwide Mutual Ins. Co.*,

693 F.3d 532, 538 (6th Cir. 2012) (citation and quotation marks omitted).

B.     The Proposed Classes Are Not Administratively Feasible

Even if a proposed class is defined by some objective criteria, the "analysis of the

objective criteria must be administratively feasible." *Brewer*, 2015 WL 13604257, at *5.  In

other words, a plaintiff must show that the court would not be required to "answer numerous

fact-intensive questions before determining if an individual may join the class." *Williams* v.

*Glickman*, No. CIV.A. 95-1149 (TAF), 1997 WL 33772612, at *4 (D.D.C. Feb. 14, 1997).

Classes have been held administratively feasible, for instance, when they require "little more"

---

[241]  *See* Ex. 96, ATM Bankcard Services 30(b)(6) Dep. 30:1–31:24 ████████████

███████████████████████████████████████████████████████

█████████████████████████████; Ex. 25, Trinity 30(b)(6) Dep. 30:8–19

(█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████).

[242]  Operator Plaintiffs proposed in their original complaint that the ATM operator is the entity
that sets the surcharge.  2d Am. Class Action Compl., ECF No. 55, ¶ 112 (defining class as
"[a]ll non-bank operators of ATM terminals, including registered ISOs and their affiliates,
that operate ATM terminals located in the relevant geographic market with the discretion to
determine the price of the ATM access fee for the terminals they operate and that have
adhered to the defendants' ATM restraints in transactions they have completed at any time on
or after October 1, 2007 ('independent ATM operators')").

than perusing human resources records, *see Brewer*, 2015 WL 13604257, at *7, or cross-referencing a database with a set of mail receipts, *see Hardy* v. *D.C.*, 283 F.R.D. 20, 26 (D.D.C. 2012).

None of the proposed classes meet this standard.  At the outset, the significant individualized factfinding described above would render this case inadministrable.  Even setting aside those issues, the administrative burden of this case would be enormous.

For Consumer Plaintiffs, the proposed *Mackmin* and *Burke* classes are limited to class members who paid surcharges that were not reimbursed, at bank or independent ATMs, respectively.  But none of the various datasets produced by parties and non-parties in this case identifies either of these two sets of proposed class members, and Consumer Plaintiffs themselves have offered no explanation for how the identification process could work.

Although claims administrators in other cases commonly rely on claims forms submitted by class members under penalty of perjury, that method would be untenable here.  It is unreasonable to expect the average cardholder to remember whether individual ATM withdrawals, from years past, were from independent or bank-operated ATMs—let alone whether the cardholder paid surcharges or had them reimbursed.  Indeed, the putative class representatives themselves cannot remember their individual ATM withdrawals.  In response to an interrogatory ███████████████████████████████████████████████████

███████████.[243]  And all of the *Burke* Plaintiffs admitted that ███████████████████████████

███████████████████████."[244]  It is unreasonable to expect that other class members, who are

---

[243] *See* Ex. 141, *Mackmin* Pls.' Objs. and Resps. to the Mastercard Defs.' First Set of Interrogs. 4–5; Ex. 142, *Burke* Pls.' Fourth Am. Objs. and Resps. to the Mastercard Defs.' First Set of Interrogs. 7–9.

[244] *See* Ex. 142, *Burke* Pls.' Fourth Am. Objs. and Resps. to the Mastercard Defs.' First Set of Interrogs. 8–9.

likely less attuned to their ATM transactions than the representatives bringing this suit, would have clearer recollections.  And in any event, "any written submissions that do not give the Defendant[s] an opportunity to challenge the memory or credibility of the individual making that averment would provide inadequate procedural protection to the Defendant[s]."  *Perez* v. *Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003).

A claims administrator would have to conduct a line-by-line review of ten years of bank records—to the extent they exist and to the extent they reflect the necessary information—for each U.S. cardholder to determine whether the cardholder incurred any unreimbursed surcharge fees at a bank-owned ATM and/or at an independent ATM.  This review would be hampered by the fact that the existence of a surcharge is not always on the bank record but rather sometimes has to be inferred from the amount of the withdrawal.[245]  And, to further complicate matters, bank statements often do not identify whether a withdrawal took place at an independently operated ATM (part of the proposed *Burke* class), at another bank's ATM (part of the proposed *Mackmin* class), or at the cardholder's own bank's ATM (part of no class at all).[246]  Thus, the claims administrator would have to investigate who operated the ATM at a particular location— some five or ten years ago.  And even then, such a determination may require a terminal-by-

---

[245] *See, e.g.*, Ex. 143, ███████████████████████████████████████; Ex. 144, Osborn Dep. Ex., ████████████████████████████████████████████.

