# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREW MACKMIN, *et al.*, | |
| *Plaintiffs*, | Civil Action No. 1:11-cv-1831-RJL |
| *v.* | Assign Date:  8/4/2015 |
| VISA INC., *et al.*, | Description:  Antitrust – Class Action |
| *Defendants*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
***MACKMIN* CONSUMER PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS'**
**FEES, REIMBURSEMENT OF LITIGATION EXPENSES,**
**AND SERVICE AWARDS FOR CLASS REPRESENTATIVES**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................................1

II.   BACKGROUND ....................................................................................................3

     A.    The Bank Settlements were the product of more than a decade of
            determined litigation by Class Counsel. ....................................................3

          1.   Early victories in the D.C. Circuit and the Supreme Court made
                   these settlements possible. ...........................................................3

          2.   Class Counsel engaged in substantial written discovery. ...........................4

          3.   Class Counsel took and defended more than 35 fact and expert
                   depositions and took a lead role in case management. ...............................6

          4.   Class Counsel and their experts engaged in extensive expert
                   discovery and analysis that was critical to prosecuting this complex
                   action............................................................................................6

          5.   Class Counsel completed thorough class certification briefing. .................7

     B.    Arm's-length settlement negotiations resulted in settlements that deliver
            assured and significant monetary relief to the Class, as well as cooperation
            in the ongoing litigation against Visa and MasterCard...........................................9

          1.   Plaintiffs engaged in extensive settlement negotiations with the
                   Bank Defendants..........................................................................9

          2.   The Bank Settlements deliver substantial monetary and non-
                   monetary relief to the Class. .....................................................10

     C.    Further proceedings and the current state of play. .................................................12

III.  ARGUMENT .......................................................................................................13

     A.    Class Counsel's fee request is fair and reasonable. ...............................................13

          1.   A fee award of 30% of the settlement fund is within the benchmark
                   range and supported by all applicable criteria. .........................................15

                a.   The fee request is well within the range of awards in
                        similar cases....................................................................15

                b.   The size of the common fund and number of persons
                        benefitted supports the fee request..................................17

    c. Class Counsel demonstrated skill and efficiency in obtaining the Settlements, further supporting the fee request. ..........................................................................................19

    d. The complexity and duration of this litigation supports the requested fee award ....................................................................21

    e. Class Counsel have demonstrated devotion to this longstanding litigation, despite a serious risk of nonpayment .................................................................................23

    f. Only one objection to the Settlements has been filed to date. ...............................................................................................25

  2. A lodestar cross-check, though not required, confirms the reasonableness of the fee request. ............................................25

 B. Class Counsel should be reimbursed for the reasonable litigation expenses incurred. ........................................................................................27

 C. Class Representatives deserve reasonable service awards for their dedication to this case. ............................................................................30

IV. CONCLUSION ..............................................................................................31

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aetna Inc. Sec. Litig.*,
   2001 WL 20928 (E.D. Pa. Jan. 4, 2001) ..................................................................22

*In re Ampicillin Antitrust Litig.*,
   526 F. Supp. 494 (D.D.C. 1981) ............................................................................16

*In re Aremissoft Corp. Secs. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002) ................................................................................27

*In re Auto. Refinishing Paint Antitrust Litig.*,
   617 F. Supp. 2d 336 (E.D. Pa. 2007) ....................................................................21

*In re Baan Co. Secs. Litig.*,
   288 F. Supp. 2d 14 (D.D.C. 2003) .........................................................................25

*Bebchick v. Wash. Metro. Area Transit Com.*,
   805 F.2d 396 (D.C. Cir. 1986) ...............................................................................14

*Beckman v. KeyBank, N.A.*,
   293 F.R.D. 467 (S.D.N.Y. 2013) ............................................................................27

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990) ...................23

*In re Black Farmers Discrimination Litig.*,
   856 F. Supp. 2d 1 (D.D.C. 2011) ...........................................................................13

*In re Black Farmers Discrimination Litig.*,
   953 F. Supp. 2d 82 (D.D.C. 2013) .........................................................................25

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) ................................................................................................14

*Bradburn Parent Teacher Store, Inc. v. 3M*,
   513 F. Supp. 2d 322 (E.D. Pa. 2007) ....................................................................16

*Bynum v. D.C.*,
   412 F. Supp. 2d 73 (D.D.C. 2006) .........................................................................15

*In re Cardinal Health Inc. Sec. Litig.*,
   528 F. Supp. 2d 752 (S.D. Ohio 2007) ..................................................................23

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
    2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) .......................................................19

*In re Corel Corp., Inc. Secs. Litig.*,
    293 F. Supp. 2d 484 (E.D. Pa. 2003) ...................................................................18

*In re Crazy Eddie Secs. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) .......................................................................18

*Cullen v. Whitman Med. Corp.*,
    197 F.R.D. 136 (E.D. Pa. 2000).............................................................................18

*Dyer v. Wells Fargo Bank, N.A.*,
    303 F.R.D. 326 (N.D. Cal. 2014)...........................................................................27

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
    4 F. Supp. 3d 94 (D.D.C. 2013) ..................................................................... *passim*

*In re Gen. Instr. Secs. Litig.*,
    209 F. Supp. 2d 423 (E.D. Pa. 2001) ...................................................................18

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000).....................................................................................23

*Gunter v. Ridgewood Energy Corp.*,
    223 F.3d 190 (3d Cir. 2000)...................................................................................24

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)..........................................................................................13, 17

*In re Ikon Off. Sols., Inc., Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000).............................................................................16

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
    2011 WL 5547159 (N.D. Iowa Nov. 9, 2011) .......................................................16

*King Drug Co. of Florence v. Cephalon, Inc. (Provigil)*,
    2015 WL 12843830 (E.D. Pa. Oct. 15, 2015).......................................................27

*Levine v. Am. Psychological Ass'n (In re APA Assessment Fee Litig.)*,
    311 F.R.D. 8 (D.D.C. 2015)...................................................................................16

*In re Linerboard Antitrust Litig.*,
    2004 WL 1221350 (E.D. Pa. June 2, 2004) .....................................................16, 21

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) ...................................................................18

*In re Lithium Ion Batteries Antitrust Litig.*,
2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ........................................................18

*Little v. Wash. Metro. Area Transit Auth.*,
313 F. Supp. 3d 27 (D.D.C. 2018) ........................................................................30

*In re Lorazepam & Clorazepam Antitrust Litig.*,
2003 WL 22037741 (D.D.C. June 16, 2003) ................................................. *passim*

*In re Medical X-Ray Film Antitrust Litig.*,
No. CV-93-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) ...............................18

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
565 F. Supp. 2d 49 (D.D.C. 2008) ........................................................................23

*Murray v. Weinberger*,
741 F.2d 1423 (D.C. Cir. 1984) ............................................................................26

*In re Newbridge Networks Sec. Litig.*,
1998 WL 765724 (D.D.C. Oct. 23, 1998) .............................................................24

*In re Nifedipine Antitrust Litig.*,
2011 WL 13392312 (D.D.C. Jan. 31, 2011) ....................................................13, 26

*In re Omnivision Techs.*,
559 F. Supp. 2d at 1046 ........................................................................................18

*Osborn v. Visa Inc.*,
797 F.3d 1057 (2015) ..............................................................................................3

*Perez v. Rash Curtis & Assocs.*,
2021 WL 4503314 (N.D. Cal. Oct. 1, 2021) .........................................................27

*In re Polyurethane Foam Antitrust Litig.*,
2015 WL 1639269 (N.D. Ohio Feb. 26, 2015) .....................................................16

*Rosenbaum v. MacAllister*,
64 F.3d 1439 (10th Cir. 1995) ..............................................................................24

*In re S.E. Milk Antitrust Litig.*,
2013 WL 2155387 (E.D. Tenn. May 17, 2013) .....................................................16

*Spano v. Boeing Co.*,
2016 WL 3791123 (S.D. Ill. Mar. 31, 2016) ........................................................27

*Std. Iron Works v. Arcelormittal* (*In re Steel Antitrust Litig.*),
2014 WL 7781573 (N.D. Ill. Oct. 22, 2014) .........................................................16

*Steiner v. Am. Broad. Co., Inc.*,
    248 F. App'x 780 (9th Cir. 2007) ........................................................27

*Steinfeld v. Discover Fin. Servs.*,
    2014 WL 1309692 (N.D. Cal. Mar. 31, 2014) ...................................27

*Swedish Hosp. Corp. v. Shalala*,
    1 F.3d 1261 (D.C. Cir. 1993) .......................................................13, 14

