**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| *Mackmin, et al. v. Visa Inc., et al.* | **Case No. 1:11-cv-01831 (RJL)** |
| | **DECLARATION OF MARK COWEN REGARDING SETTLEMENT <u>ADMINISTRATION</u>** |
| This Document Relates to: | |
| All Plaintiff Actions | |

I, Mark Cowen, hereby declare as follows:

1.      I am a Project Manager with A.B. Data, Ltd. ("A.B. Data"). I am fully familiar with the facts contained herein based upon my personal knowledge, and if called as a witness, I could and would testify competently thereto. I submit this Declaration at the request of Co-Lead Class Counsel in connection with the above-captioned action (the "Action").

2.      Pursuant to the Court's Order Granting Preliminary Approval of Settlement With Visa and Mastercard Defendants and Directing Notice to the Class dated July 26, 2024 (the "Preliminary Approval Order"), A.B. Data was appointed by the Court as Settlement Administrator in this Action with primary duties including: (1) disseminating notice to the Settlement Class; (2) receiving, reviewing, and processing Claim Forms; and (3) allocating and distributing the Net Settlement Funds to eligible members of the Settlement Class.

<u>Notice</u>

3.      As detailed in my previous Declaration of Mark Cowen in Support of Plaintiffs' Motion for Final Approval of Settlement filed with the Court on December 6, 2024 (the "Final Approval Declaration") (ECF No. 296-2), A.B. Data successfully implemented the Court-approved Notice Plan, which included (i) direct email notice to potential Settlement Class Members; (ii) a digital advertising campaign on numerous digital and social media platforms; (iii)

a news release disseminated via *PR Newswire*; (iv) a publication notice in *People* magazine; and (v) a toll-free telephone number and case-specific website to address potential Settlement Class Member inquiries.

4.    More specifically, A.B. Data effectuated direct notice by sending the Email Notice to 77,497,144 unique email addresses for potential Settlement Class Members. Supplemental notice included banner ads encompassing over 555,800,000 digital impressions being placed on various digital and social networks, advertisements placed with Google AdWords such that links to the Settlement website appeared on the search result pages for relevant searches, and a news release disseminated over *PR Newswire*. A.B. Data also published a printed advertisement in a national edition of *People* magazine.

5.    Pursuant to the Court's Order Granting Mackmin Consumer Plaintiffs' Motion for Final Approval of Settlements with the Visa and Mastercard Defendants dated June 23, 2025 (the "Final Approval Order") (ECF No. 296), the Court found that the Notice Plan was the best notice practicable under the circumstances and fully satisfied the requirements of the Federal Rules of Civil Procedure. The Court also found that the proposed Plan of Allocation to pay Settlement Class Members on a *pro rata* basis based on the number of valid Claim Forms submitted was fair, reasonable, and adequate.

## Claims Processing Activities

6.    Settlement Class Members who wish to be eligible to receive a distribution from the Settlements were required to complete and submit to A.B. Data a properly executed Claim Form postmarked or submitted online no later than January 22, 2025.

7.    In preparation for receiving and processing the submitted Claim Forms, A.B. Data created a unique database to store Claim Form details, images of Claims Forms, and any supporting documentation, and trained staff in the specifics of the project so that Claim Forms would be properly processed.

8.      As of the date of this Declaration, a total of approximately 63,506,549 Claim Forms were received by A.B. Data through the online filing portal on the case-specific website (www.atmclassaction.com), by email, or by mail. Each Claim Form was assigned a unique Claim Form number. The information from each Claim Form, including the claimant's name, address, email address, and information related to ATM surcharge transactions during the Settlement Class Period, was captured into a database developed by A.B. Data to process Claim Forms.

9.      All claims were subject to review and/or audit by the Settlement Administrator. A.B. Data performed numerous audits and secondary reviews of the submitted claims to determine which claims are valid, and for purposes of culling out any duplicate or fraudulent claims — for example, where (a) the claimed amount appears high in comparison to other claimants; (b) information on the Claim Form suggests the claimant is not a Settlement Class Member; and/or (c) members of A.B. Data's staff identified a claim that was potentially suspicious or not genuine. A.B. Data also identified certain claims that were invalid for not providing information as required by the Claim Form.