[246] *See, e.g.*, Ex. 145, Osborn Dep. Ex., ████████████████ ██████ Ex. 33, Osborn Dep. 91:4–7 ███████████████████ Ex. 146, ████████████████████████████████████████████████████████████████

terminal analysis, entailing review of contracts from the relevant ATM operators.  Further, if a

cardholder has a joint account, the statement is unlikely to show which individual cardholder

paid any particular surcharge.[247]

On top of all this, the *Mackmin* Plaintiffs present an additional level of complexity:

because their proposed class definition encompasses all access fees paid "directly to any Bank

Defendant or Bank Co-Conspirator,"[248] a claims administrator would need to analyze whether

surcharges at any particular ATM were paid directly to a bank.  This would be particularly

unclear for ATMs that are bank-owned, but located off-site (such as at convenience stores, or

airports), because of the variations in contractual relationships between the banks and these

locations.[249]  It would be difficult, if not impossible, for a claims administrator to determine

whether, and what amount of, access fees are paid "directly" to the bank in those instances.

Operator Plaintiffs fare no better.  Neither of Operator Plaintiffs' experts claims to have

identified all class members, or to know of a dataset containing all class members.[250]  And even

---

[247]  *See* ███████████████████████████ (acknowledging
███████████████).

[248]  2d Am. Class Action Compl., ECF No. 84, ¶ 130.

[249]  *See, e.g.*, Ex. 147, ██████████████████████████████
████████████████████████████████████ ; Ex. 148,
████████████████████████████████████████
████████████.

[250]  *See* Ex. 103, Zona Dep. 91:20–92:1 (████████████████████████
██████); Ex. 17, McAndrews Dep. 70:5–8 (████████████████
████████████████████████████
████████████).

While plaintiffs may attempt to point to defendants' transaction-level data to help
establish ascertainability, the data itself must be established as actually useful for identifying
class members.  *See Karhu* v. *Vital Pharm., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015)

if some form of contract review could identify class members, it would be administratively

infeasible to attempt to do so;  these are not typical contracts.  Operator Plaintiffs' industry

expert Dr. McAndrews correctly testified that ████████████████████████████████████

████,[251] ████████████████████████████████████.[252]  Moreover, according to

Operator Plaintiffs, ████████████████████████.[253] ██████████████████████

████████████████████████████.[254]  According to one named plaintiff, ████████

████████████████████████████████████████████████████████████

████.[255]  Another plaintiff stated that ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████.[256]

---

(finding plaintiff could not meet the burden of establishing that the class was identifiable in
an administratively feasible manner, where he only provided defendants' sales data as a
means to identify class members, since the data identified "mostly third-party retailers, not
class members").  Dr. Zona concedes ████████████████████████████████████.
*See* Ex. 103, Zona Dep. at 115:5–116:2 (testifying ████████████████████████
████████████████████████████████████████████████████████████
████████████).

[251] *See* Ex. 17, McAndrews Dep. 94:20–95:21.
[252] *See id.* at 95:22–97:2 (testifying that ████████████████████████████
████████).
[253] *See id.* at 97:3–13; *see also supra* note 159.
[254] Ex. 17, McAndrews Dep. 114:4–115:5.
[255] *See* Ex. 99, Just ATMs 30(b)(6) Dep. 305:13–23 ████████████████████
████████████████████████████████████████████████████████████
████.  *See also* Ex. 26, SJI ATMs 30(b)(6) Dep. 401:16–403:17 (testifying
████████████████████████████████).
[256] *See* Ex. 26, SJI ATMs 30(b)(6) Dep. 172:15–22 ██████████████████████
████████████████████████████████████████████████.

~~*Highly Confidential – Subject to Protective Order*~~

The process of determining who is a member of the class would thus require a combination of contract review, affidavits or other fact testimony on oral agreements and understandings, as well as expert opinion on "industry convention."  Given conflicting and inaccurate records, identifying class members would involve fact-intensive credibility and authenticity determinations.  That is precisely the kind of determination that requires a jury, not a claims administrator.