*In re Trans Union Corp. Privacy Litig.*,
    629 F.3d 741 (7th Cir. 2011) .............................................................23

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
    2015 WL 3396829 (N.D. Cal. May 26, 2015) ...................................16

*Trombley v. Nat'l City Bank*,
    826 F. Supp. 2d 179 (D.D.C. 2011) ...................................................25

*Visa Inc. v. Osborn*,
    137 S. Ct. 289 (2016)...........................................................................4

*Vista Healthplan, Inc., v. Warner Holdings Co. III, Ltd.*,
    246 F.R.D. 349 (D.D.C. 2007)...........................................................27

*In re Vitamins Antitrust Litig.*,
    2001 WL 34312839 (D.D.C. July 16, 2001)................................. *passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)..................................................................14

*Wells v. Allstate Ins. Co.*,
    557 F. Supp. 2d 1 (D.D.C. 2008) .......................................................25

## Other Authorities

F. Patrick Hubbard, *Substantive Due Process Limits on Punitive Damages
    Awards: "Morals Without Technique"?*, 60 Fla. L. Rev. 349, 383 (2008) ............................17

Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal
    Practice*, 47 DePaul L. Rev. 267, 286 (1998)..................................................17

# GLOSSARY OF TERMS

| Term | Description |
|---|---|
| Bank of America | Defendants Bank of America, National Association, NB Holdings Corporation, and Bank of America Association. |
| Bank Defendants | Bank of America, Chase, and Wells Fargo. |
| Carlton Decl. | Declaration of Dennis W. Carlton, concurrently filed herewith. |
| Chase | Defendants Chase Bank USA, N.A., JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A. |
| Class Counsel | Hagens Berman, Quinn Emanuel, and Mehri & Skalet. |
| Defendants | Bank Defendants and Non-Settling Defendants. |
| Dkt. | All "Dkt." citations in this brief refer to docket entries in *Mackmin et al. v. Visa, Inc. et al.*, No. 1:11-cv-1831-RJL (D.D.C.), unless otherwise noted. |
| Frankel Decl. | Declaration of Alan S. Frankel, concurrently submitted herewith. |
| Hagens Berman | Hagens Berman Sobol Shapiro LLP. |
| Joint Decl. | Joint Declaration of Steve W. Berman and Stephen R. Neuwirth in Support of *Mackmin* Consumer Plaintiffs' Notice of Motion and Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards, concurrently submitted herewith. |
| MasterCard | Defendants Mastercard Inc. and Mastercard International Inc. d/b/a Mastercard Worldwide. |
| Mehri & Skalet | Mehri & Skalet, PLLC. |
| Non-Settling Defendants | Defendants Visa and MasterCard. |
| Quinn Emanuel | Quinn Emanuel Urquhart & Sullivan, LLP. |
| Plaintiffs or *Mackmin* Consumer Plaintiffs | Plaintiffs in *Mackmin et al. v. Visa, Inc. et al.*, No. 1:11-cv-1831-RJL (D.D.C.). |
| Skalet Decl. | Declaration of Steven A. Skalet, concurrently filed herewith. |
| Wells Fargo | Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. |
| Visa | Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, and Plus System, Inc. |

## I.    PRELIMINARY STATEMENT

After more than a decade of hard-fought litigation, Court-appointed Interim Co-Lead Counsel ("Class Counsel") for the *Mackmin* Consumer Plaintiffs ("Plaintiffs") secured settlements totaling $66.74 million from the Bank of America Defendants, the Chase Defendants, and the Wells Fargo Defendants (collectively, the "Bank Defendants"). In light of the substantial risks and complex issues in this litigation, as well as the $66.74 million common fund created for the Settlement Class, Plaintiffs respectfully request (1) an award of $20,022,000 in attorneys' fees—equal to 30 percent of the common fund; (2) reimbursement of $10,000,000 to cover most (but not all) of the $13,239,917 in out-of-pocket litigation expenses incurred in connection with prosecuting this litigation; and (3) service awards of $10,000 for each of the two class representatives.

The $66.74 million settlement fund from which fees, reimbursements, and service awards have been requested represents an excellent result for the class. This common fund is equivalent to **57.5%** of the *maximum* single damages estimated for class transactions at the Bank Defendants' ATMs. That percentage demonstrates the strength of Plaintiffs' case and the settlements obtained. The Settlements also leave non-settling Defendants Visa and MasterCard ("Non-Settling Defendants") jointly and severally liable for the remainder of Plaintiffs' damages and secure cooperation from the Bank Defendants in the notice process and litigation. These strong results indicate that the requested fee award is fair and reasonable. That is particularly so in light of the significant challenges faced by Plaintiffs throughout this lengthy action, and the effective and efficient work of Class Counsel, who litigated this case on a purely contingent basis in this Court, the D.C. Circuit Court of Appeals, and the Supreme Court.

The requested 30-percent fee award is also reasonable when compared to awards in antitrust class actions in this district. *See, e.g.*, *In re Vitamins Antitrust Litig.*, 2001 WL

34312839, at *9 (D.D.C. July 16, 2001) (awarding attorneys' fees equal to 33.7% of the $365 million common fund); *In re Lorazepam & Clorazepam Antitrust Litig.*, 2003 WL 22037741, at *3, *9 (D.D.C. June 16, 2003) (in antitrust class action, awarding fees equal to 30 percent of $35 million settlement fund). Recent scholarship confirms the reasonableness of Class Counsel's fee request. In a 2021 analysis for the 2020 Antitrust Annual Report, Professor Joshua Davis found that among antitrust class action settlements surveyed between 2009 and 2020, the median fee awarded for settlements between $50 million and $99 million was 30 percent.

Although not required in this Circuit, the reasonableness of the requested award is further confirmed by a "lodestar cross-check." Based on Class Counsel's lodestar of $16,473,059 (calculated for this motion based on *historic* rates, *minus* a five-percent across-the-board reduction for billing judgment), the requested award would lead to a modest multiplier of 1.22.[1] That multiplier is well within the range of multipliers granted in similar cases, and lower than many.

Beyond fees, the expenses incurred were all critical to the representation of the Class. Most importantly, the largest category of expenses—the amount spent on economic experts, which constitutes more than 94 percent of the total costs—was essential to collecting the large amount of data needed for the experts' analyses, organizing that complex data into a usable database, and then analyzing the massive database and other documents presented in Professor Dennis Carlton's class certification reports. Even compared to other antitrust class actions, this litigation required an atypically high amount of expert work, as Professor Carlton and Dr. Alan Frankel explain in their declarations submitted concurrently with this Motion. Plaintiffs believe

---

[1] If Class Counsel used current billing rates to calculate their lodestar, as many courts (including this Court) have done, without any percentage reduction, the lodestar would be $23,722,023, with the fee request leading to a *negative* multiplier of 0.84.

that the entire $13,239,917 in expenses was reasonably incurred in connection with this litigation. Nonetheless, in this motion, Plaintiffs respectfully request reimbursement of only a portion of their incurred expenses, $10,000,000.

Additionally, the requested $10,000 service award to each of the two class representatives is also reasonable given their significant commitment to the Class and investment of time to this case. Plaintiffs respectfully request that their motion be granted.

## II.     BACKGROUND

### A.     The Bank Settlements were the product of more than a decade of determined litigation by Class Counsel.

#### 1.     Early victories in the D.C. Circuit and the Supreme Court made these settlements possible.

In October 2011, Plaintiffs filed this action on behalf of themselves and a putative class of consumers who overpaid for surcharges levied on "off-us" transactions throughout the nation at bank ATMs. *See* Dkt. 1. The Bank Defendants and their co-defendants, Visa and MasterCard, moved to dismiss the case, which Class Counsel, on Plaintiffs' behalf, briefed and argued. The judge previously assigned to this case granted that motion (Dkt. 55) and denied Plaintiffs' subsequent motion to amend their complaint (Dkt. 71).

Class Counsel appealed that order and briefed and argued the issue in the D.C. Circuit Court of Appeals. Those efforts resulted in a complete reversal of the dismissal order, with a published decision finding that Plaintiffs plausibly stated all elements of their antitrust claims against Defendants. *See Osborn v. Visa Inc.*, 797 F.3d 1057 (2015).