10.     Class action settlements, most notably those where proof of purchase is not required and where individual Class Members cannot be identified, are especially vulnerable to the rising threat of fraudulent filers.[1]

11.     As technology advances and becomes less expensive, fraudulent claim filing has become easier to do and harder to identify.  Claims administration companies previously relied on programmatic and manual reviews of each claim submitted and located those claims where only the name was changed, the address was slightly different, and the like.  Administrators often kept a list of these identities and were generally able to remove those claims from the process.  As the claims process moved from mailed-in claims to online claims, bad actors evolved to utilizing programs to submit claims.  These bad actors submitted thousands of claims; however, these

---

[1] *See* Scammers flood US class action settlements with fraudulent claims: https://www.reuters.com/legal/us-class-action-settlements-flooded-with-fraudulent-claims-by-scammers-2024-05-02/.

claims were generally easy to recognize and remove because the claims usually had the same general characteristics.

12.     In the current technology climate with AI and Machine Learning so readily accessible, fraudulent claim filing has become a business model for many bad actors and the methodology utilized, including valid data from data breaches and synthetic data, makes the identification of fraudulent claims difficult.  Furthermore, where fraudulent claims originally numbered in the tens or maybe hundreds, bad actors now, utilizing technology, are able to submit *millions* of fraudulent claims. In connection with the Bank Settlements, A.B. Data determined that there were 314,231 valid claims filed by a similarly composed Settlement Class after a similar notice process. Thus, the disparity between that figure and the more than 63 million claims filed here indicated that there likely had been millions of fraudulent claims filed.

13.     To protect the assets of the Settlement Class and distribute settlement awards to those claims submitted by actual Settlement Class Members, A.B. Data explored multiple avenues to combat fraudulent claims. A.B. Data implemented several additional safeguards, such as advanced CAPTCHA, Web Access Firewalls, and proprietary internal programs and algorithms, all dedicated to the detection of fraudulently filed claims.

14.     While employing these internal practices and policies, A.B. Data also explored external third-party vendors to assist with fraud detection. After thorough review of multiple products and methodologies, A.B. Data ultimately engaged ClaimScore, LLC ("ClaimScore"), a legal technology company specializing in complex data analysis and pattern recognition services focused on identifying fraudulent claims in class action settlements. ClaimScore has been engaged to help with fraud detection in connection with the administration of several large settlement class actions in federal and state courts and has had a very successful track record.

15.     After ClaimScore completed its thorough analysis, A.B. Data reviewed the underlying methodology, weighting system, and points of analysis that ClaimScore uses to review claim submissions for fraudulent activity and has determined that the review process used in this case was sound. Upon request of the Court, A.B. Data can submit a declaration from ClaimScore

4

with more details about the methodologies used in their fraud analysis, and an attestation about their work completed in this case.

16.     Based upon ClaimScore's analysis of the ATM Class Action Settlement claims here, 63,202,391 claims exhibited substantial evidence of fraud and were recommended to be "Rejected," 296,877 claims did not exhibit substantial evidence of fraud and were recommended to be "Approved," and 77 claims did not contain enough information to constitute a claim and were therefore not analyzed. Each claim, regardless of its determination (*e.g.*, "Rejected" or "Approved"), has been tagged with a series of deduction codes (when applicable) to indicate what evidence caused the claim's score to be reduced and ultimately lead to its determination as Rejected or Approved. According to ClaimScore's evaluation, the percentage of fraudulent and valid claims observed in this case were on par with the levels of fraud ClaimScore has observed in similar cases. A.B. Data has reviewed the analysis, processes employed, and application of determinations utilized by ClaimScore and adopts ClaimScore's recommendations related to the *denial* of claims based on fraud markers located in the review process.