## V.  The Proposed Classes Do Not Merit Rule 23(b)(2) Certification

The *Burke* and *Mackmin* Plaintiffs[257] likewise fail to carry their burden to certify classes under Rule 23(b)(2).[258]  A Rule 23(b)(2) class is appropriate only where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Put another way, a (b)(2) class is permissible only where "a single injunction" would "provide relief to each member of the class."  *Wal-Mart*, 564 U.S. at 360–61; *see also Blackman*, 633 F.3d at 1094 (Brown, J., concurring) (explaining that "cohesiveness is a significant touchstone of a (b)(2) class").  The proposed (b)(2) classes are not "cohesive" because, if the rules at issue were eliminated, some class members would be subjected to *higher* surcharges, rather than being granted relief.

To contend otherwise, Consumer Plaintiffs discount the possibility that their injunction would injure, rather than provide relief to, those putative class members with cards enabled only

---

███████; Ex. 140, William Scot Gardner Decl. dated October 9. 2019 ¶ 7; Ex. 26, SJI ATMs 30(b)(6) Dep. 210:1–215:5.

[257] Although the Operator Plaintiffs allege a Rule 23(b)(2) class in their complaint, *see* 2d Am. Class Action Compl., ECF No. 55,  ¶ 112, they did not move for class certification on this basis.

[258] *See Mackmin* Pls.' Br. at 54; *Burke* Pls.' Br. at 30–31.

for Visa/Plus or Cirrus.[259]  But they are wrong to do so.  ATM operators have testified that █

███████████████████████████████████████████████████████████████████████

███████████████████████████ ,"[260]

████████████████████████████████████████████████

███████ ,[261]

██████ .[262]  Thus, without the NDRs to protect them, Visa/Plus- and Cirrus-only cardholders

could likely face higher surcharges.[263]

The divergent interests between such cardholders (for whom the injunctive relief sought

would be a detriment) and other cardholders (for whom injunctive relief might create a

hypothetical benefit) create the sort of intra-class conflict that has previously defeated

certification.  *See Richardson* v. *L'Oreal U.S., Inc.*, 991 F. Supp. 2d 181, 203 (D.D.C. 2013)

(denying certification, in part, on cohesiveness grounds where certain class members have

stronger claims than others).  A class is not cohesive when some of its members' interests are at

odds with the chosen remedy.

---

[259] As stated above, Professor Hubbard estimates █████████████████████████████████████
████████████████████████████████████████████████████████  Hubbard Rep.
¶ 267.

[260] Ex. 104, ATMs of the South 30(b)(6) Dep. 150:24–151:5 (explaining ████████████████
█████████████████████████████████████████ ).

[261] Ex. 105, Selman 30(b)(6) Dep. 323:22–324:5 (agreeing that █████████████████████████
████████████████████████████ ).

[262] Ex. 26, SJI 30(b)(6) Dep. 301:6–302:7 (admitting ███████████████████████████████
██████████████████ ).

[263] *See also* Ex. 96, ATM Bankcard Services 30(b)(6) Dep. 202:8–14 (expressing ███████████
██████████████████ ); Ex. 105, Selman 30(b)(6) Dep. 318:19–319:18 (explaining that █████████
██████████████████ ); Ex. 32, TurnKey 30(b)(6) Dep. 54:10–18 (explaining ████████████
██████████████ ).

81

## VI.   *Burke* Plaintiffs Are Inadequate Class Representatives

Although the *Burke* Plaintiffs' failure to meet their burden under Rule 23(b)(3) and (b)(2) precludes certification, their motion fails for another, independent reason:  they cannot make the requisite threshold showing under Rule 23(a), either.  Rule 23(a)(4) imposes an ongoing burden to demonstrate that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Among other requirements, the rule 'mandates an inquiry into . . . the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of the absentees.'"  *Borum* v. *Brentwood Assocs., L.P.*, 329 F.R.D. 90, 94 (D.D.C. 2019) (quoting *Nat'l Ass'n for Mental Health, Inc.*, 717 F.2d at 1458).  But the *Burke* class representatives' own testimony shows that they are unfamiliar with even the basic contours of the case, let alone willing to take an "active role."

A putative class representative must demonstrate that he or she is informed about the relevant facts alleged, *see Harris* v. *Koenig*, 271 F.R.D. 383, 391 (D.D.C. 2010), and that the class representatives, rather than their lawyers, are directing the litigation, *see Borum*, 329 F.R.D. at 94 (quoting *Nat'l Ass'n for Mental Health*, 717 F.2d at 1458).  For example, courts have found a class representative inadequate where he lacked sufficient familiarity with the suit, such that he could not describe his claim and "was not even certain that he had seen a copy of the complaint before his deposition."  *Weisman* v. *Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978).  The *Burke* class representatives cannot clear even this modest hurdle.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████[264]

---

[264] *See* Ex. 34, Heiskell Dep at 35:6–8; Ex. 114, Byrnes Dep. at 136:6–10; Ex. 149, Harrison Dep. at 26:1–7; Ex. 35, Burke Dep. at 179:6–19.