Defendants then petitioned for *certiorari* to the Supreme Court, which the Court granted. In the subsequent merits briefing, Class Counsel explained that, "[a]fter having persuaded [the Supreme Court] to grant certiorari" on a specific, narrow issue, Defendants chose instead "to rely on a different argument" to seek to overturn the D.C. Circuit Court of Appeal's decision. The

Supreme Court agreed that Defendants overstepped and subsequently dismissed the appeal on the basis that the writ of *certiorari* had been improvidently granted. *See Visa Inc. v. Osborn*, 137 S. Ct. 289 (2016) (Mem.). As this history shows, Class Counsel had to brief complex and unique legal issues before three sets of courts before even proceeding with discovery on behalf of Plaintiffs. Without investing substantial resources in these early efforts, no recovery would have been possible.

        **2.**        **Class Counsel engaged in substantial written discovery.**

        After remand to this Court, Class Counsel aggressively pursued discovery to develop Plaintiffs' claims. Before the Supreme Court had even granted *certiorari*, the parties undertook negotiations on a comprehensive case management order and pre-trial schedule. This resulted in a Joint Report on Scheduling Matters (Dkt. 99) in which Plaintiffs agreed to coordinate all three cases for discovery purposes to maximize efficiencies. Joint Decl. ¶ 13. Following an initial status conference, in which this Court encouraged the parties to work collaboratively (Dkt. 113), Class Counsel took the lead role in negotiating a protective order (Dkt. 112), ESI protocol (Dkt. 121), and expert discovery protocols (Dkt. 130). *Id.*

        These extensively negotiated protocols set the stage for substantial, yet targeted, written and other discovery, which Class Counsel again took the lead role in pursuing and negotiating. Plaintiffs propounded 38 document requests and 8 interrogatories to both network defendants (Visa and MasterCard), along with 39 document requests and 6 interrogatories to each bank defendant (Bank of America, Chase, and Wells Fargo). *Id.* ¶ 14.

        After multiple rounds of in-person, telephonic, and written meet-and-confer negotiations spanning the better part of a year, Defendants ultimately produced more than 239,422 documents, totaling 2,419,934 pages. As this is an antitrust case focusing on alleged overcharges, data productions were of particular importance, and following negotiations, Defendants

ultimately produced an enormous transactional dataset. With the assistance of their experts, Plaintiffs cleaned and processed this dataset so that it could be analyzed for purposes of class certification and merits analyses. *Id.* ¶ 15.

Third-party discovery was also essential in this case, because a single ATM transaction involves several different entities. Members of the Class transacted at ATMs operated by banks other than the Defendant banks, over ATM networks other than those operated by the Defendant networks, and, at times, those transactions were routed through various payment processing entities. None of these entities were parties to the case. Accordingly, both Plaintiffs and Defendants subpoenaed numerous third parties for records and data. As part of this effort, Class Counsel served 24 third-party subpoenas on ATM networks and ATM processors. Ultimately, Plaintiffs obtained more than 205,444 documents (constituting 677,299 pages) and substantial data productions, which Plaintiffs and their experts used to develop the case. *Id.* ¶ 16. In total, Plaintiffs' experts processed and analyzed over 3.5 terabytes of raw data from Defendants and third parties. Carlton Decl. ¶ 7.

Not all third-party materials were produced voluntarily. Class Counsel brought three motions to compel documents against four third parties. One of these motions was withdrawn after the subpoenaed party agreed to produce requested material. The remaining motions were briefed extensively, and argued, before they were transferred to this Court, where they were granted in full.[2] Joint Decl., ¶ 17. All told, these motions to compel yielded more than 200,000 documents and 600,000 pages of discovery material. *Id.*

---

[2] *See* Minute Order, *Mackmin et al. v. NYCE Payments Network, LLC*, 19-mc-00002 (D.D.C. June 5, 2019); Minute Order, *Mackmin et al. v. Visa, Inc.*, 19-mc-00018 (D.D.C. June 5, 2019).

**3.      Class Counsel took and defended more than 35 fact and expert depositions and took a lead role in case management.**

To progress discovery in this matter, the Court convened regular "Gang of 8" conferences with counsel for all parties. Class Counsel participated in and helped lead every conference for the plaintiff side, and worked extensively with the parties in advance to narrow the issues presented to the Court. Through Class Counsel's efforts, this process moved discovery forward on multiple fronts and, among other things, also resulted in briefing parameters for class certification that facilitated a fulsome showing from Plaintiffs. Joint Decl. ¶ 18.

Depositions proceeded apace. All told, Class Counsel took and participated in over 35 depositions. *Id.* ¶ 19. Class Counsel deposed the executives most involved in Defendants' ATM businesses, as well as multiple Rule 30(b)(6) designees. In expert discovery, Class Counsel also deposed an economic expert and an industry expert who supplied reports opposing class certification. Class Counsel also prepared extensively for, and defended, the depositions of the named Plaintiff class representatives (Andrew Mackmin and Sam Osborn), as well as Plaintiffs' economic expert, Professor Carlton. *Id.*

**4.      Class Counsel and their experts engaged in extensive expert discovery and analysis that was critical to prosecuting this complex action.**

From the very start, expert analysis was essential to this litigation. The existence of the "non-discrimination" pricing rules ("NDRs") Plaintiffs challenge was never in dispute; rather, the question has always been whether the rules have anticompetitive effects and cause classwide impact. These are questions that cannot fully be answered without sustained economic expert analysis. All parties in this litigation, both plaintiffs and defendants, have retained one or more seasoned economic experts, given this reality. *Id.* ¶ 20.

Class Counsel retained multiple experts, some of which acted in a consulting role and one of which, Professor Carlton, provided testimony. To provide industry analysis and data support,

Plaintiffs retained Dr. Alan Frankel, founder and chair of Coherent Economics, as well as a team of Coherent economists to assist in his work. As their testifying and class certification expert, Plaintiffs retained Professor Dennis Carlton of Compass Lexecon. Plaintiffs split the expert work to maximize efficiencies. Dr. Frankel and his team provided invaluable insight into the ATM industry, along with data analysis. This foreground work allowed Professor Carlton to focus on liability, class certification, and damages issues, which required an enormous amount of data-specific analysis, along with a broader review of the case documents and economic literature. *Id.* ¶ 21.

Overall, this litigation required an atypically high amount of expert work, particularly due to the large amount and nature of data bearing on Plaintiffs' claims. As noted above, it was not enough just to obtain Defendants' documents and data, a task that would have been labor-intensive in its own right. Both Plaintiffs and Defendants also subpoenaed data and documents from two dozen third parties, which magnified the amount of work exponentially. While this data was essential to Professor Carlton's damages analysis, stitching it together required an incredible amount of hands-on analysis. *Id.* ¶ 22; *see* Carlton Decl. ¶¶ 6-9; Frankel Decl. ¶¶ 6-9.

All of this work culminated in Professor Carlton's report supporting Plaintiffs' motion for class certification. The report covered the waterfront of liability and damages issues and concluded that all could be established with common proof. To estimate damages, Professor Carlton constructed a regression model to estimate the relationship between net-interchange and surcharges. He then applied the output of that model to the extensive data Plaintiffs collected to estimate classwide damages. Joint Decl. ¶ 23.

**5.      Class Counsel completed thorough class certification briefing.**

On September 20, 2019, following extensive discovery, Plaintiffs filed their motion for class certification, supported by the Carlton expert report discussed above. *See* Dkt. 177-13, 177-

113. In their class certification motion, Plaintiffs showed, among other things, that Defendants'
adoption of the NDRs reduced price competition and increased costs to ATM operators across
the ATM industry. Professor Carlton demonstrated that this industry-wide elevation in marginal
costs resulted in an industry-wide elevation in surcharges (*i.e.*, consumer prices), which all or
virtually all Class members paid and suffered injury as a result. *See* Dkt. 177-13 at 29-45
(discussing Professor Carlton's conclusions).

On February 18, 2020, the Visa and MasterCard Defendants filed their opposition to
Plaintiffs' motion for class certification. Dkt. 203. The Bank Defendants did not join this
opposition because just prior to its filing, they agreed in principle to settlements with Plaintiffs
(though the negotiations leading to the final settlement agreements continued until August 2020).
*See* Section II.B.5, *infra*. The opposition to class certification was supported by Professor Glenn
Hubbard, as well as by industry expert, Anthony Hayes. Dkt. 203. After deposing Professor
Hubbard and Mr. Hayes, Plaintiffs filed their class certification reply brief, supported by the
rebuttal report of Professor Carlton, wherein he refuted the criticisms of Professor Hubbard and
reconstructed more than 100 regressions Professor Hubbard had supplied to show that, properly
specified using all available data, they actually *supported* the propriety of certifying the proposed
class. Dkt. 217, 248.