17.     It is important to note that ClaimScore does not act as an AI-powered claim review and does not ultimately accept or reject claims. A.B. Data reviews those claims that do not fail the ClaimScore fraud review for inclusion in the Settlement Class. Any claim that was not recommended to be rejected in ClaimScore's analysis for fraud, but where the claim is deficient, is being sent a notification via email and/or mail to provide the Settlement Class Member with an opportunity to resolve any issues identified related to their claim. For example, some claims will be required to furnish additional information and/or documentation to validate the information presented on their Claim Form. If the claimant fails to correct the deficiency within the time specified, the claim will be deemed invalid and will not receive a distribution from the Net Settlement Fund. A.B. Data estimates the deficiency and validation process will be completed in approximately 45 to 60 days from the date deficiency notices are sent, depending on volume, with deficiency notices to be sent no later than November 24, 2025.

**Distributions to Eligible Claimants**

18.     Claims submitted in the prior settlements with the Bank Defendants were not required to submit a claim in this Settlement in order to be included as Settlement Class Members and receive a distribution. Once the valid claims are finalized and the deficiency period has passed, A.B. Data will compare and combine the initial list of Settlement Class Members who already received a distribution with the Claims filed in the instant matter to establish a final payable list. A.B. Data will deduplicate claims filed in both matters, review any claim where the total number of transactions has been updated, and create a new distribution list.

19.     Subject to the Court's approval, A.B. Data will commence distribution of the Net Settlement Funds within 90 days of the Court issuing an order approving the distribution process. As previously approved by the Court, the Net Settlement Fund will be distributed on a *pro rata* basis to eligible Settlement Class Members based on the claimed surcharges during the Settlement Class Period as reflected on the Claim Forms.

20.     A.B. Data will send Settlement payments digitally to each eligible Settlement Class Member using the email address provided on the Claim Form. Each eligible claimant will be provided with a number of digital payment options such as a prepaid virtual debit card, ACH, PayPal/Venmo, or digital retail gift cards. At the time of distribution, claimants will also have the opportunity to request a traditional paper check payment by mail. Specific steps to request a check will be posted on the Settlement Website. Prior to sending payments by email, A.B. Data will run all email addresses through a verification process to confirm the email address is valid and functional. Any Settlement Class Member with an invalid or undeliverable email address will be sent a paper check.

21.     The digital payment links will be valid for a period of 60 days. To encourage each Settlement Class Member to redeem their digital payments, A.B. Data will send multiple reminder emails to any claimants who do not initially redeem their digital payment over the 60-day period.

22.     Paper checks sent by request or due to an invalid email address will also be valid for a period of 60 days. To encourage Settlement Class Members to deposit their payments promptly, all checks will bear a notation: "CASH PROMPTLY. VOID AND SUBJECT TO REDISTRIBUTION IF NOT CASHED BY [DATE 60 DAYS AFTER ISSUE DATE]."

23.     Settlement Class Members who do not redeem their digital payments or cash their checks within the 60-day period will not receive a recovery from the Settlement, and those residual funds will be subject to redistribution in a second distribution to other Settlement Class Members who redeemed their digital payments or cashed their checks.

24.     To conduct a second distribution, A.B. Data, after deducting the payment of any estimated administrative costs and estimated taxes, will reallocate the residual funds to all Settlement Class Members who submitted a valid claim and successfully redeemed or cashed their initial distribution payment. The second distribution will begin approximately 90 days after the initial distribution payments are voided and would also last for a period of 60 days.

25.     At the conclusion of the second distribution, A.B. Data, in conjunction with Co-Lead Class Counsel, will determine whether any further distributions of the funds remaining in the Net Settlement Fund are cost-effective and feasible. If feasible, additional rounds of distribution will be conducted in a similar manner as the initial and second distributions.

## Administrative Costs

26.     A.B. Data agreed to cap administration fees to $1,500,000. To date, A.B. Data has incurred fees and expenses totaling $1,419,755.82.

27.     A.B. Data estimates that the remaining claims administration costs, including the deficiency and distribution processes, will exceed the $80,244.18 remaining from the agreed-to cap and remaining unallocated funds set aside for administration. Any in-scope amount that A.B. Data incurs beyond the remaining funds will not be billed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of November 2025 in Apple Valley, Minnesota.

Mark Cowen