Representatives Kent Harrison, Peter Burke, and Brian Byrnes testified that ██████████

████████████████████████████.[265]  The remaining class representative,

Marin Heiskell, testified that █████████████████████████████████████

██████████████████████████████████████████████████

███████████████████.[266]

    Moreover, not one of the *Burke* class representatives ████████████████

████████████████████████████████████████████████████

██████████████████.[267]  Instead, their testimony revealed ████████████████

███████████████████████████████.  For example, ████████████

███████████████████████████████████████████████

██████████████████████████████████

████████████"[268]  And Heiskell and Byrnes believe that █████████████████████

████████.[269]  Although there is no reason to doubt the *Burke* class representatives' credibility or

good faith, their lack of engagement in the most fundamental aspects of their case renders them

inadequate to represent the interests of the proposed class.  Their motion for class certification

should therefore be denied.

---

[265] *See* Ex. 149, Harrison Dep. at 26:8–10; Ex. 35, Burke Dep. at 174:25–175:5; Ex. 114, Byrnes Dep. at 136:4–12.

[266] *See* Ex. 34, Heiskell Dep. at 35:2–5; 144:12–15.

[267] *See* Ex. 35, Burke Dep. at 176:9–177:9; Ex. 34, Heiskell Dep. 34:23–35:1; *id.* at 140:14–18; Ex. 149, Harrison Dep. at 28:16–19; Ex. 114, Byrnes Dep. at 134:20–135:2.

[268] Ex. 35, Burke Dep. at 173:24–174:3; *id.* at 175:14–18.

[269] *See* Ex. 34, Heiskell Dep at 140:14–18; 30:19–24; Ex. 114, Byrnes Dep. at 53:14–24.

~~*Highly Confidential – Subject to Protective Order*~~

## VII.   *Burke* Plaintiffs Have Failed to Show Their State-Law Claims Can Be Resolved on a Class-Wide Basis

Finally, the *Burke* Plaintiffs seek certification of state-wide classes under California, Illinois, Massachusetts, and Michigan law, but they fail to make any legal or factual argument supporting that effort.[270]  These classes should be rejected.[271]

## CONCLUSION

None of the plaintiff groups can prove class-wide injury with common evidence.  None of them properly accounts for the "two-sided" market analysis required by the Supreme Court's decision in *Amex*, or proposes a definite and administratively feasible class.  For these and the other independently sufficient reasons stated above, defendants respectfully request that this Court deny plaintiffs' motions for class certification with prejudice.

---

[270]   *See Burke* Pls.' Br. at 9.

[271]   Although the *Mackmin* Plaintiffs have also alleged state-law claims, *see* 2d Am. Class Action Compl., ECF No. 84, ¶¶ 199–211, they have not sought to certify any statewide class on the basis of those allegations.

Date:   February 18, 2020
       Washington, DC

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: */s/ Justin Anderson*
     Kenneth A. Gallo (D.C. Bar No. 371253)
     kgallo@paulweiss.com
     Justin Anderson (D.C. Bar No. 1030572)
     janderson@paulweiss.com
     Jessica Anne Morton (D.C. Bar No. 1032316)
     jmorton@paulweiss.com
     2001 K Street, NW
     Washington, DC 20006-1047
     Tel. (202) 223-7300
     Fax. (202) 223-7420

*Attorneys for Defendants*
MASTERCARD INCORPORATED AND
MASTERCARD INTERNATIONAL
INCORPORATED

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/ Matthew Eisenstein*
     Mark R. Merley (D.C. Bar No. 375866)
     mark.merley@arnoldporter.com
     Matthew A. Eisenstein (D.C. Bar No. 476577)
     matthew.eisenstein@arnoldporter.com
     Rosemary Szanyi (D.C. Bar No. 997859)
     rosemary.szanyi@arnoldporter.com
     601 Massachusetts Avenue, NW
     Washington, DC 20001-3743
     Tel. (202) 942-5000
     Fax. (202) 942-5999

*Attorneys for Defendants*
VISA INC., VISA U.S.A. INC., VISA
INTERNATIONAL SERVICE ASSOCIATION,
and PLUS SYSTEM, INC.