Unlike in most cases where the reply memorandum ends the class certification briefing,
that was not the case here. Unsatisfied by the state of play after Plaintiffs' reply brief and
Professor Carlton's rebuttal report, Visa and MasterCard filed on September 24, 2020 a motion
for leave to file a sur-reply alongside a proposed sur-reply brief and a 278-page sur-rebuttal
report by Professor Hubbard. Dkt. 220. Class Counsel then filed an opposition to Defendants'
motion for leave to file a sur-reply, explaining that Visa and MasterCard identified nothing

"new" in Professor Carlton's reply warranting a sur-reply; rather, they simply sought to (unsuccessfully) rehabilitate Professor Hubbard's analysis that Professor Carlton's showed was flawed and actually supported class certification. Dkt. 221. After this October 1, 2020 brief, the class certification briefing closed. The Court then granted Plaintiffs' motion on August 4, 2021. Dkt. 234.

**B.     Arm's-length settlement negotiations resulted in settlements that deliver assured and significant monetary relief to the Class, as well as cooperation in the ongoing litigation against Visa and MasterCard.**

**1.     Plaintiffs engaged in extensive settlement negotiations with the Bank Defendants.**

Class Counsel and counsel for the Bank Defendants first discussed potential settlement in January 2018, in a mediation before Layn Phillips, one of the nation's foremost mediators. At that time, before any major discovery had occurred, the parties were unable to reach resolution. Joint Decl. ¶ 27. In mid-2019, after the parties had engaged in substantial discovery, including discovery strongly supporting Plaintiffs' case, the Chase Defendants and Plaintiffs began to discuss settlement again. *Id*.

In the midst of these discussions, Plaintiffs filed their motion for class certification in September 2019. After numerous exchanges about the scope of the settlement negotiations, and with Defendants' opposition to Plaintiffs' class certification motion due in the beginning of 2020, Plaintiffs and the Chase Defendants agreed to have another mediation session with Judge Phillips, and did so in December 2019. *Id*. ¶ 28. That full-day mediation resulted in a settlement that Plaintiffs and the Chase Defendants agreed to in principle. *Id*. Plaintiffs subsequently offered similar settlement terms to the other Bank Defendants, each of whom accepted Plaintiffs' offer. *Id*. Plaintiffs then negotiated with the Bank Defendants to ensure that the key terms of the

settlements protected the Settlement Class, executing terms sheets with the Bank Defendants in the middle of March 2020. *Id.*

The parties then engaged in numerous negotiation sessions regarding long-form settlement agreements. Those negotiations included specifics about the information and assistance the Bank Defendants would provide to Plaintiffs regarding, *inter alia*, class notice and the payment of settlement funds to members of the proposed Settlement Class. *Id.* ¶ 29. That process, which took many months, resulted in the long-form Settlement Agreements signed in August 2020. Dkt. 250-2, Exs. A, C, E. Throughout, Bank Defendants' counsel, who are highly experienced and capable, vigorously advocated their clients' positions in the settlement negotiations. Joint Decl. ¶ 29. Class Counsel, who were well-informed of the facts and issues concerning liability and damages and the relative strengths and weaknesses of each side's litigation position, as well as the importance of obtaining cooperation and assistance from the Bank Defendants, just as vigorously advocated Plaintiffs' positions. *Id.*

### 2. The Bank Settlements deliver substantial monetary and non-monetary relief to the Class.

Pursuant to the Settlement Agreements, the Bank Defendants will collectively make cash payments of $66.74 million, with the Bank of America Defendants paying $26,420,000, the Wells Fargo Defendants paying $20,820,000, and the Chase Defendants paying $19,500,000. The Bank Defendants agreed to assist the process of providing notice and payment of settlement funds to members of the proposed Settlement Class (thereby reducing costs), including by:

- Providing information reasonably available to help Co-Lead Class Counsel identify potential members of the proposed Settlement Class, including contact information for those individuals or entities; and

- Making reasonable and good faith efforts to cooperate with Plaintiffs' claims administrator and other third party service providers with respect to notice, claims processing, and claims distribution by providing information regarding the Bank

Defendants' respective ability to facilitate notice and direct payments to members of the proposed Settlement Class.

Dkt. 250-2, Exs. A, C & E ¶ 10(b). Prominent among the Bank Defendants' cooperation is that they collectively agreed to produce email addresses for millions of potential members of the proposed Settlement Class for use in the direct notice program. Joint Decl. ¶ 31. The Bank Defendants ultimately produced a total of 87.68 million unique email addresses to the Settlement Administrator. *Id.*

The Bank Defendants also agreed to assist in the litigation by authenticating and otherwise establishing the admissibility of their documents for use at trial. Dkt. 250-2, Exs. A, C & E ¶ 10(a). In addition, the Bank Defendants have stipulated to certification of the Settlement Class, which is substantively identical to the litigation class definition proposed in Plaintiffs' motion for class certification. *Compare id.*, Exs. A, C & E ¶ 3(a), *with* Dkt. 177-13 at 2. Each proposed Settlement Class is identical, with the Settlement Class defined as:

> All individuals and entities that paid an unreimbursed ATM Access Fee directly to any Bank Defendant or Alleged Bank Co-Conspirator for a Foreign ATM Transaction using an ATM card issued by a financial institution in the United States to withdraw cash at an ATM located in the United States at any time from October 1, 2007 to the date of the Preliminary Approval Order.

Dkt. 250-2, Exs. A, C & E ¶ 3(a). In exchange for the consideration described above, members of the proposed Settlement Class for each Bank Defendant group will release the respective Bank Defendants from claims that were or could have been alleged in this Action. *Id.* ¶ 9.[3] Claims against the Non-Settling Defendants (Visa and MasterCard) are not released by the settlements,

---

[3] The full text of the proposed release, including the limitations thereof, is set forth in the Settlement Agreements. Dkt. 250-2, Exs. A, C & E ¶¶ 2(ff)-(hh), ¶ 2(rr), ¶ 9.

and these Non-Settling Defendants remain jointly and severally liable for all damages alleged, minus an offset for the settlement amounts.

**C.      Further proceedings and the current state of play.**

On October 5, 2020, Plaintiffs moved for preliminary approval of the settlements with the Bank Defendants and to direct notice to the Settlement Class, which was only a few days after the class certification briefing closed, as discussed *supra* in Section II.B.5. Dkt. 222. Prior to issuing a decision on the preliminary approval motion, on August 4, 2021 this Court issued orders granting Plaintiffs' motion for class certification, as well as the class certification motions of the other two plaintiff groups. Dkt. 234, 235, *amended order* at Dkt. 238. Following the class certification orders, Visa and MasterCard filed petitions under Rule 23(f) for permission to appeal the class certification orders, which after subsequent briefing, the D.C. Circuit granted. *See In re: Visa Inc., et al.*, No. 21-8005 (D.C. Cir. Oct. 1, 2021), Doc. 1916425.

On September 23, 2021, after completion of the 23(f) briefing but before the D.C. Circuit's order granting the petition, this Court denied without prejudice Plaintiffs' motion for preliminary approval of the Bank Settlements as partially moot in light of the Court's order certifying the class and appointing class counsel. *See* Minute Order on Motion for Settlement (Sept. 23, 2021). Plaintiffs filed their renewed motion for preliminary approval of the Bank Settlements and to direct notice to the Settlement Class on October 15, 2021. Dkt. 250. This Court issued an order granting the renewed motion on November 12, 2021. Dkt. 252.

As ordered by this Court, notice to the Settlement Class commenced on December 10, 2021. Joint Decl. ¶ 36. In the meanwhile, Plaintiffs and the Visa and MasterCard Defendants are briefing the class certification appeal before the D.C. Circuit Court of Appeals. *Id*.

## III.   ARGUMENT

The *Mackmin* Consumer Plaintiffs respectfully request an award of $20.022 million in attorneys' fees—equal to 30 percent of the $66.74 million common fund obtained by the Bank Settlements. Although the D.C. Circuit does not require it, if this Court applies a lodestar crosscheck, the requested fee award would result in a modest 1.22 multiplier of Class Counsel's lodestar at historical rates of $16,473,058,[4] not including fees spent on this motion, or fees Plaintiffs will incur through final approval, settlement distribution, and appeals. Plaintiffs also request reimbursement of expenses incurred in connection with this litigation of $10 million, which is close to $3.24 million *less* than the expenses actually incurred by Class Counsel, $13,239,917. Finally, Plaintiffs request that this Court grant service awards of $10,000 to each of the two class representatives.

### A.   Class Counsel's fee request is fair and reasonable.

The Bank Settlements at issue are common fund, non-reversionary settlements. A court's ultimate duty when determining attorneys' fees in common fund litigation is to ensure that the request is reasonable in light of the overall facts of the case. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993). In class actions, the common fund doctrine "allows a party who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees." *Swedish Hosp.*, 1 F.3d at 1265; *see also In*

---

[4] In order to offer as conservative a number as possible, Class Counsel have preemptively reduced their lodestar across-the-board by 5%. Class Counsel also reports their lodestar at *historical* billing rates, even though courts frequently calculate lodestar using *current* (and thus typically higher) billing rates. *See, e.g.*, *In re Nifedipine Antitrust Litig.*, 2011 WL 13392312, at *1 (D.D.C. Jan. 31, 2011) (Leon, J.) (calculating lodestar with current hourly rates); *see also infra* at n.10.

*re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 39 (D.D.C. 2011). As the Supreme Court has recognized, the doctrine is based on the concept that "persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The doctrine is "designed to spread the costs of litigation among all the beneficiaries of an identifiable fund." *Bebchick v. Wash. Metro. Area Transit Com.*, 805 F.2d 396, 402 (D.C. Cir. 1986).

The D.C. Circuit has joined other circuits in "concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases." *Swedish Hosp.*, 1 F.3d at 1271; *accord In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 4 F. Supp. 3d 94, 110 (D.D.C. 2013) (Leon, J.); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *2 ("[T]his Circuit requires the percentage of the recovery method in common fund cases . . . .").

Courts do so because the percentage-of-recovery method "directly aligns the interests of the Class and its counsel and it provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system." *In re Lorazepam*, 2003 WL 22037741, at *7 (citation and internal quotation marks omitted). This is as opposed to the "lodestar method" which, in contrast, "create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (alterations in original).

As demonstrated below in Section III.A.1, Plaintiffs' fee request of $20.022 million is reasonable under the percentage-of-the-fund analysis utilized in this Circuit.

**1.** **A fee award of 30% of the settlement fund is within the benchmark range and supported by all applicable criteria.**

Plaintiffs respectfully submit that a fee award of 20,022,000, equal to 30 percent of the common settlement fund, is a reasonable award under the criteria considered in this Circuit. As this Court has observed, the D.C. Circuit "has not yet developed a formal list of factors to be considered in evaluating fee requests under the percentage-of-recovery method." *In re Fannie Mae*, 4 F. Supp. 3d at 110-11 (quoting *In re Lorazepam*, 2003 WL 22037741, at *8). Nevertheless, courts in this district "often consider[] the following seven factors: (1) the size of the fund created and the number of persons benefited, (2) the presence or absence of substantial objections by class members to the settlement terms or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of litigation, (5) the risk of nonpayment, (6) the time devoted to the case by plaintiffs' counsel, and (7) awards in similar cases." *Id.*

All of these criteria support the fee request here.

**a.** **The fee request is well within the range of awards in similar cases.**

To provide appropriate context for the application of these factors to their fee request, Plaintiffs begin by describing the range of awards in similar cases. This court in its 2013 decision in *In re Fannie Fae* explained that "[b]oth nationally in our Circuit, a majority of common fund class action fee awards fall between twenty and thirty percent." *See* 4 F. Supp. 3d at 111 (citation and internal quotation marks omitted); *see also id.* (quoting 4 William B. Rubenstein, Alba Conte & Herbert B. Newberg, Newberg On Class Actions § 14:6 (4th ed. 2002) for the following proposition: "In the normal range of common fund recoveries in securities and antitrust suits, common fee awards fall in the 20 to 33 per cent range.").

Indeed, Class Counsel's request for an award of 30 percent of the Settlement Fund is in line with, if not lower than, attorneys' fees awarded in several other antitrust and complex class actions in this district. *See, e.g.*, *In re Vitamins*, 2001 WL 34312839, at *9 (awarding attorneys' fees equal to 33.7% of $365 million settlement fund in complex antitrust class action); *Bynum v. D.C.*, 412 F. Supp. 2d 73, 81 (D.D.C. 2006) (awarding 1/3 (33.3%) of settlement funds in attorneys' fees to class counsel); *In re Lorazepam*, 2003 WL 22037741, at *3, *9 (in antitrust class action, awarding fees equal to 30 percent of $35 million settlement fund); *Levine v. Am. Psychological Ass'n* (*In re APA Assessment Fee Litig.*), 311 F.R.D. 8, 22 (D.D.C. 2015) (awarding 30 percent of settlement fund to counsel); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494, 498 (D.D.C. 1981) (noting that several courts have awarded more than 40 percent of the settlement fund in antitrust cases).[5]

Recent scholarship confirms the reasonableness of Class Counsel's fee request. In a 2021 analysis for the 2020 Antitrust Annual Report, Professor Joshua Davis found that among antitrust class action settlements surveyed between 2009 and 2020, the median fee awarded for settlements between $50 million and $99 million was 30 percent. *See* Joint Decl., Ex. 13 at 29.

Furthermore, the requested 30 percent fee award is less than the norm in the private marketplace, where attorneys negotiate typical contingent arrangements in excess of 30 percent.

---

[5] *See also In re S.E. Milk Antitrust Litig.*, 2013 WL 2155387, at *3 (E.D. Tenn. May 17, 2013) (awarding one-third of $158 million settlement fund); *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 2011 WL 5547159, at *3 (N.D. Iowa Nov. 9, 2011) (awarding 36 percent of $18.5 million settlement fund); *In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015) (awarding 30 percent of $147.8 million settlement fund); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2015 WL 3396829, at *2 (N.D. Cal. May 26, 2015) (awarding 30 percent of settlement fund due to substantial litigation); *Std. Iron Works v. Arcelormittal* (*In re Steel Antitrust Litig.*), 2014 WL 7781573, at *3 (N.D. Ill. Oct. 22, 2014) (awarding 33 percent of $163.9 million settlement fund); *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 340 (E.D. Pa. 2007) (awarding 35 percent of $39.75 million settlement fund); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004) (awarding 30 percent of $202 million settlement fund).

*In re Vitamins*, 2001 WL 34312839, at *12 ("[P]ercentage of recovery method is meant to simulate awards that would otherwise prevail in the market . . . ."). Attorneys regularly contract for contingent fees between 30 and 40 percent with their clients in non-class, commercial litigation. *Id.* (one-third is a common percentage of recovery in private contingency fee cases); *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."); F. Patrick Hubbard, *Substantive Due Process Limits on Punitive Damages Awards: "Morals Without Technique"?*, 60 Fla. L. Rev. 349, 383 (2008) (discussing "'the usual 33-40 percent contingent fee'" (quoting *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003)).[6]

In sum, Class Counsel's 30 percent fee request is well within the range of fee percentages granted in similar common fund cases, and it is in line with, if not lower than, contingent arrangements in the private marketplace. The fee request is particularly reasonable in the circumstances of this case, as further discussed below.

b.   **The size of the common fund and number of persons benefitted supports the fee request.**

One of the most important factors in assessing the reasonableness of a fee request is the result achieved for the Settlement Class. *See Hensley*, 461 U.S. at 436 ("[T]he most critical factor is the degree of success obtained."). Here, Class Counsel have secured valuable benefits for a nationwide Settlement Class, which weighs heavily in favor of the fee request.

---

[6] *See also* Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DePaul L. Rev. 267, 286 (1998) (reporting the results of a survey of Wisconsin lawyers, which found that "[o]f the cases with a [fee calculated as a] fixed percentage [of the recovery], a contingency fee of 33% was by far the most common, accounting for 92% of those cases").

Plaintiffs have a strong case and the settlement values reflect that. Based on the preliminary estimates provided by Plaintiffs' damages expert in their motion for class certification, each of the bank settlements—Bank of America ($26,420,000), Wells Fargo ($20,820,000), and Chase ($19,500,000), totaling $66.74 million—represents **57.5%** of these banks' ***maximum*** single damages, as estimated by Professor Carlton. Dkt. 250-2 at ¶ 15.[7] In *In re Cathode Ray Tube (CRT) Antitrust Litigation*, the court cited a survey of 71 settled antitrust cases which showed a weighted mean recovery of 19% of single damages, demonstrating the strength of a recovery of 57.5% of the potential singles damages attributable to the Bank Defendants. *See* 2016 WL 3648478, at *7 & n.19 (N.D. Cal. July 7, 2016). Indeed, decisions across the country, including in antitrust class actions, have awarded *33 percent* or more in fees where class members recovered 20 percent or less of possible damages in complex and risky actions.[8]

---

[7] The 57.5% estimate is based on the damages methodology of the three offered at class certification that yields the *largest* damages estimates (referred to as Approach 3). If one were to look at the other two methods, Approach 1 and Approach 2, the settlements would represent approximately 115% and 77% of the single damages estimated for class transactions at the Settling Banks' ATMs, respectively. Dkt. 250-2 at ¶ 15.

[8] *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *19-*20, *23 (N.D. Cal. Dec. 10, 2020) (describing recovery of 11.7% of possible single damages as an "excellent" result and awarding Class Counsel just under 30% of the settlement fund); Order Granting Award of Attys.' Fees, Reimb. of Expenses & Incentive Payments, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819-CW (N.D. Cal. Oct. 14, 2011), ECF No. 1407 (33 percent awarded to IPP counsel); *Id.* at ECF No. 1375 (showing that 33 percent awarded, $41.322 million, was 15% of possible damages estimated by IPPs' expert in *SRAM*); *In re Corel Corp., Inc. Secs. Litig.*, 293 F. Supp. 2d 484, 489-90, 498 (E.D. Pa. 2003) (one-third fee awarded from settlement fund that comprised about 15% of damages); *In re Gen. Instr. Secs. Litig.*, 209 F. Supp. 2d 423, 431, 434 (E.D. Pa. 2001) (one-third fee awarded from $48 million settlement fund that was 11% of the plaintiffs' estimated damages); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 148 (E.D. Pa. 2000) (one-third awarded in fees from settlement of class consisting of defrauded vocational students that was 17% of the tuition the class members paid); *In re Medical X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515, at *7-*8 (E.D.N.Y. Aug. 7, 1998) (court increased 25% benchmark to 33.3% where plaintiffs recovered 17% of damages); *In re Crazy Eddie Secs. Litig.*, 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (court increased 25% benchmark to 33.8% where plaintiffs recovered 10% of damages); *see also In re Omnivision Techs.*, 559 F. Supp. 2d at 1046 ("[A] total award of approximately 9% of the possible damages . . . weighs in favor of granting the requested 28% fee.").

In addition to the substantial monetary fund, the Bank Settlements have significant value as so-called "ice-breaker" settlements in this conspiracy action, with the potential to "bring other defendants to the point of serious negotiations." *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) (noting "that this settlement has significant value as an 'ice-breaker' settlement—it is the first settlement in the litigation—and should increase the likelihood of future settlements").[9] This exerts pressure on the Non-Settling Defendants (Visa and MasterCard), given that they are now by themselves jointly and severally liable for the entirety of the putative litigation class's damages (minus the settlement amounts), which total more than $1 billion. These settlements' value to the proposed Settlement Class as "ice-breakers" is enhanced by the cooperation the Bank Defendants will provide in connection with administration of the settlements and at trial in this case. That cooperation is thus valuable both to the Settlement Class and the substantively identical proposed litigation class.

### c.      Class Counsel demonstrated skill and efficiency in obtaining the Settlements, further supporting the fee request.

The skill and efficiency of Class Counsel also weighs in favor of the requested fee. Class Counsel's vigorous prosecution of this case and the substantial resources they have dedicated to it demonstrate the reasonableness of the fee request. Class Counsel faced a substantial risk of never proceeding past the pleadings stage. After the case was initially dismissed by the original judge assigned to the case, Class Counsel's skill in drafting comprehensive appellate briefs and arguing the case before the D.C. Circuit Court of Appeals led to a complete reversal in a published appellate decision. And then, after Defendants persuaded the Supreme Court to grant

---

[9] *See also In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *6 (N.D. Cal. Dec. 17, 2015) ("[T]his settlement provides increased value in another pending class action suit in this case by creating added incentive for the remaining defendants to settle or allowing greater recovery for the Plaintiffs at trial.").

*certiorari* on a narrow issue, Class Counsel successfully argued in its merits briefing that Defendants chose instead "to rely on a different argument." The Supreme Court agreed with Plaintiffs, dismissing the case on the basis that the writ of *certiorari* had been improvidently granted.

After ultimately prevailing at the Supreme Court, Class Counsel turned their attention to discovery. As discussed in the Background, Class Counsel engaged in substantial written discovery, took or participated in more than thirty-five depositions, and undertook critical expert discovery. *See supra*, Sections II.B.2-4. Class Counsel showed skill, foresight, and efficiency in completing this discovery, which required not only obtaining documents and information from Defendants, but also subpoenaing numerous third parties. As part of this effort, Class Counsel served 24 third-party subpoenas on ATM networks and ATM processors, and when some key ones refused to comply, Class Counsel brought multiple successful motions to compel in different jurisdictions. *See supra*, Sections II.B.2-3. Finally, Class Counsel's skill in prosecuting this case is demonstrated by the comprehensive motion for class certification that they brought against the Defendants, which likely, in large part, convinced the Bank Defendants to settle.

Thus, from the very beginning of the case Class Counsel had to brief complex and unique legal issues before three sets of courts before their final victory at the Supreme Court allowed them to proceed with discovery on behalf of Plaintiffs, and then counsel engaged in substantial discovery and class certification briefing. Without investing substantial resources into these efforts, no recovery would have every been possible.

Moreover, this Court has already held that Rules 23(c)(1)(B) and 23(g) were satisfied in appointing Hagens Berman, Quinn Emanuel, and Mehri & Skalet as Class Counsel for the litigation class. Dkt. 238. These firms have extensive experience prosecuting antitrust class

actions and have litigated some of the largest class actions in history, and they continue to do so today. All three firms have been recognized in courts throughout the U.S. for their abilities, skills, and experience in handling major class litigation efficiently and obtaining outstanding results for their clients. *See* Joint Decl. ¶¶ 72-86, Exs. 11, 12; Skalet Decl. ¶¶ 2, 12, Ex. D. Class Counsel are therefore well-acquainted with this type of litigation and well-positioned to litigate this complex action and to weigh its relative strengths and risks in reaching these settlements.

The performance and quality of opposing counsel likewise weigh in favor of the requested fee. Courts consider the skill and experience of counsel on both sides of the litigation in determining a reasonable fee award. *In re Vitamins*, 2001 WL 34312839, at *11; *In re Lorazepam*, 2003 WL 22037741, at *8-*9 (approving fee award of 30 percent of settlement fund where class counsel were "experienced antitrust litigators" and defendants mounted an "aggressive and vigorous defense"). Here, Chase, Bank of America, and Wells Fargo were primarily represented by Skadden, Arps, Slate, Meagher, & Flom LLP; Morrison & Foerster LLP; and Patterson Belknap Webb & Tyler LLP, respectively. Each of these firms is well-known for its highly skilled and experienced attorneys, and together they brought to bear the resources of some of the largest and most powerful law firms in the world. Throughout this litigation, defense counsel have fiercely advocated their clients' positions. The skill and experience of counsel on both sides support the reasonableness of the fee request.

> **d.   The complexity and duration of this litigation supports the requested fee award.**

The complexity and duration of this case also weighs in favor of the requested fee. Courts have recognized that the "antitrust class action is arguably the most complex action to prosecute." *See In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *10 (quoting *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000) (internal

quotation marks omitted)); *see also In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) (the "antitrust class action is arguably the most complex action to prosecute[;] [t]he legal and factual issues involved are always numerous and uncertain in outcome" (internal quotation marks and citation omitted)).

This was and remains a particularly complex antitrust class action to prosecute. From the beginning of the case, Defendants challenged Plaintiffs' fundamental legal theory, obtaining a dismissal by the judge previously assigned to this case, before the D.C. Circuit Court of Appeal reversed and the Supreme Court remanded the case to this Court after initially granting *certiorari.* Plaintiffs also had to prove that the nondiscrimination rules at issue, which were established in 1996, had anticompetitive effects and caused classwide impact to millions of ATM customers during a class period that began ten years later. These issues required extensive discovery, not only from Defendants, but also from third parties spread throughout the country that vigorously contested Plaintiffs' requests. The complexity of the case is also evident in the sophisticated economic analyses Professor Carlton presented at class certification to define the relevant market, and show that classwide impact and damages may be demonstrated and measured through common evidence.

The long duration of this case also weighs in favor of the fee request. Class counsel initiated this action in October 2011, more than ten years ago. Additionally, this is not a case where Plaintiffs settled quickly after filing their pleadings or relied on parallel guilty pleas. Indeed, Plaintiffs reached the first settlement in this case, in principle, in December 2019—eight years after filing the first iteration of the complaint and only after multiple arm's-length bargaining sessions over the course of several years with one of the nation's leading mediators. The complexities and length of this case support the fee request. *See In re Aetna Inc. Sec. Litig.*,

2001 WL 20928, at *14, *16 (E.D. Pa. Jan. 4, 2001) (awarding 30 percent of settlement fund where "the course of this litigation was prolonged, having been actively litigated for nearly three years, and involved complex issues").

> **e.**   **Class Counsel have demonstrated devotion to this longstanding litigation, despite a serious risk of nonpayment.**

The risk of nonpayment weighs in favor of the fee request. Many courts emphasize that the attorneys' risk is a "foremost factor" in determining the fee award. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 54 (2d Cir. 2000); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990) (a contingency fee arrangement often justifies an increase in the award of attorneys' fees). As noted in the accompanying declarations, Class Counsel have prosecuted this case on a purely contingent basis. The contingent nature of the fee "stands as a proxy for the risk that attorneys will not recover compensation for the work they put into a case." *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 766 (S.D. Ohio 2007). Indeed, "within the set of colorable legal claims, a higher risk of loss does argue for a higher fee." *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 746 (7th Cir. 2011).

This was a particularly challenging case where there was always a *bona fide* risk of no recovery. From the beginning of the case, Plaintiffs had to overcome an initial dismissal order, first by prevailing at the D.C. Circuit Court of Appeals, and then by successfully convincing the Supreme Court to dismiss Defendants' appeal. Moreover, while Plaintiffs believe their case is strong, at the time of these settlements (and still), there were many hurdles yet to overcome, any one of which could have led to no recovery at all: class certification, summary judgment, trial, and appeals. *See Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 565 F. Supp. 2d 49, 55 (D.D.C. 2008) ("[C]omplex antitrust litigation is rife with uncertainties, risks, and delays . . . ."). Indeed, the post-settlement events reinforce the riskiness of this litigation. While this Court

granted Plaintiffs' motion for class certification in August 2021, that order is now on

discretionary appeal pursuant to Rule 23(f). Moreover, though it has been two years since these

settlements were reached, if the class certification order is ultimately affirmed, that will take

time, and the risks inherent in summary judgment, trial, and appeals remain.

Despite these serious risks of nonpayment, Class Counsel have diligently worked on the

case for over a decade, totaling 30,591.6 hours and generating a lodestar (at historical rates and

after a 5% across-the-board billing judgment reduction) of $16,473,059. Class Counsel also

incurred close to $13.24 million in out-of-pocket costs. *See infra*, Sections III.A.2 & III.B

(discussing calculation of lodestar and litigation expenses in more detail). Class Counsel have

thus assumed an enormous financial risk in prosecuting this complex litigation on a 100-percent

contingent basis. Indeed, the amount of time devoted by Class Counsel alone weighs in favor of

the fee request. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)

(court should look to "amount of time devoted to the case by plaintiffs' counsel"); *Rosenbaum v.

MacAllister*, 64 F.3d 1439, 1445 (10th Cir. 1995) (court should look at the "time and labor

required"); *see also, e.g.*, *In re Newbridge Networks Sec. Litig.*, 1998 WL 765724, at *3 (D.D.C.

Oct. 23, 1998) (awarding fees of 30 percent of common fund where counsel "engaged in

extensive motions practice and conducted considerable discovery").

In sum, the significant risks faced by Plaintiffs throughout this complex litigation, and

Class Counsel's skilled efforts and substantial investment of resources and money over the

course of more than a decade on behalf of Plaintiffs, purely on a contingent basis with no

guarantee of any recovery, further supports the reasonableness of the 30 percent fee request. *See

In re Lorazepam*, 2003 WL 22037741, at *9 (awarding 30 percent of $35 million settlement fund

where class action was "vigorously litigated for a protracted period of time, raised novel and

complex issues, involved a substantial risk of absolute non-payment, and demonstrated the quality of Class Counsel's reputation").

### f.    Only one objection to the Settlements has been filed to date.

Despite the fact that direct email notice of these Settlements has been provided to close to 58 million potential settlement class members in combination with a robust publication notice campaign (Joint Decl. ¶ 37), only one "objection" has been lodged as of the date of this application. *See* Dkt. 254 ("Class Member Shiyang Huang's Response/Objection to Motion for Settlement Approval [ECF No. 250]"). The objection from Mr. Huang, a serial objector, is without merit and Class Counsel will file a response in accordance with the schedule set by the Court. No one besides Mr. Huang has objected to the Settlements to date, which favors granting the fee request given that millions of class members had the opportunity to do so. However, the opt-out deadline of March 11, 2022 has not passed. Class Counsel is filing this Motion ahead of the opt-out deadline and will make this brief and all supporting documents available on the settlement website (https://www.atmclassaction.com), so that interested class members will have an opportunity to review and comment. Joint Decl. ¶ 37. Class Counsel will update the Court regarding this factor in Plaintiffs' motion for final approval and response to objections and exclusions, which will be filed on or before March 25, 2022. *See* Dkt. 252 at ¶ 19.

### 2.    A lodestar cross-check, though not required, confirms the reasonableness of the fee request.

Some circuits require that district courts cross-check the contemplated percentage award against counsel's lodestar. *In re Fannie Mae*, 4 F. Supp. 3d at 113 & n.20. In this Circuit, although a lodestar cross-check is not required, district courts may conduct one at their discretion to confirm a fee award's reasonableness. *Id.*; *In re Black Farmers Discrimination Litig.*, 953 F.

Supp. 2d 82, 101 (D.D.C. 2013); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 205 (D.D.C. 2011) (citing *Swedish Hosp.*, 1 F.3d at 1266-67); *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 7 (D.D.C. 2008); *In re Baan Co. Secs. Litig.*, 288 F. Supp. 2d 14 (D.D.C. 2003).

The reasonableness of the requested fee award is confirmed by the lodestar cross-check. As explained in Mr. Berman and Mr. Neuwirth's Joint Declaration and the Skalet Declaration, as well as the accompanying exhibits, Class Counsel's attorneys and staff have collectively worked 30,591.6 hours during this more than decade-long litigation, on a variety of tasks essential to representing Plaintiffs in this case. Joint Decl. ¶ 52. Moreover, the hours counted toward the lodestar do not include hours spent on this fee motion, and the lodestar will increase through final approval, distribution of the settlement funds, and any appeals. Joint Decl. ¶ 38. Applying the *historical* rates charged by attorneys and professional staff of Class Counsel to the hours expended, along with an across-the-board 5% reduction (*see supra* at n. 6), yields a total lodestar of $16,473,059. *Id.*[10] Class Counsel's requested fee is $20,0220,000 million, which represents a modest 1.22 multiplier of that total lodestar. *Id.*

The 1.22 multiplier is reasonable in light of the substantial common fund obtained for the class, the significant risks faced by Plaintiffs throughout this lengthy action, and the effective and efficient work of Class Counsel, who litigated this case on a purely contingent basis. Moreover,

---

[10] Courts in this Circuit, and elsewhere, frequently use current billing rates to calculate lodestar. *See, e.g., In re Nifedipine Antitrust Litig.*, 2011 WL 13392312, at *1 (Leon, J.); *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 22037741, at *9. Using current rates can "counterbalance the delay in payment," particularly when "legal services were provided over a multiple-year period." *Murray v. Weinberger*, 741 F.2d 1423, 1433 (D.C. Cir. 1984). That reasoning has particular resonance here given that Class Counsel has litigated this case since 2011, and in the ensuing decade-plus billing rates have increased and Class Counsel has received no compensation for its substantial investment. If Class Counsel used current billing rates, without any billing judgment adjustment, its lodestar would be $23,722,023, leading to a *negative* multiplier of 0.84. Joint Decl. ¶¶ 52-53, Ex. 7. Nonetheless, to be conservative, for the purposes of this Motion, Class Counsel is using historical billing rates along with a conservative 5% across-the-board reduction for billing judgment.

the 1.22 multiplier requested here is well within the range of multipliers granted in other cases, and lower than many. *See In re Lorazepam*, 2003 WL 22037741, at *9 (explaining that "multiples ranging up to 'four are frequently awarded in common fund cases when the lodestar method is applied'" (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 341 (3d Cir. 1998)); *Spano v. Boeing Co.*, 2016 WL 3791123, at *3 (S.D. Ill. Mar. 31, 2016) ("In risky litigation such as this, lodestar multipliers can be reasonable in a range between 2 and 5.").[11]

**B.    Class Counsel should be reimbursed for the reasonable litigation expenses incurred.**

This Court has explained that "'[i]n addition to being entitled to reasonable attorneys' fees, class counsel in common fund cases are also entitled to reasonable litigation expenses from that fund." *In re Fannie Mae*, 4 F. Supp. 3d at 113 (quoting *In re Lorazepam*, 2003 WL 22037741, at *10); *see also Vista Healthplan, Inc., v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 365 (D.D.C. 2007) ("[T]here is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of . . . reasonable litigation expenses from that fund."). In this Motion, Plaintiffs respectfully request reimbursement of out-of-pocket expenses in the amount of $10,000,000. That is only a portion of the $13,239,917 in out-of-

---

[11] *See also Steiner v. Am. Broad. Co., Inc.*, 248 F. App'x 780, 783 (9th Cir. 2007) (affirming fee award with multiplier of 6.85 as "fall[ing] well within the range of multipliers that courts have allowed"); *Perez v. Rash Curtis & Assocs.*, 2021 WL 4503314, at *5 (N.D. Cal. Oct. 1, 2021) (approving fees of 37% of $75 million settlement fund, a lodestar multiplier of 4.8); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (explaining that "Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers," and collecting cases); *King Drug Co. of Florence v. Cephalon, Inc. (Provigil)*, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015) (awarding a $140.8 million fee equating to 4.12 multiplier); *In re Aremissoft Corp. Secs. Litig.*, 210 F.R.D. 109, 134-35 (D.N.J. 2002) (fee award resulted in lodestar multiplier of 4.3); *Steinfeld v. Discover Fin. Servs.*, 2014 WL 1309692, at *2 (N.D. Cal. Mar. 31, 2014) (approving fee that resulted in a 3.5 multiplier); *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (finding a 2.83 multiplier appropriate).

pocket expenditures by Class Counsel during the more than ten years of litigation, all of which were reasonably incurred in connection with the prosecution of this case. Joint Decl., ¶ 60.

The total expenses incurred by Plaintiffs are broken down by category in the supporting declarations and exhibits. *See* Joint Decl. ¶¶ 60-68, Exs. 3, 6, 8, 10; Skalet Decl. ¶ 10, Ex. C. With regard to expenses incurred by Class Counsel, the individual firm expenses include expenses for items such as attorney travel for case-related events, online legal research, service of subpoenas and process, and postage. Individual firm expenses that have been reasonably incurred in this litigation total approximately $223,059. *See* Joint Decl. ¶ 67, Exs. 3, 6, 8; Skalet Decl. ¶ 10, Ex. C.

For the bulk of expenses in this litigation, however, Class Counsel created a Litigation Fund, 100% funded by counsel. No outside litigation funders have contributed to, or have an interest in, this Litigation Fund. Hagens Berman administered the Litigation Fund in connection with the prosecution of this case. The expenses incurred by the Litigation Fund are reflected in the books and records of Hagens Berman. These books and records are prepared from invoices, checks, and other source materials which are regularly kept and maintained by Hagens Berman and accurately reflect the expenses incurred. Joint Decl. ¶ 64. Payments from the Litigation Fund in this case total approximately $13,016,858, or 98 percent of all of the expenses incurred in this case. *Id.* ¶ 65. Payments from the Litigation Fund went toward critical common expenditures, including economic experts and other consultants, the online database Plaintiffs used to house and review documents collected for and produced in the case (Everlaw, Inc.), deposition-related services, and mediation services. *See* Joint Decl. ¶ 66, Ex. 10.

Class Counsel submit that the litigation expenses incurred were reasonable and necessary to obtain the results achieved for the Settlement Class in light of the complexities of the case, the

amount of discovery that was required of the five defendants and numerous third parties, and the challenging liability and expert issues raised in the case. Furthermore, these expenses are typical expenses that counsel would generally bill to paying clients in the marketplace. Joint Decl. ¶ 63. Indeed, the "fact that Class Counsel were willing to expend their own money, as an investment whose reimbursement was entirely contingent on the success of this litigation, is perhaps the best indicator that the expenditures were reasonable and necessary." *In re Lorazepam*, 2003 WL 22037741, at \*10 (internal quotation marks omitted).

In this case, as is often the situation in complex antitrust class actions, Plaintiffs' investments in economic experts constituted the largest category of expenditure. Class Counsel invested $12,476,151 in economic experts, which is equivalent to more than 94% of the total expenditures in the case. *See* Joint Decl. ¶ 66, Ex. 10. As Plaintiffs discussed in Section II.B.4, *supra*, expert analysis was and remains essential to this litigation. The key question has always been whether the non-discrimination rules at issue have anticompetitive effects, and cause classwide impact, and these are questions that cannot be fully answered without sustained economic analysis. The economic experts in this case—Dr. Frankel of Coherent Economics and Professor Carlton of Compass Lexecon, Plaintiffs' testifying expert at class certification—split the work to maximize efficiencies and provide support to Class Counsel throughout the course of this litigation. In discovery, that work included researching and identifying the data needed from defendants and third parties, advising Class Counsel during the meet-and-confer process, and then after the data had been obtained, painstakingly cleaning it (*i.e.*, rendering it analyzable) and putting it all together in a single database. Utilizing that database, Professor Carlton and his team then supported Plaintiffs' class certification motion with a comprehensive report and set of analyses showing, among other things, that Defendants' conduct caused antitrust injury to all or

nearly all class members, and that common evidence may be used to calculate the Class's damages. Professor Carlton was also deposed at length, and then in his rebuttal report, he refuted the criticisms of defense expert, Professor Hubbard, and showed how Professor Hubbard's analysis actually *supported* the propriety of certifying the proposed class. This work has been critical to prosecuting the action. And even more than in most antitrust class actions, the economic expert work here was particularly time-consuming and demanding, as explained in the accompanying declarations of Professor Carlton and Dr. Frankel. *See* Carlton Decl. ¶¶ 2-13; Frankel Decl. ¶¶ 3-12.

In sum, Plaintiffs respectfully submit that all of the $13,239,917 in expenses were reasonable expenses incurred in connection with this decade-plus long litigation. This Court has recognized that prosecuting cases of this size, duration, and complexity may require a large outlay in expenses. In *In re Fannie Mae*, this Court awarded the requested $15,294,860.78 in expenses to class counsel, which were incurred over nine years of litigation and where, like here, expenditures on experts also constituted the bulk of expenses. *See In re Fannie Mae*, 4 F. Supp. 3d at 113-14. Nonetheless, in connection with this Motion, Plaintiffs respectfully request reimbursement of only a portion of their incurred expenses, $10,000,000. Assuming Plaintiffs obtain a further settlement or judgment against the remaining Defendants, Visa and Mastercard, they intend to seek the remainder of their expenses at that time.

## C.    Class Representatives deserve reasonable service awards for their dedication to this case.

Plaintiffs request modest service awards for each of the two class representatives in the amount of $10,000 each. This award would be in recognition of the service the class representatives, Andrew Mackmin and Sam Osborn, have provided to the proposed Settlement Class, and in this district, "Courts routinely compensate named plaintiffs for the services

provided and the risks incurred during class action litigation." *See Little v. Wash. Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 39 (D.D.C. 2018).

In this case, the $10,000 service awards are well-deserved. Each class representative took his responsibilities seriously and devoted substantial time to the case. Defendants deposed both representatives, and each spent substantial time preparing for these depositions with counsel. Defendants also propounded 46 document requests and 26 interrogatories to each class representative. Messrs. Mackmin and Osborn provided valuable input throughout the case, reviewed pleadings, and, in consultation with counsel, reviewed and approved of the Settlements. In light of the value of the settlement proceeds and the class representatives' extraordinary service to the Settlement Class, Class Counsel respectfully submits that the requested awards are reasonable. Joint Decl. ¶¶ 69-71; Mackmin Decl. ¶¶ 2-7; Osborn Decl. ¶¶ 2-7.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request an award of $20,022,000 in attorneys' fees, reimbursement of litigation expenses incurred in the amount of $10,000,000, and $10,000 in service awards to each of the two class representatives.

Dated:  February 25, 2022

By:  /s/ Steve W. Berman

Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 2nd Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Ben M. Harrington (*pro hac vice*)
Benjamin J. Siegel (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3034
benh@hbsslaw.com
bens@hbsslaw.com

Stephen R. Neuwirth (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
stephenneuwirth@quinnemanuel.com

Adam B. Wolfson (*pro hac vice*)
Viola Trebicka (*pro hac vice*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
adamwolfson@quinnemanuel.com
violatrebicka@quinnemanuel.com

Steven A. Skalet
(D.C. Bar No. 359804)
MEHRI & SKALET, PLLC
1250 Connecticut Avenue, NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
sskalet@findjustice.com

*Interim Co-Lead Class Counsel for Mackmin Plaintiffs*